# Exhibit A
# Part 1

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 2 of 189

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK: COMMERCIAL DIVISION**

THE BANK OF NEW YORK MELLON, solely
in its capacity as trustee for 4.125% Notes due
2022 issued by Samarco Mineração S.A.,

                    Plaintiff,

     v.

SAMARCO MINERAÇÃO S.A.,
                  Defendant.

Index No.: _____

Date Filed: September 2, 2020

Plaintiffs designate New York
County as the place of trial

Basis of venue is CPLR 501 and
503(a)

**<u>SUMMONS</u>**

TO THE ABOVE-NAMED DEFENDANT:

YOU ARE HEREBY SUMMONED and required to submit to Plaintiff's attorneys your answering papers on this motion by October 6, 2020, the time period set out in the notice of motion annexed hereto. In case of your failure to submit answering papers, summary judgment will be taken against you by default for the relief demanded in the notice of motion.

The action will be heard in the Supreme Court of the State of New York in and for the County of New York. This action is brought in the County of New York pursuant to CPLR 501 and 503(a) because the parties have agreed in writing that New York County is an appropriate venue for trial, Plaintiff's principal place of business is in New York State, and Plaintiff designates New York County as the place of trial.

Dated:    New York, New York
        September 2, 2020


DAVIS POLK & WARDWELL LLP

By:     /s/ *Antonio Perez-Marques*
        Antonio Perez-Marques
        Timothy Graulich
        Matthew Cormack

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
antonio.perez@davispolk.com
timothy.graulich@davispolk.com
matthew.cormack@davispolk.com

*Attorneys for Plaintiff*

To:

SAMARCO MINERAÇÃO S.A.
C/o Law Debenture Corporate Services, Inc.
400 Madison Avenue – 4th Floor
New York, New York 10017

# Exhibit A
# Part 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

THE BANK OF NEW YORK MELLON, as
Trustee, solely in its capacity as trustee for
4.125% Notes due 2022 issued by Samarco
Mineração S.A.,

              Plaintiff,

      - against -

SAMARCO MINERAÇÃO S.A.,

             Defendant.

---

Index No. _____

**NOTICE OF MOTION FOR
SUMMARY JUDGMENT IN
LIEU OF A COMPLAINT**

     PLEASE TAKE NOTICE that upon the Summons, dated September 2, 2020, the

Affidavit of David Kerr, sworn to September 1, 2020, and the exhibits attached thereto,

and the accompanying Memorandum of Law, Plaintiff The Bank of New York Mellon, as

Trustee, by its attorneys, Davis Polk & Wardwell LLP, will move this Court, in the

Motion Submissions Part, Room 130, in the Courthouse located at 60 Centre Street, New

York, New York, on the 8th day of October, 2020, at 9:30 a.m. or as soon thereafter as

counsel can be heard, for an order under CPLR 3213 awarding summary judgment to

Plaintiff against Defendant Samarco Mineração S.A., in the amount of that certain

indenture (the "Indenture"), dated as of October 31, 2012, Defendant as Issuer; Plaintiff

as Trustee, Registrar, Transfer Agent and Paying Agent; and the Bank of New York

Mellon Trust (Japan), Ltd., as Principal Paying Agent, copies of which are attached as

Exhibit 1 to the Affidavit of David Kerr.

     PLEASE TAKE FURTHER NOTICE THAT answering papers, if any, shall be

served upon the undersigned no later than October 6th, 2020.

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 7 of 189

Dated:   New York, New York
         September 2, 2020


                              DAVIS POLK & WARDWELL LLP

                              By:   /s/ *Antonio Perez-Marques*
                                    Antonio Perez-Marques
                                    Timothy Graulich
                                    Matthew Cormack

                              450 Lexington Avenue
                              New York, New York 10017
                              Telephone: (212) 450-4000
                              Facsimile: (212) 701-5800
                              antonio.perez@davispolk.com
                              timothy.graulich@davispolk.com
                              matthew.cormack@davispolk.com

                              *Attorneys for Plaintiff*

2

# Exhibit A
# Part 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

THE BANK OF NEW YORK MELLON, solely
in its capacity as trustee for 4.125% Notes due
2022 issued by Samarco Mineração S.A.,

               Plaintiff,

        - against -

SAMARCO MINERAÇÃO S.A.,

            Defendant.

Index No.

Assigned to the Hon.
Justice [       ]
IAS part [   ]

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN LIEU OF A COMPLAINT

Antonio Perez-Marques
Timothy Graulich
Matthew Cormack

**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for Plaintiff*

Case 1:20-cv-08206-JPC    Document 1-1    Filed 10/02/20    Page 10 of 189

Plaintiff The Bank of New York Mellon, as Trustee ("Plaintiff") respectfully submits this memorandum of law in support of its motion for summary judgment in lieu of a complaint, pursuant to CPLR 3213, against Samarco Mineração S.A. ("Defendant") to recover money due and owing under promissory notes and an indenture agreement.

## FACTUAL BACKGROUND

This is an action for breach of contractual obligations and to demand payment from Defendant for: (1) unpaid installments of interest that were due on November 1, 2016, May 1, 2017, November 1, 2017, May 1, 2018, November 1, 2018, May 1, 2019, November 1, 2019, and May 1, 2020; (2) interest on the unpaid installments of interest; and (3) unpaid principal and interest that became due on August 31, 2020, in respect of the 4.125% Notes due 2022 (the "Notes"), issued by Defendant pursuant to that certain indenture (the "Indenture"),[1] dated as of October 31, 2012, by and among Defendant as Issuer; Plaintiff as Trustee, Registrar, Transfer Agent and Paying Agent; and the Bank of New York Mellon Trust (Japan), Ltd., as Principal Paying Agent. The following is a brief description of the events leading up to this filing.

In October 2012, Defendant issued the Notes in the principal amount of $1 billion. (*See* Aff. ¶ 5.) The Notes were issued under and are governed by the Indenture. (*See* Aff. ¶ 6.) Under Section 6.3 of the Indenture, upon the occurrence of an Event of Default for failure to pay an Interest Payment, "the Trustee, in its own name as trustee of an express trust, (i) may institute a judicial proceeding for the collection of the whole amount then due and payable on such Notes for principal and premium, if any, and

---

[1] A true and correct copy of the Indenture is attached as Exhibit 1 to the Affidavit of David Kerr ("Aff."), filed herewith.

2

interest (including Additional Amounts), and interest on any overdue principal and premium, if any, and, to the extent that payment of such interest (including Additional Amounts) shall be legally enforceable, upon any overdue installment of interest (including Additional Amounts), at the rate borne by the Notes, and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel." (*See* Aff. ¶ 14; Aff., Ex. 1, Indenture § 6.3.) Further, Defendant has consented to jurisdiction in this Court. (*See* Aff., Ex. 1, Indenture § 11.10.)

By the terms of the Notes, Defendant is required to make semi-annual interest payments (the "Interest Payments") on the Notes on May 1 and November 1 of each year (each, an "Interest Payment Date"), unless such date is not a business day, in which case the Interest Payment Date is the next succeeding business day, to the person in whose name such Note is registered in the Register at the close of business on April 15 or October 15 (whether or not a business day) next preceding such Interest Payment Date (the "Noteholders"). (*See* Aff. ¶ 7). Section 4.1 of the Indenture states that "[t]he Issuer shall punctually pay the principal of and premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes." The Issuer is defined by Section 1.1 of the Indenture as Defendant "Samarco Mineração S.A. and any successor thereof." (*See* Aff., Ex. 1, Indenture § 1.1.)

On November 1, 2016, May 1, 2017, November 1, 2017, May 1, 2018, November 1, 2018, May 1, 2019, November 1, 2019, and May 1, 2020,  Interest Payments of $20,625,000 became due and payable on the Notes under the terms of the Indenture (the

3

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 12 of 189

"Missed Interest Payments"). (*See* Aff. ¶ 8.) The Noteholders are entitled to receive these Interest Payments plus interest thereon at a rate specified by the notes plus 1% per annum (i.e., 5.125%). (*See* Aff. ¶ 12.) As of the date of this Motion, Defendant has not paid any portion of the Missed Interest Payments. (*See* Aff. ¶ 9.)

Each failure to make these payments is a breach of Defendant's obligations and becomes an Event of Default under the Indenture if and when such default continues uncured for 30 days. (*See* Aff., Ex. 1, Indenture § 6.1(1) (defining "Event of Default" to include when "[t]he Issuer defaults in the payment of any installment of interest . . . upon any Note as and when the same shall become due and payable, and continuance of such Default for 30 days").) More than 30 days has passed since the occurrence of each Missed Interest Payment (with the most recent Missed Interest Payment being May 1, 2020), rendering each Missed Interest Payment an Event of Default. (*See* Aff. ¶¶ 10-11.) Under the Indenture, upon the occurrence of an Event of Default Plaintiff as Trustee is authorized to "institute a judicial proceeding for the collection of the whole amount then due and payable on such Notes" and to "proceed to protect and enforce . . . the rights of the Holders by any available proceeding at law or in equity." (*See* Aff. ¶¶ 14-15; *see also* Aff., Ex. 1, Indenture § 6.3.)

In light of these Events of Default, on August 31, 2020, Plaintiff issued an "acceleration notice" to Defendant which pursuant to the terms of the Indenture rendered all unpaid principal and accrued and unpaid interest immediately due and payable. (*See* Aff. ¶ 16; *see also* Aff., Ex. 1, Indenture § 6.2.). As a result of this acceleration, a total amount of $1 billion in principal and $13,750,000 in accrued interest became immediately due and payable. (*See id.*).

4

At the time that the principal and accrued interest became immediately due and payable, interest began to accrue on that principal at a rate of that specified by the notes plus 1% per annum. (*See* Aff. ¶¶ 16, 18-19.)

As of the date of this Motion, Defendant has not paid: (1) any portion of the installment of interest payments due November 1, 2016, May 1, 2017, November 1, 2017, May 1, 2018, November 1, 2018, May 1, 2019, November 1, 2019, and May 1, 2020; (2) interest on the Missed Interest Payments; or (3) the $ 1 billion in principal and $13,750,000 in accrued interest that became immediately due and payable on August 31, 2020, due to the acceleration notice, as well as interest on that accelerated principal and interest. In the aggregate across all Holders, as of August 31, 2020 Defendant owes $20,625,000 for each of the eight Interest Payments described above; $17,617,187.50 in interest on the Missed Interest Payments; $1 billion in principal and $13,750,000 in accrued interest that became due upon the issuance of the acceleration notice. (*See* Aff. ¶ 19.)[2]

## ARGUMENT

This action to recover money due and owing under the Notes and Indenture is warranted under CPLR 3213 because it is "based upon [ ] instrument[s] for the payment of money only." C.P.L.R. 3213. CPLR 3213's "purpose was to provide quick relief on documentary claims so presumptively meritorious that a formal complaint is superfluous, and even the delay incident upon waiting for an answer and then moving for summary judgment is needless." *Weissman v. Sinorm Deli, Inc.*, 88 N.Y.2d 437, 443 (1996)

---

[2] Although these damages calculations are based on the date of August 31, 2020, interest on the amounts will continue to accrue, increasing the total damages to which Plaintiff is entitled in an amount that can be calculated as a sum certain at any future date. (*See* Aff. ¶ 22.)

5

(internal quotation marks omitted).  For the reasons set forth below, Plaintiff's claim is presumptively meritorious and is entitled to the accelerated procedures available under CPLR 3213.

"The procedure for accelerated judgment under CPLR 3213 is appropriate where plaintiff establishes a prima facie case by virtue of a note and a failure to make payments called for therein."  *Warburg, Pincus Equity Partners, L.P. v. O'Neill*, 11 A.D.3d 327, 327 (1st Dep't 2004) (citation omitted).

"The prototypical example of an instrument within the ambit of the statute is of course a negotiable instrument for the payment of money—an unconditional promise to pay a sum certain, signed by the maker and due on demand or at a definite time.  In fact, the remedy has proved an effective one, particularly for financial institutions recovering on promissory notes and unconditional guaranties."  *Weissman*, 88 N.Y.2d at 444 (internal citations omitted).  Specifically, failure to make payments pursuant to promissory notes is the quintessential example of a CPLR 3213 case.  *See, e.g.*, *Boland v. Indah Kiat Fin. (IV) Mauritius Ltd.*, 291 A.D.2d 342, 343 (1st Dep't 2002) (granting plaintiff's motion for summary judgment in lieu of a complaint pursuant to CPLR 3213 in case seeking balance due on promissory note under an indenture).

The Notes and Indenture here are instruments for the payment of money only and the Plaintiff can establish "a prima facie case by virtue of a note and a failure to make payments called for therein."  *See Warburg*, 11 A.D.3d at 327. First, Defendant executed the Notes.  (*See, e.g.*, Aff., Ex. 1, Indenture Signature Page.)  Second, Defendant offered an unconditional promise to pay.  (*See* Aff., Ex. 1, Indenture §§ 4.1; 6.2.)  Third, and finally, Defendant has failed to pay the interest owed (which accrues at a fixed rate and

6

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 15 of 189

becomes due and payable on certain specified dates), which constitute Events of Default

under the Indenture, as well as the principal and interest that became due upon the

issuance of the acceleration notice, as discussed above.  (*See supra* Factual Background;

Aff. ¶¶ 10-11, 16.)  Thus, because Plaintiff has met the requirements of CPLR 3213, this

Court must enter summary judgment in favor of Plaintiff.

For the reasons set forth above, Plaintiff's motion should be granted in its

entirety, and this Court should order the following relief:

a.  Payment of the Missed Interest Payments in the amount of no less than
$165,000,000;

b.  Payment of interest on the Missed Interest Payments in the amount of no
less than $17,617,187.50;

c.  Payment of accelerated unpaid principal in the amount of no less than $1
billion and interest on that principal that began to accrue on August 31,
2020;

d.  Payment of accelerated unpaid interest in the amount of $13,750,000 and
interest on that sum that began to accrue on August 31, 2020;

e.  Attorneys' fees and the costs of this action;

f.  Reimbursement to the Trustee for expenses incurred in this collection
action;

g.  Pre-judgment and post-judgment interest; and

h.  Such other relief as this Court deems just and proper.

Respectfully submitted,

7

Dated:    New York, New York
              September 2, 2020

DAVIS POLK & WARDWELL LLP

By:      */s/ Antonio Perez-Marques*
        Antonio Perez-Marques
        Timothy Graulich
        Matthew Cormack

450 Lexington Avenue
New York, New York 10017
(212) 450-4000
(212) 701-5800
antonio.perez@davispolk.com
timothy.graulich@davispolk.com
matthew.cormack@davispolk.com

*Attorneys for Plaintiff*

8

## WORD COUNT CERTIFICATION

This memorandum of law was prepared using Microsoft Word 2016, and I hereby certify that the total number of words, exclusive of the caption, table of contents, table of authorities, and signature block, is 1,758 words.

Dated:      New York, New York
            September 2, 2020

DAVIS POLK & WARDWELL LLP

By:   /s/ *Antonio Perez-Marques*
      Antonio Perez-Marques
      Timothy Graulich
      Matthew Cormack

450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4559
Fax: (212) 701-5800
antonio.perez@davispolk.com
timothy.graulich@davispolk.com
matthew.cormack@davispolk.com

*Attorneys for Plaintiff*

# Exhibit A
# Part 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

| | |
|---|---|
| THE BANK OF NEW YORK MELLON, solely in its capacity as trustee for 4.125% Notes due 2022 issued by Samarco Mineração S.A.,<br><br>Plaintiff,<br><br>- against -<br><br>SAMARCO MINERAÇÃO S.A.,<br><br>Defendant. | Index No.<br><br>Assigned to the Hon.<br>Justice [      ]<br>IAS part [    ]<br><br>**AFFIDAVIT OF DAVID KERR IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN LIEU OF A COMPLAINT** |

STATE OF NEW JERSEY      )
                                              ) ss.:
COUNTY OF  Union           )

David Kerr, being duly sworn, says:

1.      I am Vice President of The Bank of New York Mellon, the Trustee under the Indenture (defined in ¶ 2).  I make this affidavit based upon my personal knowledge, my review of the documents attached as exhibits to this affidavit, and/or my review of publicly available information.

2.      As set forth in the accompanying memorandum of law, the above-captioned action is for breach of contractual obligations and to demand payment from Defendant for: (1) unpaid interest that was due on November 1, 2016, May 1, 2017, November 1, 2017, May 1, 2018, November 1, 2018, May 1, 2019, November 1, 2019, and May 1, 2020 (the "Missed Interest Payments"); (2) unpaid interest on the Missed Interest Payments; and (3) unpaid principal and interest that became due on August 31, 2020, in respect of the 4.125% Notes due 2022 (the "Notes"), issued by Defendant

pursuant to a certain indenture (the "Indenture"), dated as of October 31, 2012.  The Indenture is by and among Defendant as Issuer; Plaintiff as Trustee, Registrar, Transfer Agent and Paying Agent; and The Bank of New York Mellon Trust (Japan), Ltd., as Principal Paying Agent.

3. Attached to this affidavit as Exhibit 1 is a true and correct copy of the Indenture.

4. The Bank of New York Mellon is a corporation with trust powers formed in the State of New York with its principal place of business at 240 Greenwich Street, New York, New York 10286.

5. In October 2012, Defendant executed the Indenture, and issued the Notes in the principal amount of $1 billion.  Attached to this affidavit as Exhibits 2, 3 and 4 are true and correct copies of the Notes issued pursuant to the Indenture.

6. The Notes were issued under and are governed by the Indenture.

7. Defendant is required to make semi-annual interest payments (the "Interest Payments") on the Notes on May 1 and November 1 of each year (each, an "Interest Payment Date"), unless such date is not a business day, in which case the Interest Payment Date is the next succeeding business day, to the person (the "Noteholders") in whose name such Note is registered in the Register at the close of business on April 15 or October 15 (whether or not a business day) next preceding such Interest Payment Date.  Section 4.1 of the Indenture states that "[t]he Issuer shall punctually pay the principal of and premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes."  The Issuer is defined by Section 1.1 of the Indenture as "Samarco Mineração S.A. and any successor thereof."

2

8.      On each of November 1, 2016, May 1, 2017, November 1, 2017, May 1, 2018, November 1, 2018, May 1, 2019, November 1, 2019, and May 1, 2020, Interest Payments of $20,625,000 became due and payable on the Notes under the terms of the Indenture.

9.      To date, Defendant has not made any portion of those Interest Payments (the "Missed Interest Payments").

10.     Under Section 6.1(i) of the Indenture, failure to pay the Missed Interest Payments is a breach of Defendant's obligations and becomes an Event of Default under the Indenture if and when such default continues uncured for 30 days.

11.     As of the date of this affidavit, failure to pay the Missed Interest Payments plus interest thereon continues to be an Event of Default under the Indenture.

12.     At the time of each Missed Interest Payment, pursuant to Section 4.1 of the Indenture interest began to accrue on that Missed Interest Payment amount at a rate of that specified by the Notes plus 1% per annum.  As the rate specified by the Notes is 4.125%, this interest rate is 5.125% per annum.

13.     Under Section 6.2 of the Indenture, if an Event of Default occurs and is continuing, the Trustee may declare all unpaid principal of, and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in writing to Defendant, stating that such notice is an "acceleration notice," and upon any such declaration such amounts shall become due and payable immediately.

14.     Under Section 6.3 of the Indenture, upon the occurrence of an Event of Default for failure to pay an Interest Payment, "the Trustee, in its own name as trustee of an express trust, (i) may institute a judicial proceeding for the collection of the whole

3

amount then due and payable on such Notes for principal and premium, if any, and interest (including Additional Amounts), and interest on any overdue principal and premium, if any, and, to the extent that payment of such interest (including Additional Amounts) shall be legally enforceable, upon any overdue installment of interest (including Additional Amounts), at the rate borne by the Notes, and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel."

15.      Also under Section 6.3 of the Indenture, upon the occurrence of an Event of Default, Plaintiff is authorized to "proceed to protect and enforce . . . the rights of the Holders by any available proceeding at law or in equity."

16.      On August 31, 2020, The Bank of New York Mellon, acting as Trustee, issued an Acceleration Notice in writing to Defendant via courier.  As a result of this acceleration, pursuant to Section 4.1 of the Indenture, a total amount of $1 billion in principal and $13,750,000 in accrued interest became immediately due and payable, and interest began to accrue on that principal and accrued interest at the rate specified by the Notes plus 1% per annum.  As the rate specified by the notes is 4.125%, this interest rate is 5.125% per annum.

17.      Attached to this affidavit as Exhibit 5 is a true and correct copy of the Acceleration Notice.

18.      The Noteholders are entitled to receive all unpaid accelerated principal and accrued and unpaid interest.

4

19.    As August 31, 2020, in aggregate, the Noteholders hold $1 billion in principal amount of the Notes and are also entitled to receive $165,000,000 of Missed Interest Payments that became due on account of the Notes on the above-mentioned dates. The Noteholders are also entitled to $17,617,187.50 in interest on those Missed Interest Payments, $13,750,000 in accrued interest that became due and payable pursuant to the Acceleration Notice, and interest on the accelerated principal and accrued accelerated interest that began to accrue on August 31, 2020 pursuant to the Acceleration Notice.

20.    As of the date of August 31, 2020, Defendant, in breach of its payment obligations under the Indenture, has failed to pay any portion of the $1,196,367,187.50 due to the Noteholders.

21.    Pursuant to Sections 6.3 and 7.6 of the Indenture, the Trustee is entitled to prompt reimbursement for "all reasonable out-of-pocket expenses incurred or made by it, including costs of collection."

22.    Although the damages calculations discussed herein are current as of the date of this affidavit, interest on the amounts will continue to accrue, increasing the total damages to which Plaintiff is entitled in an amount that can be calculated as a sum certain at any future date.

23.    The Plaintiff demands judgment in its favor against Defendant as follows:

    a.    Payment of Missed Interest Payments in the amount of no less than $165,000,000;

    b.    Payment of interest on the Missed Interest Payments in the amount of no less than $17,617,187.50;

5

    c.    Payment of unpaid accelerated principal in the amount of no less than $1 billion and interest on that principal that began to accrue at the rate specified herein on August 31, 2020;

    d.    Payment of accelerated accrued interest in the amount of no less than $13,750,000 and interest on that sum that began to accrue at the rate specified herein on August 31, 2020;

    e.    Attorneys' fees and the costs of this action;

    f.    Reimbursement to the Trustee for expenses incurred in this collection action;

    g.    Pre-judgment and post-judgment interest; and

    h.    Such other relief as this Court deems just and proper.

**WHEREFORE**, I respectfully request that a judgment be entered for the relief sought and such other relief as the Court deems just and proper.

Dated:  September 1, 2020

 

_____
David Kerr

On 9/1/20 before me, Latrese Stewart, Notary Public in and for said county, personally appeared David Kerr, who has satisfactorily identified himself/herself as the signer of the above referenced document.

Sworn to before me on September 1, 2020.

_____
Notary Public*

LATRESE A. STEWART
NOTARY PUBLIC OF NEW JERSEY
Lic. No. 2447654
My Commission Expires July 2, 2024

*This notarial act was performed remotely using communication technology in accordance with P.L. 2020, c.26.

6

## **WORD COUNT CERTIFICATION**

This affidavit was prepared using Microsoft Word 2016, and I hereby certify that the

total number of words, exclusive of the caption and signature block, is 1,376 words.

Dated:     New York, New York
          September 2, 2020

                       DAVIS POLK & WARDWELL LLP

                       By:    _/s/ Antonio Perez-Marques_
                             Antonio Perez-Marques
                             Timothy Graulich
                             Matthew Cormack

                       450 Lexington Avenue
                       New York, New York 10017
                       Tel: (212) 450-4559
                       Fax: (212) 701-5800
                       antonio.perez@davispolk.com
                       timothy.graulich@davispolk.com
                       matthew.cormack@davispolk.com

                       _Attorneys for Plaintiff_

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 26 of 189

# EXHIBIT 1

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 27 of 189

EXECUTION VERSION

---

SAMARCO MINERAÇÃO S.A.,
as Issuer

and

THE BANK OF NEW YORK MELLON,
as Trustee, Registrar, Transfer Agent and Paying Agent

and

THE BANK OF NEW YORK MELLON TRUST (JAPAN), LTD.
as Principal Paying Agent

————————————

**INDENTURE**

Dated as of October 31, 2012

————————————

4.125% Notes due 2022

---

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION**

SECTION 1.1.   Definitions.............................................................................. 1
SECTION 1.2.   Rules of Construction................................................................ 11
SECTION 1.3.   Table of Contents; Headings...................................................... 11
SECTION 1.4.   Form of Documents Delivered to Trustee...................................... 11
SECTION 1.5.   Acts of Holders ...................................................................... 12

**ARTICLE II THE NOTES**

SECTION 2.1.   Form and Dating .................................................................... 13
SECTION 2.2.   Execution, Authentication and Delivery........................................ 13
SECTION 2.3.   Transfer Agents, Registrar and Paying Agents ............................... 14
SECTION 2.4.   Paying Agent to Hold Money in Trust.......................................... 16
SECTION 2.5.   Payment of Principal and Interest; Principal and Interest Rights Preserved...... 16
SECTION 2.6.   Holder Lists........................................................................... 17
SECTION 2.7.   Transfer and Exchange............................................................. 17
SECTION 2.8.   Replacement Notes .................................................................. 20
SECTION 2.9.   Temporary Notes .................................................................... 21
SECTION 2.10.  Persons Deemed Owners .......................................................... 21
SECTION 2.11.  Cancellation .......................................................................... 21
SECTION 2.12.  Defaulted Interest ................................................................... 21
SECTION 2.13.  CUSIP and ISIN Numbers ........................................................ 22
SECTION 2.14.  Open Market Purchases ........................................................... 22

**ARTICLE III REDEMPTION**

SECTION 3.1.   Right of Redemption................................................................ 22
SECTION 3.2.   Applicability of Article ............................................................. 23
SECTION 3.3.   Election to Redeem; Notice to Trustee .......................................... 23
SECTION 3.4.   Notice of Redemption by the Issuer.............................................. 23
SECTION 3.5.   Selection of Notes to Be Redeemed in Part ..................................... 24
SECTION 3.6.   Deposit of Redemption Price ..................................................... 24
SECTION 3.7.   Effect of Notice of Redemption .................................................. 24
SECTION 3.8.   Change of Control................................................................... 25

**ARTICLE IV COVENANTS**

SECTION 4.1.   Payment of Principal, Premium and Interest Under the Notes .............. 27
SECTION 4.2.   Maintenance of Office or Agency................................................. 28
SECTION 4.3.   Money for Note Payments to Be Held in Trust ................................ 28
SECTION 4.4.   Maintenance of Corporate Existence ............................................ 29
SECTION 4.5.   Payment of Additional Amounts.................................................. 29
SECTION 4.6.   Reporting Requirements ........................................................... 32

- i -

SECTION 4.7.   Available Information ............................................................... 32
SECTION 4.8.   Limitation on Mortgages ......................................................... 33
SECTION 4.9.   Limitation on Sale and Leaseback Transactions .......................... 35
SECTION 4.10.   Waiver of Certain Covenants .................................................. 36

ARTICLE V CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 5.1.   Limitation on Consolidation, Merger or Transfer of Assets .............. 36
SECTION 5.2.   Successor Substituted ............................................................. 37

ARTICLE VI EVENTS OF DEFAULT AND REMEDIES

SECTION 6.1.   Events of Default .................................................................... 37
SECTION 6.2.   Acceleration of Maturity, Rescission and Amendment .................... 38
SECTION 6.3.   Collection Suit by Trustee ........................................................ 39
SECTION 6.4.   Other Remedies ..................................................................... 39
SECTION 6.5.   Trustee May Enforce Claims Without Possession of Notes .............. 39
SECTION 6.6.   Application of Money Collected .................................................. 39
SECTION 6.7.   Limitation on Suits ................................................................. 40
SECTION 6.8.   Rights of Holders to Receive Principal, Premium and Interest .......... 40
SECTION 6.9.   Restoration of Rights and Remedies ........................................... 40
SECTION 6.10.   Trustee May File Proofs of Claim ............................................ 41
SECTION 6.11.   Delay or Omission Not Waiver ................................................ 41
SECTION 6.12.   Control by Holders ............................................................... 41
SECTION 6.13.   Waiver of Past Defaults and Events of Default ............................ 41
SECTION 6.14.   Rights and Remedies Cumulative ............................................ 42
SECTION 6.15.   Waiver of Stay or Extension Laws ............................................ 42

ARTICLE VII TRUSTEE AND AGENTS

SECTION 7.1.   Duties of Trustee ................................................................... 42
SECTION 7.2.   Rights of Trustee and Agents .................................................... 43
SECTION 7.3.   Individual Rights of Trustee and Agents ..................................... 45
SECTION 7.4.   Trustee's Disclaimer .............................................................. 45
SECTION 7.5.   Notice of Defaults and Events of Default ..................................... 45
SECTION 7.6.   Compensation and Indemnity ................................................... 46
SECTION 7.7.   Replacement of Trustee ........................................................... 47
SECTION 7.8.   Successor Trustee by Merger .................................................... 48
SECTION 7.9.   Eligibility; Disqualification ...................................................... 48
SECTION 7.10.   Resignation of an Agent ........................................................ 49

ARTICLE VIII DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.1.   Discharge of Liability on Notes ................................................. 49
SECTION 8.2.   Conditions to Defeasance ........................................................ 50
SECTION 8.3.   Application of Trust Money ...................................................... 51
SECTION 8.4.   Repayment to Company .......................................................... 51
SECTION 8.5.   Indemnity for Governmental Obligations ..................................... 51

- ii -

SECTION 8.6.   Reinstatement ................................................................................... 51

ARTICLE IX AMENDMENTS

SECTION 9.1.   Without Consent of Holders ............................................................. 52
SECTION 9.2.   With Consent of Holders................................................................... 53
SECTION 9.3.   Revocation and Effect of Consents and Waivers.............................. 54
SECTION 9.4.   Notation on or Exchange of Notes.................................................... 54
SECTION 9.5.   Trustee to Sign Amendments ........................................................... 54
SECTION 9.6.   Payment for Consent ........................................................................ 55

ARTICLE X MEETINGS OF HOLDERS

SECTION 10.1.   Purposes for Which Meetings May Be Called................................. 55
SECTION 10.2.   Manner of Calling Meetings .......................................................... 55
SECTION 10.3.   Call of Meetings by Company or Holders ...................................... 56
SECTION 10.4.   Who May Attend and Vote at Meetings .......................................... 56
SECTION 10.5.   Regulations May Be Made by Trustee; Conduct of the Meeting; Voting
                         Rights; Adjournment ..................................................................... 56
SECTION 10.6.   Voting at the Meeting and Record to Be Kept ................................. 57
SECTION 10.7.   Exercise of Rights of Trustee or Holders May Not Be Hindered or
                         Delayed by Call of Meeting............................................................. 57
SECTION 10.8.   Procedures Not Exclusive .............................................................. 57

ARTICLE XI MISCELLANEOUS

SECTION 11.1.   Provisions of Indenture and Notes for the Sole Benefit of Parties and
                         Holders of Notes ............................................................................ 57
SECTION 11.2.   Notices ........................................................................................... 58
SECTION 11.3.   Officer's Certificate and Opinion of Counsel as to Conditions Precedent....... 59
SECTION 11.4.   Statements Required in Officer's Certificate or Opinion of Counsel.............. 59
SECTION 11.5.   Rules by Trustee, Registrar, Paying Agent and Transfer Agents ................... 60
SECTION 11.6.   Currency Indemnity ....................................................................... 60
SECTION 11.7.   No Recourse Against Others............................................................ 60
SECTION 11.8.   Legal Holidays ............................................................................... 60
SECTION 11.9.   Governing Law; Waiver of Jury Trial.............................................. 61
SECTION 11.10.   Consent to Jurisdiction; Waiver of Immunities ............................ 61
SECTION 11.11.   Successors and Assigns................................................................. 62
SECTION 11.12.   Multiple Originals ....................................................................... 62
SECTION 11.13.   Severability Clause ...................................................................... 62
SECTION 11.14.   Tax Purposes ............................................................................... 62
SECTION 11.15.   Patriot Act ................................................................................... 62

- iii -

EXHIBITS:

EXHIBIT A  -  Form of Note

EXHIBIT B  -  Form of Transfer Notice

EXHIBIT C  -  Form of Certificate for Transfer from Restricted Global Note to Regulation S Global Note

EXHIBIT D  -  Form of Certificate for Transfer from Restricted Global Note to Regulation S Global Note

EXHIBIT E  -  Form of Certificate for Removal of the Securities Act Legend on a Note

INDENTURE, dated as of October 31, 2012, among SAMARCO MINERAÇÃO S.A., closely held company incorporated under the laws of Brazil (the "Issuer"), THE BANK OF NEW YORK MELLON, as Trustee, Registrar, Transfer Agent and Paying Agent and THE BANK OF NEW YORK MELLON TRUST (Japan), Ltd., as Principal Paying Agent.

## RECITALS

The Issuer has duly authorized the issue of 4.125% Notes due 2022 (the "Notes"), initially in an aggregate principal amount of U.S.$1,000,000,000, and has duly authorized the execution and delivery of this Indenture.

All things necessary have been done to make the Notes, when executed and authenticated and delivered hereunder and duly issued, the valid obligations of the Issuer, and to make this Indenture a valid agreement of the Issuer.

## NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders, as follows:

## ARTICLE I

## DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.1.   Definitions.

"Act," when used with respect to any Holder, has the meaning specified in Section 1.5.

"Additional Amounts" has the meaning specified in Section 4.5(a).

"Affiliate" means, with respect to any specified Person, (i) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (ii) any other Person who is a director or officer (a) of such specified Person, (b) of any Subsidiary of such specified Person or (c) of any Person described in clause (i) above.  For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means any Paying Agent, Transfer Agent, Registrar or any other agent appointed pursuant to this Indenture.

"Applicable Procedures" means the applicable procedures of DTC, Euroclear and Clearstream, in each case to the extent applicable.

"Attributable Indebtedness" means, as to any particular lease under which any Person is liable at the time as lessee, and at any date as of which the amount of the payment is to be determined, the total net amount of rent required to be paid by such Person under such lease during the remaining term of such lease (including any period for which such lease has been extended or may, at the option of the lessor, be extended), discounted from the respective due dates thereof to the date of determination at a rate per annum equivalent to the rate inherent in such lease (as determined by the directors of the Issuer) compounded semiannually, excluding amounts required to be paid on account of or attributable to operating costs and overhead charges with respect to such lease and including, in certain circumstances, any termination penalty in the case of a lease terminable by the lessee; *provided, however*, that if such lease results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of Capital Lease Obligation.

"Authenticating Agent" has the meaning specified in Section 2.2(b).

"Authorized Denomination" has the meaning specified in Section 2.2(a)(v).

"Bankruptcy Law" means (i) Title 11, United States Code or any similar U.S. federal or state law for the relief of debtors or the administration or liquidation of debtors' estates for the benefit of their creditors and (ii) the Brazilian Federal Law No. 11,101, of February 9, 2005, as amended, or any similar Brazilian federal or state law for the relief of debtors or the administration or liquidation of debtors' estates for the benefit of their creditors.

"Below Investment Grade Ratings Event" means the Notes cease to be rated Investment Grade by each of the Rating Agencies on any date during the period commencing the day of, and ending 30 days after (which 30-day period will be extended so long as the rating of the notes is under publicly announced consideration for a possible downgrade by any Rating Agency) the earlier of (1) the occurrence of a Change of Control; or (2) public notice by the Issuer of the occurrence of a Change of Control or the intention of the Issuer to effect a Change of Control.  Notwithstanding the foregoing, a Below Investment Grade Ratings Event otherwise arising by virtue of a particular reduction in rating shall not be deemed to have occurred in respect of a particular Change of Control (and thus shall not be deemed a Below Investment Grade Ratings Event for purposes of the definition of Change of Control Repurchase Event hereunder) if the Rating Agencies making the reduction in rating to which this definition would otherwise apply do not announce or publicly confirm or inform the Trustee in writing that the reduction was the result, in whole or in part, of any event or circumstance comprised of or arising as a result of, or in respect of, the applicable Change of Control (whether or not the applicable Change of Control shall have occurred at the time of the ratings event).

"Board of Directors" means, as the case may be, the Board of Directors of the Issuer (*Conselho de Administração*) or any committee thereof duly authorized to act on behalf of such Board of Directors.

"Board Resolution" means a copy of a resolution certified by the Secretary (*Secretário*), the Assistant Secretary or another Person performing corporate secretarial functions of the Issuer, as applicable, to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification and delivered to the Trustee.

- 2 -

"Brazil" means the Federative Republic of Brazil.

"Brazilian Taxes" means any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature (and any fines, penalties or interest related thereto) imposed or levied by or on behalf of Brazil or any political subdivision or authority of or in Brazil having power to tax.

"Business Day" means any day which is not, in London, England, São Paulo, New York City, Tokyo or the place of payment of interest or principal a Saturday, Sunday, a legal holiday or a day on which banking institutions in such places are authorized or obligated by law to close.

"Capital Lease Obligations" means any obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with GAAP, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with GAAP; and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"Capital Stock" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such person's equity including any preferred stock, but excluding any debt securities convertible into or exchangeable for such equity.

"Certificated Note" has the meaning specified in Section 2.1.

"Change of Control" means:

(i)    the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of consolidation, amalgamation or merger), in one or a series of related transactions, of all or substantially all of the assets of the Issuer and its Subsidiaries taken as a whole to any "person" (as that term is used in Section 13(d)(3) of the Exchange Act), other than to the Issuer or one of its Subsidiaries;

(ii)    the consummation of any transaction (including, without limitation, any consolidation, amalgamation, or merger or other combination (including by way of a scheme of arrangement)) the result of which is that any "person" (as that term is used in Section 13(d)(3) of the Exchange Act) other than a Permitted Holder becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act) directly or indirectly, of more than 50% of the outstanding Voting Stock of the Issuer, measured by voting power rather than number of shares (or its successor by merger, consolidation or purchase of all or substantially all of its assets); or

(iii)    the adoption of a plan relating to the liquidation, winding up or dissolution of the Issuer;

- 3 -

*provided*, that notwithstanding the foregoing, a transaction will not be deemed to involve a change of control for the purposes of this definition if (1) the Issuer becomes a direct or indirect Wholly-Owned Subsidiary of a holding company and (2)(A) the direct or indirect holders of the Voting Stock of such holding company immediately following that transaction are substantially the same as the holders of the Issuer's Voting Stock immediately prior to that transaction or (B) immediately following that transaction no person (other than a holding company satisfying the requirements of this sentence) is the beneficial owner, directly or indirectly, of more than 50% of the Voting Stock of such holding company.

"Change of Control Repurchase Event" means the occurrence of both a Change of Control and a Below Investment Grade Ratings Event.

"Clearstream" means Clearstream Banking, société anonyme.

"Closing Date" means October 31, 2012 or such later date on which the initial Notes are issued hereunder.

"Code" means the Internal Revenue Code of 1986, as amended.

"Consolidated Net Tangible Assets" means the aggregate amount of consolidated assets (less applicable provisions) after deducting therefrom (1) all current liabilities; (2) all goodwill, trade names, trademarks, patents, unamortized debt discount and financings costs and all similar intangible assets; and (3) appropriate adjustments on account of minority interests of other Persons holding stock in any Subsidiary of the Issuer, all as set forth on the most recent consolidated balance sheet of the Issuer and computed in accordance with GAAP.

"Corporate Trust Office" means the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office as of the date of this Indenture is located at 101 Barclay Street, Floor 4 East, New York, New York 10286.

"covenant defeasance option" has the meaning specified in Section 8.1(b).

"Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

"CVM" means the Brazilian Securities Commission (*Comissão de Valores Mobiliários*).

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"defeasance trust" has the meaning specified in Section 8.2(a).

"Depositary" means DTC or any successor depositary for the Notes.

"DTC" means The Depository Trust Company.

- 4 -

"Euroclear" means Euroclear Bank S.A./N.V., as operator of the Euroclear System.

"Event of Default" has the meaning specified in Section 6.1.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended.

"Expiration Date" has the meaning specified in Section 3.8(a)(vi).

"Fitch" means Fitch, Inc., a subsidiary of Fimalac, S.A., and its successors.

"GAAP" means, (i) the accounting principles prescribed by Brazilian Law No. 6,404/76, as amended and (ii) the rules and regulations issued by applicable regulators, including the Brazilian Federal Accounting Council *(Sonselho Federeral de Contabilidade)* or CFC and the Brazilian Accounting Standards Committee *(Comitê de Pronunciamentos Contábeis)*, as in effect from time to time.

"Global Note" means a global note held in the name of the Depositary representing the Notes substantially in the form attached hereto as Exhibit A.

"Government Obligations" money or obligations issued by the United States government.

"Holder" means the Person in whose name a Note is registered in the Register.

"Indebtedness" with respect to any Person, means any amount payable (whether as a direct obligation or indirectly through a guaranty by such Person) pursuant to (i) an agreement or instrument involving or evidencing money borrowed, (ii) a conditional sale or a transfer with recourse or with an obligation to repurchase or (iii) a lease with substantially the same economic effect as any such agreement or instrument and which, under GAAP, would constitute a Capitalized Lease Obligation.

"Indenture" means this Indenture, as amended or supplemented from time to time in accordance with the provisions hereof.

"interest" means, when used with respect to a Note, the interest on such Note (including any Additional Amounts payable by the Issuer in respect of such interest).

"Interest Payment Date" means the Stated Maturity of an installment of interest on the Notes.

"Investment Grade" means a rating of BBB- or better by S&P or Fitch (or its equivalent under any successor rating categories of S&P and Fitch); or the equivalent Investment Grade credit rating from any additional Rating Agency or Rating Agencies selected by the Issuer.

"Issuer" means Samarco Mineração S.A. and any successor thereof.

"Issuer Jurisdiction" means any of the jurisdictions of incorporation or residence for tax purposes of the Issuer or any successor entity, or any political subdivision or taxing authority thereof or therein.

"Issuer Order" means a written order signed in the name of the Issuer by an Officer.

"legal defeasance option" has the meaning specified in Section 8.1(b).

"Luxembourg Paying Agent" has the meaning specified in Section 2.3(a)(i).

"Luxembourg Stock Exchange" means Bourse de Luxembourg.

"Luxembourg Transfer Agent" has the meaning specified in Section 2.3(a)(i).

"Mortgage" means any mortgage, deed of trust, pledge, hypothecation, lien, encumbrance, charge or other security interest of any kind.

"Maturity" means, when used with respect to any Note, the date on which the outstanding principal of and premium, if any, and interest on such Note becomes due and payable as therein or herein provided, whether upon Stated Maturity, redemption, declaration of acceleration or otherwise.

"Notes" has the meaning specified in the first paragraph of the Recitals of this Indenture and shall be substantially in the form set forth in Exhibit A.

"Notice of Default" has the meaning specified in Section 6.1(3).

"Offer to Purchase" has the meaning specified in Section 3.8(a).

"Offer to Purchase Payment" has the meaning specified in Section 3.8(a).

"Offer to Purchase Payment Date" has the meaning specified in Section 3.8(a)(vi).

"Officer" means, with respect to a corporation, the President, Chief Executive Officer, Chief Financial Officer or any other executive or senior officer performing decision-making functions for such corporation (including any member of its *Diretoria* (Board of Executive Officers)).

"Officer's Certificate" means a certificate signed by any Officer of the Issuer, and delivered to the Trustee.

"Opinion of Counsel" means a written opinion of legal counsel of recognized standing who shall be reasonably acceptable to the Trustee.

"Outstanding" means, when used with respect to the Notes, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture, except:

- 6 -

(iv)    Notes theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(v)    Notes for whose payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Issuer) in trust or set aside and segregated in trust by the Issuer (if the Issuer shall act as its own Paying Agent) for the Holders of such Notes; *provided* that, if such Notes are to be redeemed pursuant to Article III, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(vi)    Notes, except to the extent provided in Sections 8.1 and 8.2, with respect to which the Issuer has effected legal defeasance and/or covenant defeasance as provided in Article VIII; and

(vii)    Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, other than any such Notes in respect of which there shall have been presented to the Trustee proof satisfactory to it that such Notes are held by a protected purchaser (within the meaning of the New York Uniform Commercial Code) in whose hands such Notes are valid obligations of the Issuer;

*provided, however,* that in determining whether the Holders of the requisite principal amount of Outstanding Notes have given any request, demand, authorization, direction, consent, notice or waiver hereunder, Notes owned by the Issuer or any of its Affiliates shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, consent, notice or waiver, only Notes which a Responsible Officer of the Trustee has received written notice at its address specified herein of being so owned shall be so disregarded.  Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Issuer or any other obligor upon the Notes or any of their respective Affiliates.

"Paying Agent" means any Person authorized by the Issuer to pay the principal of and premium, if any, or interest on any Notes on behalf of the Issuer hereunder, including The Bank of New York Mellon in its capacity as a Paying Agent, the Principal Paying Agent and the Luxembourg Paying Agent.

"Payment Date" means the date on which payment of interest and premium, if any, on and/or principal of the Notes is due, including, without limitation, any Interest Payment Date, Redemption Date and date of Maturity.

"Permitted Holder" means any of Vale S.A., BHP Billiton plc and BHP Billiton Limited and any of their majority controlled or owned affiliates.

"Person" means any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof;

- 7 -

"premium" means, when used with respect to a Note, the amount payable on such Note, in addition to the principal amount thereof upon any redemption of such Note (including any Additional Amounts payable by the Issuer in respect of such premium).

"principal" means, when used with respect to a Note, the principal amount of such Note (including any Additional Amounts payable by the Issuer in respect of such principal).

"Principal Paying Agent" means The Bank of New York Mellon Trust (Japan), Ltd., until a successor Principal Paying Agent shall have become such pursuant to the applicable provisions of this Indenture.

"Principal Property" the interest of the Issuer or any Subsidiary in any (a) mineral property or (b) manufacturing or processing plant, building, structure, dam or other facility, together with the land upon which it is erected and fixtures comprising a part thereof, whether owned as of the date of this Indenture or thereafter acquired or constructed by the Issuer or any Subsidiary, of which interest the net book value in each case, on the date as of which the determination is being made, is an amount which exceeds 10% of Consolidated Net Tangible Assets, other than (i) any such mineral property, manufacturing or processing plant, building, structure, dam or other facility which, in the opinion of the Board of Directors, is not of material importance to the total business conducted by the Issuer and its Subsidiaries as an entirety or (ii) any portion of any such property which, in the opinion of the Board of Directors, is not of material importance to the use or operation of such property.

"Proceeding" has the meaning specified in Section 11.10(a).

"Process Agent" has the meaning specified in Section 11.10(a).

"Project Financing" means the financing or refinancing of the acquisition, construction, expansion, improvement or development of any physical assets in which the providers of such finance or refinance solely look to the entity that owns and operates such assets, the equity interests in such entity, the assets themselves, and/or the revenues generated thereby as the source of repayment of the amounts financed or refinanced, without recourse to the Issuer or any Subsidiary (other than such entity) other than through a completion guarantee, guarantees from sponsors or other obligations that are customary in non-recourse financing or refinancing.

"Rating Agency" means each of (1) S&P or (2) Fitch; *provided* that if any of S&P or Fitch ceases to rate the Notes or fails to make a rating of the Notes publicly available for reasons outside of the Issuer's control, a "nationally recognized statistical rating organization" within the meaning of Section 3(a)(62) of the Exchange Act, selected by the Issuer (as certified by a resolution of the Chief Executive Officer or Chief Financial Officer) as a replacement agency for S&P or Fitch, or all of them, as the case may be.

"Record Date" means, when used with respect to the interest on the Notes payable on any Interest Payment Date, the April 15 or October 15 (whether or not a Business Day), as the case may be, next preceding such Interest Payment Date.

"Redemption Date" means, when used with respect to any Note to be redeemed pursuant to Article III, the date fixed for such redemption by or pursuant to this Indenture.

"Redemption Price" means, when used with respect to any Note to be redeemed pursuant to Article III, the price at which it is to be redeemed pursuant to this Indenture.

"Register" has the meaning specified in Section 2.3(a).

"Registrar" means The Bank of New York Mellon, until a successor Registrar shall have become such pursuant to the applicable provisions of this Indenture, and, thereafter, "Registrar" shall mean such successor Registrar.

"Regulation S" means Regulation S under the Securities Act, as in effect from time to time.

"Regulation S Global Note" means one or more permanent Global Notes in definitive fully registered form without interest coupons representing Notes initially sold outside of the United States pursuant to Regulation S.

"Relevant Withholding Taxes" has the meaning specified in Section 4.5(e).

"Responsible Officer" means any officer or agent of the Trustee in the Corporate Trust Office with direct responsibility for the administration of this Indenture.

"Restricted Global Note" means one or more permanent Global Notes in definitive fully registered form without interest coupons initially sold to "qualified institutional buyers" (as such term is defined in Rule 144A) pursuant to Rule 144A.

"Restricted Subsidiary" means (1) any Subsidiary which owns or leases a Principal Property; and (2) any Subsidiary engaged primarily in the business of owning or holding securities of Restricted Subsidiaries.

"Rule 144A" means Rule 144A under the Securities Act, as in effect from time to time.

"S&P" means Standard & Poor's LLC, a subsidiary of The McGraw-Hill Companies, Inc., or any successor to the rating agency business thereof.

"Sale and Leaseback Transaction" means any arrangement with a bank, insurance company or other lender or investor (other than the Issuer or a Restricted Subsidiary) providing for the leasing by the Issuer or any Restricted Subsidiary of any Principal Property which has been or is to be sold or transferred, more than 180 days after the later of the acquisition, completion of construction or commencement of full operation thereof by the Issuer or such Restricted Subsidiary to such lender or investor or to any Person to whom funds have been or are to be advanced by such lender or investor on the security of that property or asset.

"Securities Act" means the U.S. Securities Act of 1933, as amended.

"Securities Act Legend" means the applicable legend set forth in the form of Note attached hereto as Exhibit A.

"Significant Subsidiary" means any Subsidiary that would be a "significant subsidiary" under the definition in Article 1, Rule 1-02(w)(2) of Regulation S-X (but as calculated pursuant to GAAP), promulgated pursuant to the Securities Act, as such regulation is in effect on the date hereof.

"Stated Maturity" means, with respect to any security the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the Holder thereof upon the happening of any contingency unless such contingency has occurred).

"Subsidiary" means, at any relevant time, any Person of which the voting shares or other interests carrying more than 50% of the outstanding voting rights attached to all outstanding voting shares or other interests are owned, directly or indirectly, by or for the Issuer and/or one or more Subsidiaries of the Issuer.

"Tax" means any tax, levy, impost or other governmental charge (and any fines, penalties or interest related thereto) whatsoever imposed, assessed, levied or collected.

"Transfer Agent" means The Bank of New York Mellon and any other Person authorized by the Issuer to effectuate the exchange or registration of transfer of any Note on behalf of the Issuer hereunder, including, without limitation, the Luxembourg Transfer Agent.

"Trustee" means The Bank of New York Mellon, until a successor Trustee shall have become such pursuant to the applicable provisions of this Indenture and, thereafter, "Trustee" shall mean such successor Trustee.

"United States" and "U.S." mean the United States of America (including the states thereof and the District of Columbia) and its territories, its possessions and other areas subject to its jurisdiction.

"U.S. Dollars" and "U.S.$" mean such coin or currency of the United States as at the time of payment will be legal tender for the payment of public and private debts.

"Voting Stock" of any specified "person" (as that term is used in Section 13(d)(3) of the Exchange Act) as of any date means the capital stock of such person that is at the time entitled to vote generally in the election of the board of directors, managers or other voting members of the governing body of such person.

"Wholly-Owned Subsidiary" means a Subsidiary of which at least 95% of the Capital Stock (other than directors' qualifying shares) is owned by the Issuer or another Wholly-Owned Subsidiary.

- 10 -

SECTION 1.2.   Rules of Construction.

(a)   For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(i)   the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular;

(ii)   the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(iii)   "or" is not exclusive;

(iv)   "including" means including, without limitation; and

(v)   unless the context otherwise requires, any reference to an "Article", a "Section" or an "Exhibit" refers to an Article, a Section or an Exhibit, as the case may be, of this Indenture.

(b)   All accounting terms not otherwise defined herein shall have the meanings assigned to them in accordance with GAAP.

(c)   For purposes of the definitions set forth in Article I and this Indenture generally, all calculations and determinations shall be made in accordance with GAAP and shall be based upon the consolidated financial statements of the Issuer and its Subsidiaries prepared in accordance with GAAP.

SECTION 1.3.   Table of Contents; Headings.   The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 1.4.   Form of Documents Delivered to Trustee.   In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any Officer's Certificate may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless the Officer or Officers executing such Officer's Certificate know, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which the certificate or opinion is based are erroneous.  Any Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer or Officers of the Issuer stating that the information with respect to such factual matters is in the possession of

- 11 -

the Issuer, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

SECTION 1.5.   Acts of Holders.

(a)   Any request, demand, authorization, direction, consent, notice, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by agents duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Issuer.  Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 1.5.

(b)   The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof.  Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority.  The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee reviewing such instrument or writing deems sufficient.

(c)   The principal amount and serial numbers of Notes held by any Person, and the date of holding the same, shall be proved by the Register.

(d)   If the Issuer solicits from the Holders of Notes any request, demand, authorization, direction, consent, notice, waiver or other Act, the Issuer may, at its option, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, consent, notice, waiver or other Act, but the Issuer shall not have any obligation to do so.  If such a record date is fixed, such request, demand, authorization, direction, consent, notice, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, consent, notice, waiver or other Act, and for that purpose the Outstanding Notes shall be computed as of such record date; *provided* that no such authorization, agreement or consent by the Holders on such record date shall be deemed

- 12 -

effective unless it shall become effective pursuant to the provisions of this Indenture not later than eleven months after the record date.

(e)     Any request, demand, authorization, direction, consent, notice, waiver or other Act of the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration or registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee, the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

## ARTICLE II

## THE NOTES

SECTION 2.1.   Form and Dating.  The Notes and the Trustee's certificate of authentication shall be substantially in the form set forth in Exhibit A, which is hereby incorporated in and expressly made a part of this Indenture.  The Notes may have such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and may have such letters, numbers or other marks of identification and such notations, legends or endorsements as may be required to comply with any law, stock exchange rule, agreement to which the Issuer is subject, if any, or usage; *provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer.

Each Global Note and each definitive certificated non-global Note ("Certificated Note") shall be dated the date of its authentication.

The Notes shall be printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by the rules of any stock exchange on which the Notes may be listed, if any, all as determined by the Officers executing such Notes, as evidenced by their execution of such Notes.

SECTION 2.2.   Execution, Authentication and Delivery.

(a)     An Officer of the Issuer shall sign the Notes for the Issuer by manual or facsimile signature.

(i)     If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

(ii)     A Note shall not be valid until an authorized signatory of the Trustee or an Authenticating Agent manually signs the certificate of authentication on the Note upon Issuer Order.  Such signature shall be conclusive evidence that the Note has been authenticated under this Indenture.  Such Issuer Order shall specify the amount of the Notes to be authenticated and the date on which the original issue of Notes is to be authenticated.

(iii)     The Trustee or an authenticating agent shall initially authenticate and deliver Notes on the Closing Date in an aggregate principal amount of

- 13 -

U.S.$1,000,000,000.

(iv)   The Issuer may from time to time, without notice to or the consent of the Holders of the Notes, create and issue an unlimited principal amount of additional Notes having the same terms and conditions as the Notes issued on the Closing Date in all respects, except that the issue date, the issue price and the first payment of interest thereon may differ; *provided*, *however*, that unless such additional Notes are issued under a separate CUSIP, such additional Notes will be fungible with the original notes for U.S. federal income tax purposes or, if such additional Notes are not fungible with the original Notes for U.S. federal income tax purposes, neither the original Notes nor the additional Notes are issued with more than a *de minimis* amount of original issue discount for U.S. federal income tax purposes.  Any such additional Notes will form a single series and vote together with the previously Outstanding Notes for all purposes hereof.

(v)   The Notes shall be issued in fully registered form without coupons attached in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof (each, an "Authorized Denomination").

(b)   The Trustee may appoint an authenticating agent reasonably acceptable to the Issuer to authenticate the Notes (the "Authenticating Agent").  Unless limited by the terms of such appointment, an Authenticating Agent may authenticate Notes whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by an Authenticating Agent.  An Authenticating Agent has the same rights as the Registrar or any Transfer Agent or Paying Agent.

(i)   Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

(ii)   Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer.  The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Issuer.  Upon receiving such notice of resignation or upon such a termination, the Trustee may appoint a successor Authenticating Agent reasonably acceptable to the Issuer and shall give written notice of such appointment to the Issuer.

(iii)   The Issuer agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services and reimbursement for its reasonable expenses relating thereto.

SECTION 2.3.   Transfer Agents, Registrar and Paying Agents.

(a)   Subject to such reasonable regulations as the Issuer may prescribe, the books of the Issuer for the exchange, registration and registration of transfer of Notes shall be

- 14 -

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 46 of 189

kept at the office of the Registrar (such books maintained in such office and in any other office or agency designated for such purpose being herein referred to as the "Register").  The Issuer shall also cause the Trustee to maintain books for the exchange, registration and registration of transfer of Notes.  The Trustee shall notify the Registrar and the Registrar shall notify the Trustee, when necessary, upon any exchange, registration or registration of transfer of any Notes and shall cause their respective books to be amended accordingly.  The Issuer may have one or more co-registrars and one or more additional Transfer Agents or Paying Agents.  The term "Registrar" includes any co-registrar.

(i)     Upon the issue of Certificated Notes, the Issuer will appoint and maintain a Paying Agent in Luxembourg (the "Luxembourg Paying Agent") and a Transfer Agent in Luxembourg (the "Luxembourg Transfer Agent") for so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of such exchange so require.  In such event, an announcement shall be made through the Luxembourg Stock Exchange and shall include all material information with respect to the delivery of the Certificated Notes, including details of the Luxembourg Paying Agent.

(ii)     The Issuer shall enter into any appropriate agency agreements with any Agent not a party to this Indenture, which shall implement the provisions of this Indenture that relate to such Agent.  The Issuer shall notify the Trustee of the name and address of any such Agent.  If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.6.  The Issuer initially appoints the Trustee as Registrar, Transfer Agent and Paying Agent.

(b)     The Trustee shall keep a record of all the Notes and shall make such record available during regular business hours for inspection upon the request of the Issuer provided to the Trustee a reasonable amount of time prior to such inspection.  Such books and records shall include notations as to whether such Notes have been redeemed, or otherwise paid or cancelled, and, in the case of mutilated, destroyed, defaced, stolen or lost Notes, whether such Notes have been replaced.  In the case of the replacement of any of the Notes, the Trustee shall keep a record of the Note so replaced, and the Notes issued in replacement thereof.  In the case of the cancellation of any of the Notes, the Trustee shall keep a record of the Note so cancelled and the date on which such Note was cancelled.

(c)     Each Paying Agent shall comply with applicable backup withholding tax and information reporting requirements under the Code and U.S. Treasury Regulations promulgated thereunder with respect to payments made under the Notes (including, to the extent required, the collection of Internal Revenue Service Forms W-8 and W-9 and the filing of U.S. Internal Revenue Service Forms 1099 and 1096).

(d)     The Issuer hereby covenants with the Trustee and each Paying Agent that it will provide each of the Trustee and the Paying Agents with sufficient information so as to enable the Trustee and the Paying Agents  to determine whether or not the Trustee or such Paying Agent, as applicable, is obliged, in respect of any payments to be made by it pursuant to this Indenture and the Notes, to make any withholding or deduction pursuant to an agreement described in Section 1471(b) of the Code or otherwise imposed pursuant to

- 15 -

Sections 1471 through 1474 of the Code and any regulations or agreements thereunder or official interpretations thereof (the "FATCA Withholding Tax"). The Trustee and each Paying Agent shall be entitled to deduct FATCA Withholding Tax, and shall have no obligation to gross-up any payment hereunder or to pay any Additional Amount as a result of such FATCA Withholding Tax.

SECTION 2.4.  Paying Agent to Hold Money in Trust. By 10:00 a.m. (New York City time), no later than one Business Day prior to each Payment Date, the Issuer shall deposit with the Principal Paying Agent in immediately available funds a sum in U.S. Dollars sufficient to pay such principal, premium, if any, and interest when due on such Payment Date (including any Additional Amounts). The Issuer shall request that the bank through which such deposit is to be made agree to supply to the Principal Paying Agent by 10:00 a.m. (New York City time) two Business Days prior to such Payment Date an irrevocable confirmation (by tested telex) of its intention to make such deposit. Each Paying Agent shall hold in trust all money held by such Paying Agent for the payment of principal of or premium, if any, or interest on the Notes and shall notify the Trustee of any default by the Issuer in making such payments. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it. Upon complying with this Section 2.4, such Paying Agent shall have no further liability for the money delivered to the Trustee. As of the date hereof and until such time as it has been notified in writing to the contrary, the Principal Paying Agent shall be the Paying Agent receiving the funds as described in this section.

Payment on the due date therefor by the Issuer of any amount payable under the Notes to or to the order of a Paying Agent in accordance with the terms of the Notes and this Indenture shall satisfy the obligation of the Issuer to make such payment; *provided, however*, that the liability of a Paying Agent hereunder shall not exceed any amounts paid to it by the Issuer, or held by it, on behalf of the Holders under this Indenture. Notwithstanding the preceding sentence or any other provision of this Indenture, the Issuer shall indemnify the Holders in the event that there is subsequent failure by the Trustee or any Paying Agent to pay any amount due in respect of the Notes in accordance with the Notes and this Indenture in amounts equal to such amounts as would have been received by them had no such failure occurred.

SECTION 2.5.  Payment of Principal and Interest; Principal and Interest Rights Preserved.

(a)  Except as otherwise provided herein for the redemption of the Notes, the payment of principal of or premium, if any, or interest on the Notes shall be allocated on a pro rata basis among all Outstanding Notes, without preference or priority of any kind among the Notes.

(b)  Final payments in respect of any Note (whether upon Stated Maturity, redemption, declaration of acceleration or otherwise) shall be made only against presentation and surrender of such Note at the Corporate Trust Office, at the offices of the Trustee and, subject to any fiscal or other laws and regulations applicable thereto, at the specified offices of any other Paying Agent appointed by the Issuer.

- 16 -

(c)     Payment of principal and premium, if any, in respect of each Note shall be made upon presentation and surrender thereof on the Maturity date by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears in the Register.  Upon written notice from a Holder received by any Paying Agent at least 15 Business Days prior to any Maturity date of a Note, such payment may be made by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York.

(d)     Payment of interest in respect of each Note shall be made on each Interest Payment Date to the Person in whose name such Note is registered in the Register at the close of business on the Record Date next preceding such Interest Payment Date, by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register.  Upon written notice from a Holder received by any Paying Agent at least 15 Business Days prior to any Interest Payment Date, such payment may be made by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York.  Unless such designation is revoked, any such designation made by such Holder with respect to such Note shall remain in effect with respect to any future payments with respect to such Note payable to such Holder.  The Issuer shall pay any administrative costs imposed by banks in connection with making payments by wire transfer.

If the Payment Date in respect of any Note is not a Business Day, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day and shall not be entitled to any further interest or other payment in respect of any such delay.

Notwithstanding the provisions of this Section 2.5, payments on Notes registered in the name of the Depositary or its nominee shall be effected in accordance with the Applicable Procedures.

SECTION 2.6.   Holder Lists.  The Trustee shall preserve in as current a form as is reasonably practicable, the most recent list available to it of the names and addresses of Holders.  If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee in writing, at least seven Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Holders.

SECTION 2.7.   Transfer and Exchange.

(a)     Interests in the Regulation S Global Note and the Restricted Global Note shall be exchangeable or transferable, as the case may be, for physical delivery of Certificated Notes if (i) DTC notifies the Issuer that it is unwilling or unable to continue as Depositary for such Global Note, or DTC ceases to be a "clearing agency" registered under the Exchange Act, and a successor Depositary is not appointed by the Issuer within 90 days, or (ii) an Event of Default has occurred and is continuing with respect to the Notes; *provided* that such transfer or exchange is made in accordance with the provisions of this Indenture and the Applicable Procedures.

- 17 -

Upon receipt of notice by DTC or the Trustee, as the case may be, regarding the occurrence of any of the events described in the preceding paragraph, the Issuer shall use its best efforts to make arrangements with DTC for the exchange of interests in the Global Notes for individual Certificated Notes, and cause the requested individual Certificated Notes to be executed and delivered to the Trustee in sufficient quantities and authenticated by the Trustee for delivery to Holders. In the case of Certificated Notes issued in exchange for a Global Note required to bear the Securities Act Legend, such Certificated Notes shall bear the Securities Act Legend. Upon the registration of transfer, exchange or replacement of Notes bearing such Securities Act Legend, or upon specific request for removal of the Securities Act Legend on a Note, the Issuer shall deliver only Notes that bear such Securities Act Legend, or shall refuse to remove such Securities Act Legend, as the case may be, unless there is delivered to the Issuer a certificate in the form of Exhibit E or such satisfactory evidence as may reasonably be required by the Issuer, which may include an opinion of counsel, that neither the Securities Act Legend nor the restrictions on transfer set forth therein are required to ensure compliance with the provisions of the Securities Act. The Trustee shall exchange a Note bearing the Securities Act Legend for a Note not bearing such Securities Act Legend only if it has been directed to do so in writing by the Issuer, upon which direction it may conclusively rely.

(b)    A beneficial interest in the Regulation S Global Note may be transferred to a transferee who takes delivery of such interest in the form of an interest in the Restricted Global Note only in Authorized Denominations in accordance with the Applicable Procedures and upon receipt by the Trustee or Transfer Agent of a written certification from the transferor of the beneficial interest in the form of Exhibit D to the effect that such transfer is being made to a Person who the transferor reasonably believes is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

(c)    A beneficial interest in the Restricted Global Note may be transferred to a transferee who takes delivery of such interest in the form of an interest in the Regulation S Global Note only in Authorized Denominations in accordance with the Applicable Procedures and upon receipt by the Trustee or Transfer Agent of a written certification from the transferor of the beneficial interest in the form of Exhibit C to the effect that such transfer is being made in accordance with Regulation S.

(d)    In the event that a Global Note or beneficial interest therein is exchanged for Certificated Notes pursuant to Section 2.7(a), or, a Certificated Note is exchanged for another such Certificated Note, or a Certificated Note is exchanged for a beneficial interest in a Global Note, such Notes or interests therein may be exchanged or transferred for one another only in accordance with such procedures as are substantially consistent with the provisions of clauses (b) and (c) above as may be from time to time adopted by the Issuer.

(e)    Beneficial interests in the Global Notes shall be shown on, and transfers thereof shall be effected only through records maintained by DTC and its direct and indirect participants, including the depositories for Euroclear and Clearstream.

- 18 -

Transfers between DTC Participants shall be effected in accordance with DTC's procedures, and will be settled in same-day funds. Transfers between accountholders in Euroclear and Clearstream shall be effected in the ordinary way in accordance with their respective rules and operating procedures.

(f)  Certificated Notes may be exchanged or transferred in whole or in part in the principal amount of Authorized Denominations by surrendering such Certificated Notes at the office of the Trustee or any Transfer Agent with a written instrument of transfer as provided in this Indenture in the form of Exhibit B hereto duly executed by the Holder thereof or his attorney duly authorized in writing.

In exchange for any Certificated Note properly presented for transfer, the Trustee shall within three Business Days of the receipt of a written instrument of transfer as provided in this Indenture in the form of Exhibit B, authenticate and deliver or cause to be authenticated and delivered to the transferee at the Corporate Trust Office or by mail (at the risk of the transferee) to such address as the transferee may request, a Certificated Note or Notes, as the case may require, registered in the name of such transferee, for the same aggregate principal amount as was transferred.  In the case of the transfer of any Certificated Note in part, the Trustee shall within three Business Days of the receipt of a written instrument of transfer as provided in this Indenture in the form of Exhibit B, authenticate and deliver or cause to be authenticated and delivered to the transferor at the Corporate Trust Office or by mail (at the risk of the transferor) to such address as the transferor may request, a Certificated Note or Notes, as the case may require, registered in the name of such transferor, for the aggregate principal amount that was not transferred.  No transfer of any Notes shall be made unless the request for such transfer is made by the registered Holder or his attorney duly authorized in writing at the Corporate Trust Office and is accompanied by a completed instrument of transfer in the form of Exhibit B attached to the Note presented for transfer.

(g)  Exchanges and registrations of transfers of any Note or Notes shall be permitted and executed as provided in this Section 2.7 without any charge to the Holder of any such Note or Notes by or on behalf of the Issuer, the Registrar or the Transfer Agent other than payment, or the giving of such indemnity as the Registrar or the Transfer Agent may require, in respect of any taxes or other governmental charges which may be imposed in relation to it or insurance charges that may be imposed in relation thereto or any expenses of delivery by other than regular mail, but subject to such reasonable regulations as the Issuer, the Registrar and the Trustee may prescribe.

The costs and expenses of effecting any exchange or registration of transfer pursuant to the foregoing provisions, except for the expense of delivery by other than regular mail (if any) and except for the payment of a sum sufficient to cover any tax or other governmental charges or insurance charges that may be imposed in relation thereto, shall be borne by the Issuer.

All Certificated Notes issued upon any exchange or registration of transfer of Notes shall be valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits, as the Notes surrendered upon exchange or registration of transfer.

- 19 -

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 51 of 189

(h)    The Trustee or the Transfer Agent shall effect transfers of Global Notes and Certificated Notes.  In addition, the Registrar shall keep the Register of the ownership, exchange and transfer of any Notes.  The Transfer Agent shall give prompt notice to the Registrar and the Registrar shall likewise give prompt notice to the Trustee of any exchange or transfer of such Notes.  Neither the Trustee nor any Transfer Agent shall register the exchange or the transfer of interests for a period of 15 days preceding any Redemption Date or between a Record Date and the related Payment Date.

(i)    Upon any exchange of all or a portion of any Global Note for a Certificated Note or an interest in any other Global Note, the Global Note to be so exchanged shall be marked to reflect the reduction of its principal amount by the aggregate principal amount of such Certificated Note or the interest to be so exchanged for an interest in the applicable Global Note.  Until so exchanged in full, such Global Note shall in all respects be entitled to the same benefits under this Indenture as the Notes authenticated and delivered hereunder.

(j)    None of the Trustee or any Agent shall have any responsibility or obligation to any beneficial owner of an interest in a Global Note, a member of, or a participant in, the Depositary or other Person with respect to the accuracy of the records of the Depositary or its nominee or of any participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any participant, member, beneficial owner or other person (other than the depositary) of any notice (including any notice of redemption) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes.  All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the depositary or its nominee in the case of a Global Note).  The rights of beneficial owners in any Global Note shall be exercised only through the Depositary subject to the applicable rules and procedures of depositary.  The Trustee and each Agent may rely and shall be fully protected in relying upon information furnished by the depositary with respect to its members, participants and any beneficial owners.

(k)    Neither the Trustee nor any Agent shall have any obligation or duty to monitor, determine or inquire as to compliance with any tax or securities laws with respect to any restrictions on transfer imposed under this Indenture or under applicable law (including any transfers between or among Depositary participants, members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

SECTION 2.8.    <u>Replacement Notes</u>.  If any Note at any time becomes mutilated, defaced, destroyed, stolen or lost, such Note may be replaced at the cost of the applicant (including reasonable legal fees of the Issuer, the Trustee, the Transfer Agents, the Registrar and the Paying Agents) at the office of the Trustee or any Transfer Agent, upon provision of, in the case of destroyed, stolen or lost Notes, evidence satisfactory to the Trustee and the Issuer that such Note was destroyed, stolen or lost, together with such indemnity as the Trustee and the

- 20 -

Issuer may require.  Mutilated or defaced Notes must be surrendered before replacements shall be issued.

Each Note authenticated and delivered in exchange for or in lieu of any such Note shall carry rights to accrued and unpaid interest and to interest to accrue equivalent to the rights that were carried by such Note before such Note was mutilated, defaced, destroyed, stolen or lost.

Every replacement Note is an additional obligation of the Issuer and shall be entitled to the benefits under this Indenture.

SECTION 2.9.   Temporary Notes.  Subject to the provisions of Section 2.7(a), until Certificated Notes are ready for delivery, the Issuer may prepare and the Trustee shall authenticate temporary Notes.  Temporary Notes shall be substantially in the form of permanent Notes but may have variations that the Issuer considers appropriate for temporary Notes. Without unreasonable delay, the Issuer shall prepare and the Trustee shall authenticate permanent Notes and deliver them in exchange for temporary Notes at the office or agency of the Issuer or the Trustee, without charge to the Holder.  Until so exchanged, the temporary Notes shall be entitled to the same benefits under this Indenture as permanent Notes.

SECTION 2.10.   Persons Deemed Owners.  Prior to the presentment of a Note for registration of transfer, the Issuer, the Trustee and any agent of the Issuer or the Trustee may treat the Person in whose name such Note is registered as the owner of such Note for the purpose of receiving payment of principal of and premium, if any, and, subject to Sections 2.5(d) and 2.12, interest on such Notes and for all other purposes whatsoever, whether or not such Note be overdue and regardless of any notice of ownership, trust or any interest in it, writing on, or theft or loss of, the definitive Note issued in respect of it, and none of the Issuer, the Trustee, any Agent or any of their respective agents shall be affected by notice to the contrary.

SECTION 2.11.   Cancellation.  The Issuer at any time may deliver Notes to the Trustee for cancellation.  The Transfer Agents, the Registrar and the Paying Agents shall forward to the Trustee any Notes surrendered to them for transfer, exchange or payment.  The Trustee and no one else shall cancel and the Trustee shall destroy in accordance with its customary procedures (subject to the record-retention requirements of the Exchange Act) all Notes surrendered for transfer, exchange, payment or cancellation and, if so requested by the Issuer in writing, deliver a certificate of such destruction to the Issuer, unless the Issuer directs the Trustee in writing to deliver cancelled Notes to the Issuer.

SECTION 2.12.   Defaulted Interest.  If the Issuer defaults in a payment of interest on the Notes, the Issuer shall pay the defaulted interest (plus interest on such defaulted interest at the rate specified in Section 4.1 to the extent lawful) in any lawful manner not inconsistent with the requirements of any stock exchange on which the Notes may be listed, and upon such notice as may be required by such exchange, if, after written notice given by the Issuer to the Trustee of the proposed payment pursuant to this Section 2.12, such manner of payment shall be deemed practicable by the Trustee.

- 21 -

The Issuer may pay the defaulted interest to the Persons who are Holders on a subsequent special record date, which date shall be at least five Business Days prior to the Payment Date of such defaulted interest. The Issuer shall fix or cause to be fixed any such special record date and Payment Date, and, at least 15 days before any such special record date, the Issuer shall deliver to each Holder, with a copy to the Trustee, a notice that states the special record date, the Payment Date and the amount of defaulted interest to be paid.

SECTION 2.13. <u>CUSIP and ISIN Numbers</u>. The Issuer in issuing the Notes may use CUSIP and ISIN numbers (if then generally in use) and, if so, the Trustee shall use CUSIP and ISIN numbers in notices as a convenience to Holders; *provided, however,* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice and that reliance may be placed only on the other identification numbers printed on the Notes, and any such notice shall not be affected by any defect in or omission of such numbers. The Issuer shall promptly notify the Trustee in writing of any change in CUSIP and ISIN numbers.

SECTION 2.14. <u>Open Market Purchases</u>. The Issuer or any of their Affiliates may at any time purchase Notes in the open market or otherwise at any price. All Notes so purchased and Notes that have been redeemed (i) may not be resold, except in compliance with applicable requirements or exemptions under any relevant securities and other laws and (ii) at the option of the Issuer, may be delivered to the Trustee for cancellation or remain Outstanding.

# ARTICLE III

# **REDEMPTION**

SECTION 3.1. <u>Right of Redemption</u>.

(a) Except as described in this Section 3.1, Section 3.8 and Paragraph 9 of the Notes, the Notes may not be redeemed prior to their Stated Maturity.

(b) The Notes shall be redeemable, at the option of the Issuer or any successor, in whole, but not in part, upon giving not less than 30 days' nor more than 60 days' notice to the Holders at any time, at 100% of the principal amount thereof, plus accrued and unpaid interest thereon, to, but excluding, the Redemption Date, if , as a result of any change in, expiration of or amendment to the laws of the Issuer Jurisdiction (or of any political subdivision or taxing authority thereof or therein) or any regulations or rulings promulgated thereunder or any change in the official interpretation or official application of such laws, regulations or rulings, or any change in the official application or interpretation of, or any execution of or amendment to, any treaty or treaties affecting taxation to which the Issuer Jurisdiction (or such political subdivision or taxing authority) is a party, which change, amendment, expiration or treaty becomes effective on or after October 31, 2012, the Issuer is or would be obligated on the next succeeding due date for a payment with respect to the Notes to pay Additional Amounts in excess of those attributable to Brazilian withholding tax on the basis of a statutory rate of 15%, and such obligation cannot be avoided by the use of

- 22 -

reasonable measures available to the Issuer; *provided, however,* (i) no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer or any successor, as the case may be, would be obligated to pay such Additional Amounts and (ii) at the time such notice of redemption is given, such obligation to pay such Additional Amounts remains in effect.

Prior to giving any notice of redemption pursuant to the preceding paragraph, the Issuer or any successor shall deliver to the Trustee an Officer's Certificate stating that the Issuer is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of redemption have occurred. The Trustee shall accept such certificate as sufficient evidence of the satisfaction of the conditions precedent set forth in clauses (i) and (ii) of the preceding paragraph of this Section 3.1(b), in which event it shall be conclusive and binding on the Holders.

(c) The Notes shall be redeemable, at the option of the Issuer, in whole or in part, at any time, and from time to time, upon giving not less than 30 nor more than 60 days' notice to the Holders at the Redemption Price and on the terms and conditions, described in Paragraph 9(c) of the Notes.

SECTION 3.2. <u>Applicability of Article</u>. Redemption of Notes at the option of the Issuer, as permitted by Section 3.1 or required by any provision of this Indenture, shall be made in accordance with such provision and this Article III.

SECTION 3.3. <u>Election to Redeem; Notice to Trustee</u>. The election of the Issuer to redeem the Notes pursuant to Section 3.1(b) or Section 3.1(c) shall be evidenced by a Board Resolution. In case of any redemption of Notes at the election of the Issuer, the Issuer shall notify the Trustee in writing of such Redemption Date and the aggregate principal amount of Notes to be redeemed at least 15 days prior to the date notice of redemption shall be given to the Holders (unless a shorter notice period shall be satisfactory to the Trustee), which notice shall be revocable at any time prior to the date on which the notice to the Holders referred to in Section 3.1(b) or Section 3.1(c) has been given.

SECTION 3.4. <u>Notice of Redemption by the Issuer</u>. The Issuer shall give a notice of redemption to each Holder of any Note to be redeemed and the Trustee in accordance with Section 11.2 at least 30 days but not more than 60 days before the Redemption Date.

The notice shall state:

(i) the Redemption Date;

(ii) the Redemption Price;

(iii) the name and address of each Paying Agent;

(iv) the paragraph of the Notes pursuant to which the Notes called for redemption are being redeemed;

(v) the CUSIP or ISIN number of the Notes, if any; and

- 23 -

(vi)    that no representation is made as to the correctness or accuracy of the CUSIP or ISIN number, if any, listed in such notice or printed on the Notes.

At the Issuer's election and at its request, made in writing to the Trustee at least five Business Days before notice is to be given to the Holders, the Trustee shall give the notice of redemption in the Issuer's name and at the Issuer's expense; *provided* that the Issuer shall deliver to the Trustee, at least five Business Days prior to the date in which notice is to be given to the Holders, an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph; *provided further* that if the Issuer revokes the notice to the Trustee required by Section 3.3 in accordance with Section 3.3 prior to the Trustee's delivering of notice to the Holders, the Trustee will not deliver such notice of redemption.

SECTION 3.5.    <u>Selection of Notes to Be Redeemed in Part</u>.

(a)    In the event that less than all of the Notes are to be redeemed at any time, selection of Notes for redemption will be made by the Trustee by such method as the Trustee shall deem fair and appropriate (or, in the case of Notes issued in global form, based on the applicable procedures of DTC, Euroclear or Clearstream, as applicable).  If Notes are redeemed in part, the remaining outstanding amount of any Note must be at least equal to US$200,000 and be an integral multiple of US$1,000.  The Trustee shall make the selection from the Outstanding Notes not previously called for redemption.  The Trustee shall promptly notify the Issuer in writing of the Notes selected for redemption and, in the case of any Notes selected for partial redemption, the principal amount of the Notes to be redeemed.  In the event of a partial redemption by lot, the Trustee shall select the particular Notes to be redeemed not less than 30 days nor more than 60 days prior to the relevant Redemption Date from the Outstanding Notes not previously called for redemption.  The Trustee may select for redemption portions (equal to U.S.$200,000 or integral multiples of U.S.$1,000 in excess thereof) of the principal of Notes that have denominations larger than U.S.$1,000.

(b)    For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to redemption of Notes shall relate, in the case of any Note redeemed or to be redeemed only in part, to the portion of the principal amount of that Note which has been or is to be redeemed.

SECTION 3.6.    <u>Deposit of Redemption Price</u>.  By 10:00 a.m. (New York City time), no later than one Business Day prior to the Redemption Date, the Issuer shall deposit with the Principal Paying Agent money sufficient to pay the Redemption Price of and accrued and unpaid interest on the Notes to be redeemed other than Notes that have been delivered by the Issuer to the Trustee for cancellation at least five Business Days prior to the Redemption Date.  The Issuer shall request that the bank through which such deposit is to be made agree to supply to the Principal Paying Agent by 10:00 a.m. (New York City time) two Business Days prior to such Redemption Date an irrevocable confirmation (by tested telex) of its intention to make such deposit.

SECTION 3.7.    <u>Effect of Notice of Redemption</u>.  Notice of redemption having been given as aforesaid, the Notes to be redeemed shall, on the Redemption Date, become due

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 56 of 189

and payable at the applicable Redemption Price (together with accrued and unpaid interest, if any, to the Redemption Date), and from and after such date (except in the event of a default in the payment of the Redemption Price and accrued and unpaid interest) such Notes shall cease to bear interest.  Upon surrender of any such Note to a Paying Agent for redemption in accordance with such notice, such Note shall be paid by the Issuer at the Redemption Price, plus accrued and unpaid interest, if any, to the Redemption Date; *provided, however,* that installments of interest whose Payment Date is on or prior to the Redemption Date shall be payable to the Holders of such Notes registered as such at the close of business on the relevant Record Dates according to their terms.

If any Note to be redeemed shall not be so paid upon surrender thereof in accordance with the Issuer's instructions for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Notes.

SECTION 3.8.   Change of Control.

(a)   If a Change of Control Repurchase Event occurs, unless the Issuer has exercised its option to redeem the Notes under Section 3.1 or Paragraph 9 of the Notes, the Issuer shall make an offer to each Holder of Notes to repurchase all or any part of that Holder's Notes pursuant to the offer described below (the "Offer to Purchase") at a price in cash (the "Offer to Purchase Payment") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon to, but not including, the Offer to Purchase Payment Date. Within 30 days following any Change of Control Repurchase Event or, at the option of the Issuer, prior to any Change of Control, but after the public announcement of the Change of Control, the Issuer will give notice to each Holder (with a copy to the Trustee) in accordance with Section 11.2 with the following information:

(i)   description of the transaction or transactions that constitute or may constitute the Change of Control Repurchase Event;

(ii)   if given prior to the date of consummation of the Change of Control, a statement that that the offer to purchase is conditioned on a Change of Control Repurchase Event occurring on or prior to the payment date specified in the notice;

(iii)   information concerning the business of the Issuer and its Subsidiaries which the Issuer believes will enable the Holders to make an informed decision with respect to the Offer to Purchase;

(iv)   that an Offer to Purchase is being made pursuant to this Section 3.8 and that all Notes properly tendered pursuant to such Offer to Purchase will be accepted for payment;

(v)   that a Holder may tender all or any portion of its Notes pursuant to such Offer to Purchase, subject to the requirement if a Holder tenders only a portion of its Notes, the remaining Notes must be no less than U.S.$200,000 in principal amount and integral multiples of U.S.$1,000 in excess thereof;

- 25 -

(vi)    the purchase price, the expiration date (the "Expiration Date") of the Offer to Purchase, which will be no less than 30 days nor more than 60 days after the date such notice is given, and the purchase date, which will be no less than five Business Days after the Expiration Date (the "Offer to Purchase Payment Date");

(vii)    any Note not properly tendered will remain Outstanding and continue to accrue interest;

(viii)    unless the Issuer defaults in the payment of the Offer to Purchase Payment, all Notes accepted for payment pursuant to the Offer to Purchase will cease to accrue interest on the Offer to Purchase Payment Date;

(ix)    Holders electing to have any Notes purchased pursuant to an Offer to Purchase will be required to surrender the Notes, together with a duly executed letter of transmittal properly completed in accordance with the instructions thereto, to the Paying Agent specified in such notice at the address specified in such notice prior to the close of business on the Expiration Date;

(x)    Holders shall be entitled to withdraw their tendered Notes and their election to require the Issuer to purchase such Notes; *provided* that such Paying Agent receives, not later than the close of business on the Expiration Date, a withdrawal request completed in accordance with the instructions thereto setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased; and

(xi)    that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered; *provided* that each such new Note will be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.

If a notice is given in a manner provided in this Section 3.8 and any Holder fails to receive such notice or a Holder receives such notice but it is defective, such Holder's failure to receive such notice or such defect shall not affect the validity of the Offer to Purchase as to all other Holders that properly received such notice without defect.

(b)    On the Business Day prior to the Offer to Purchase Payment Date, the Issuer shall, to the extent lawful, deposit an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof properly tendered with a Paying Agent;

(c)    On the Offer to Purchase Payment Date following a Change of Control Repurchase Event, the Issuer shall, to the extent lawful:

(i)    accept for payment all Notes or portions of Notes properly tendered and not withdrawn pursuant to the Offer to Purchase; and

(ii)     deliver, or cause to be delivered, to the Trustee for cancellation the Notes properly accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

(d)     The Paying Agent shall promptly mail to each Holder the Offer to Purchase Payment for its Notes that have been accepted for payment in the Offer to Purchase, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; *provided* that each such new Note will be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.

(e)     Notwithstanding Section 3.8(a) or Paragraph 9(e) of the Notes, the Issuer shall not be required to make an Offer to Purchase upon a Change of Control Repurchase Event if (i) a third party makes an offer to purchase in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 3.8 applicable to an Offer to Purchase made by the Issuer and such third party purchases all Notes properly tendered and not withdrawn under such offer, or (ii) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.4, unless and until there is a default in payment of the applicable Redemption Price.  Notwithstanding anything to the contrary contained herein or in the Notes, an Offer to Purchase may be made in advance of a Change of Control Repurchase Event, conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(f)     The Issuer will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 3.8 or Paragraph 9(e) of the Notes by virtue thereof.

## ARTICLE IV

## <u>COVENANTS</u>

SECTION 4.1.   <u>Payment of Principal, Premium and Interest Under the Notes</u>. The Issuer shall punctually pay the principal of and premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes.  By 10:00 a.m. (New York City time), no later than one Business Day prior to any Payment Date, the Issuer shall irrevocably deposit with the Principal Paying Agent in immediately available funds a sum sufficient to pay the principal, premium, if any, and interest becoming due on such Payment Date.

The Issuer shall pay interest on overdue principal and premium, if any, at the rate borne by the Notes plus 1% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

No interest shall be payable hereunder in excess of the maximum rate permitted by applicable law; *provided*, *however*, that neither the Trustee nor any Paying Agent shall be

liable or responsible for determining whether the interest payable hereunder exceeds the maximum rate permitted by applicable law.

SECTION 4.2.   Maintenance of Office or Agency.  The Issuer shall maintain in each place of payment for the Notes an office or agency where Notes may be presented or surrendered for payment and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture (other than the type contemplated by Section 11.10) may be served. The Corporate Trust Office of the Trustee shall be such office or agency of the Issuer, unless the Issuer shall designate and maintain some other office or agency for one or more of such purposes.  The Issuer shall give prompt written notice to the Trustee of any change in the location of any such office or agency.  If at any time the Issuer shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee, and the Issuer hereby appoints the Trustee as its agent to receive all such presentations, surrenders, notices and demands.

SECTION 4.3.   Money for Note Payments to Be Held in Trust.  If the Issuer shall at any time act as its own Paying Agent, it shall, on the Business Day prior to each Payment Date on any of the Notes, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal or premium, if any, or interest so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided and shall promptly notify the Trustee of its action or failure so to act.

Each Paying Agent, subject to the provisions of this Section 4.3, shall:

(i)    hold all sums held by it for the payment of the principal of or premium, if any, or interest on Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein; *provided, however*, such sums need not be segregated from other funds held by it, except as required by law;

(ii)    give the Trustee written notice of any default by the Issuer (or any other obligor upon the Notes) in the making of any payment of principal, premium, if any, or interest; and

(iii)    at any time during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Issuer shall cause each Paying Agent (other than the Trustee) not a party to this Indenture to execute and deliver an instrument in which such Paying Agent shall agree with the Trustee to act as a Paying Agent in accordance with this Section 4.3.

The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Issuer or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Issuer or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such sums.

- 28 -

Subject to applicable law, any money deposited with the Trustee or any Paying Agent, or then held by the Issuer, in trust for the payment of the principal of or premium, if any, or interest on any Note and remaining unclaimed for two years after such principal, premium, if any, or interest has become due and payable shall be paid to the Issuer at the written request of the Issuer and subject to any relevant unclaimed property laws and regulations, or (if then held by the Issuer) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Issuer as trustee thereof, shall thereupon cease; *provided, however,* that the Trustee or such Paying Agent, before being required to make any such repayment, shall, upon written request and at the expense of the Issuer, cause to be published once, in a newspaper published in the English language, customarily published at least five days a week and of general circulation in (i) the Borough of Manhattan in The City of New York and (ii) so long as the Notes continue to be listed on the Luxembourg Stock Exchange, a newspaper having general circulation in Luxembourg, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining shall be repaid to the Issuer.

SECTION 4.4.   <u>Maintenance of Corporate Existence</u>.  The Issuer shall, and shall cause each of its Significant Subsidiaries to, (i) maintain in effect its corporate existence and all registrations necessary therefor; *provided* that these restrictions shall not prohibit any transactions permitted by Article V or the merger of any Significant Subsidiary with or into the Issuer or with or into any other Wholly-Owned Subsidiary of the Issuer; (ii) take all reasonable actions to maintain all rights, privileges, titles to property, franchises and the like necessary or desirable in the normal conduct of its business, activities or operations; and (iii) maintain or cause to be maintained in good repair, working order and condition (normal wear and tear excepted) all properties used or useful in their business; *provided, however,* that neither the Issuer nor its Subsidiaries shall be prevented from dissolving one or more Subsidiaries, discontinuing those operations or suspending the maintenance of those properties which, in the reasonable judgment of the Issuer as evidenced by a Board Resolution, are no longer necessary or useful in the conduct of the Issuer's business, or that of its Subsidiaries; and *provided, further,* that such dissolution or discontinuation of operations or maintenance shall not be disadvantageous to the Holders of the Notes.

SECTION 4.5.   <u>Payment of Additional Amounts</u>.

(a)     All payments by the Issuer in respect of the Notes shall be made without withholding or deduction for or on account of any and all present or future Taxes by or for the account of the applicable Issuer Jurisdiction, unless such withholding or deduction is required by law.  If the Issuer is required by the applicable Issuer Jurisdiction to deduct or withhold Taxes, the Issuer will pay to a Holder of a Note or the beneficial owner thereof such additional amounts ("Additional Amounts") as may be necessary so that the net amount received by such Holder or beneficial owner will not be less than the amount such Holder or beneficial owner would have received if such Taxes had not been withheld or deducted; *provided, however*, that the Issuer shall not be required to pay any Additional Amounts for or on account of:

- 29 -

(i)     any Taxes that would not have been so imposed, assessed, levied or collected but for the fact that the Holder of the Note (or a fiduciary, settlor, beneficiary, member or shareholder of, or possessor of a power over, such Holder, if such Holder is an estate, trust, partnership or corporation) is or has been a domiciliary, national or resident of, or engaging or having been engaged in a trade or business or maintaining or having maintained a permanent establishment or being or having been physically present in the jurisdiction in which such Taxes have been imposed, assessed, levied or collected or otherwise having or having had some connection with such jurisdiction, other than the mere holding or ownership of, or the collection of principal of, and interest on a Note;

(ii)     any Taxes that would not have been so imposed, assessed, levied or collected but for the fact that, where presentation is required in order to receive payment, the Note was presented more than 30 days after the date on which such payment became due and payable or was provided for, whichever is later, except to the extent that the Holder or beneficial owner thereof would have been entitled to Additional Amounts had the Note been presented for payment on any day during such 30-day period;

(iii)     any Taxes that would not have been so imposed, assessed, levied or collected but for the failure by the Holder or the beneficial owner of the Note to comply (following a written request addressed to the Holder or beneficial owner, as applicable), with any certification, identification or other reporting requirements concerning the nationality, residence or identity of such Holder or beneficial owner or its connection with the applicable Issuer Jurisdiction if compliance is required by statute, regulation or administrative practice of such Issuer Jurisdiction as a condition to relief or exemption from such Taxes;

(iv)     any estate, inheritance, gift, sales, transfer, excise, personal property or similar Taxes;

(v)     any withholding or deduction imposed on a payment to or for the benefit of an individual that is required to be made pursuant to European Union Directive 2003/48/EC, any law implementing this Directive or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings, or any law implementing or complying with, or introduced in order to conform to, such Directive;

(vi)     any withholding or deduction that is imposed on the Note that is presented for payment, where presentation is required, by or on behalf of a Holder who would have been able to avoid such withholding or deduction by presenting such Note to another Paying Agent in a member state of the European Union;

(vii)     any Taxes that are payable otherwise than by deduction or withholding from payments on or in respect of the Note; or

(viii)     any combination of the above.

(b)     The Issuer will also pay any present or future stamp, court or documentary taxes or any other excise taxes, charges or similar levies which arise in any

- 30 -

jurisdiction from or through which payment is made or on behalf of the Issuer (including the jurisdiction of any Paying Agent) on the execution, delivery, registrations, or the making of payments in respect of the Notes and the Indenture, excluding any such taxes, charges or similar levies imposed by any jurisdiction outside of any Issuer Jurisdiction.

(c)   No Additional Amounts shall be paid in respect of any payment in respect of the Notes to any Holder or beneficial owner of the Notes that is a fiduciary, a partnership, a limited liability company or any person other than the sole beneficial owner of such payment to the extent such payment would be required by the laws of the Issuer Jurisdiction to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary, a member of such partnership, an interest holder in such limited liability company or a beneficial owner that would not have been entitled to such amounts had such beneficiary, settlor, member, interest holder or beneficial owner been the Holder of such Notes.

(d)   If requested in writing by the Trustee, the Issuer shall use reasonable efforts to obtain certified copies of tax receipts evidencing the payment of any Taxes so withheld or deducted from the Issuer Jurisdiction's taxing authority imposing such tax, and if certified copies are unavailable, the Issuer shall use reasonable efforts to obtain other evidence satisfactory to the Trustee, and the Trustee shall make such certified copies or other evidence available to the Holders or the Paying Agents, upon request to the Trustee.

(e)   The Issuer shall:

(i)   at least seven Business Days prior to the first Payment Date (and at least seven Business Days prior to each succeeding Payment Date if there has been any change with respect to the matters set forth in the below-mentioned Officer's Certificate), deliver to the Trustee and each Paying Agent an Officer's Certificate (A) specifying the amount, if any, of taxes described in this Section 4.5 (the "Relevant Withholding Taxes") required to be deducted or withheld on the payment of principal of or premium, if any, or interest on the Notes to Holders and the Additional Amounts, if any, due to Holders in connection with such payment, and (B) certifying that the Issuer shall pay such deduction or withholding;

(ii)   prior to the due date for the payment thereof, pay any such Relevant Withholding Taxes, together with any penalties or interest applicable thereto; and

(iii)   pay any Additional Amounts due to Holders on any Payment Date, to the Trustee or Principal Paying Agent in accordance with the provisions of this Section 4.5.

(f)   The Issuer shall indemnify each of the Trustee and the Paying Agents for, and hold each of them harmless for, from and against, any loss, liability, damage, cost, claim or expense reasonably incurred without gross negligence, bad faith or willful misconduct on such Person's part, arising out of or in connection with actions taken or omitted by any of them in reliance on any Officer's Certificate furnished pursuant to this Section 4.5 or the failure of the Trustee or any Paying Agent for any reason to receive on a timely basis any such Officer's Certificate or any information or documentation requested by it or otherwise required by applicable law or regulations to be obtained, furnished or filed in respect of such Relevant

Withholding Taxes.  The Issuer shall make available to any Holder requesting the same (within a reasonable period of time), evidence that the applicable Relevant Withholding Taxes have been paid.

SECTION 4.6.   Reporting Requirements.

So long as any Notes are Outstanding, the Issuer shall provide the Trustee with the following reports for delivery to Holders upon their written request therefor:

(a)    an English language translation of its annual audited consolidated financial statements prepared in accordance with GAAP within 150 days after the close of each fiscal year (ending December 31 or such other fiscal year end date as adopted and notified to the Trustee by the Issuer);

(b)    an English language translation of its unaudited half-year financial statements prepared in accordance with GAAP, within 60 days after the close of the first semester of its fiscal year;

(c)    simultaneously with the delivery of each set of financial statements referred to in Section 4.6(a) and (b), an Officer's Certificate stating whether, to the knowledge of the Officer or Officers executing such Officer's Certificate, a Default or Event of Default exists on the date of such certificate and, if a Default or Event of Default exists, setting forth the details thereof and the action which the Issuer is taking or proposes to take with respect thereto; and

(d)    within five Business Days after any director or executive officer of the Issuer becomes aware of the existence of a Default or Event of Default, an Officer's Certificate setting forth the details thereof and the action which the Issuer is taking or proposes to take with respect thereto.

The above reports may be delivered by the Issuer to the Trustee in physical or electronic form, as determined by the Issuer.  If the Issuer files the reports described in clauses (a) or (b) above or makes such reports available on its website, it will be deemed to have satisfied the reporting requirement set forth in such applicable clause upon written notice thereof the Trustee.  The Trustee shall have no obligation to determine if and when the Issuer's information is available on any website.

Delivery of the above reports (other than the certificates required by Section 4.6(c) and (d)) to the Trustee is for informational purposes only and the Trustee's receipt of such reports shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the compliance of the Issuer with any of its covenants in this Indenture (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

SECTION 4.7.   Available Information.  For so long as any Notes remain outstanding and are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, the Issuer will, during any period in which it is neither subject to Section 13 or 15(d) of the Exchange Act, nor exempt from reporting pursuant to Rule 12g3-2(b) under the

- 32 -

Case 1:20-cv-08206-JPC Document 1-1 Filed 10/02/20 Page 64 of 189

Exchange Act, make available to any registered Holder of Notes (or any beneficial owner of a book-entry interest in such Notes designated by the registered Holder thereof) in connection with any sale thereof and to any prospective purchaser of Notes or a book-entry interest in Notes designated by such registered Holder, in each case upon request of such registered Holder, the information specified in, and meeting the requirements of, Rule 144A(d)(4) under the Securities Act.

SECTION 4.8.  Limitation on Mortgages.  For so long as the Notes remain Outstanding hereunder, the Issuer shall not, and shall not permit any Restricted Subsidiary to, create, incur, issue or assume any guarantee or any Mortgage on or over any Principal Property now owned or hereafter acquired by the Issuer or a Restricted Subsidiary to secure any Indebtedness of the Issuer or any Restricted Subsidiary, or on shares of stock or Indebtedness of any Restricted Subsidiary now owned or hereafter acquired by the Issuer or a Restricted Subsidiary to secure any Indebtedness of the Issuer or any Restricted Subsidiary, unless at the time thereof or prior thereto the Notes then outstanding hereunder are secured equally and ratably with (or prior to) any and all such Indebtedness for so long as such Indebtedness is so secured by such Mortgage.  The preceding sentence shall not require the Issuer or any Subsidiary to equally and ratably secure the Notes if the Mortgage consists of the following permitted encumbrances:

(a)    any Mortgage on property, shares of stock or Indebtedness of any Person existing at the time such Person becomes a Restricted Subsidiary or (b) created, incurred, issued or assumed in connection with the acquisition of any such Person; *provided* that such Mortgage is not created, incurred or assumed on such Person in connection with, or in contemplation of, such acquisition by the Issuer or any Restricted Subsidiary; and provided that the maximum sum secured by such Mortgage shall not exceed the purchase price of such Person or the Indebtedness incurred solely for the purpose of financing the acquisition of such Person;

(i)    any Mortgage on any Principal Property created, incurred, issued or assumed at or prior to the time such property became a Principal Property or existing at the time of acquisition of such Principal Property by the Issuer or a Restricted Subsidiary, whether or not assumed by the Issuer or such Restricted Subsidiary; *provided* that no such Mortgage will extend to any other Principal Property of the Issuer or any Restricted Subsidiary;

(ii)    any Mortgage on all or any part of any Principal Property (including any improvements or additions to improvements on a Principal Property) hereafter acquired, developed, expanded or constructed by the Issuer or any Restricted Subsidiary to secure the payment of all or any part of the purchase price, cost of acquisition or cost of development, expansion or construction of such Principal Property or of improvements or additions to improvements thereon (or to secure any Indebtedness incurred by the Issuer or a Restricted Subsidiary for the purpose of financing all or any part of the purchase price, cost of acquisition or cost of development, expansion or construction thereof or of improvements or additions to improvements thereon) created prior to, at the time of, or within 360 days after the later of, the acquisition, development, expansion or completion of construction (including construction of improvements or additions to improvements thereon), or commencement of full operation of such Principal Property; *provided* that no

- 33 -

such Mortgage will extend to any other Principal Property of the Issuer or a Restricted Subsidiary other than, in the case of any such construction, improvement, development, expansion or addition to improvement, all or any part of any other Principal Property on which the Principal Property so constructed, developed or expanded, or the improvement or addition to improvement, is located;

(iii)   any Mortgage on any Principal Property of any Restricted Subsidiary to secure Indebtedness owing by it to the Issuer or another Restricted Subsidiary;

(iv)   any Mortgage on any Principal Property of the Issuer to secure Indebtedness owing by it to a Restricted Subsidiary;

(v)   any Mortgage on any Principal Property or other assets of the Issuer or any Restricted Subsidiary existing on the date of the Indenture;

(vi)   arising in the ordinary course of business in connection with the financing, export, import or other trade transactions to secure Indebtedness of the Issuer;

(vii)   any Mortgage on any Principal Property arising by operation of law (or an agreement solely evidencing otherwise applicable law) and arising in the ordinary course of business;

(viii)   judgment Mortgages on any Principal Property not giving rise to an Event of Default; *provided* that the judgment such Mortgage secures shall not, within 90 days after the entry thereof, have been discharged or execution thereof stayed pending appeal, or shall not have been discharged within 90 days after the expiration of any such stay;

(ix)   any Mortgage granted upon or with regard to any present or future asset or property of the Issuer or any Restricted Subsidiary, directly or indirectly, to (i) any Brazilian governmental credit agency (including, but not limited to the Brazilian National Treasury, Banco Nacional de Desenvolvimento Econômico e Social, BNDES Participações S.A., Financiadora de Estudos e Projetos and Agência Especial de Financiamento Industrial); (ii) any Brazilian official financial institutions (including, but not limited to Banco da Amazônia S.A – BASA and Banco do Nordeste do Brasil S.A. – BNB); (iii) any non-Brazilian official export-import bank or official export-import credit insurer; or (iv) the International Finance Corporation or any non-Brazilian multilateral or government-sponsored agency;

(x)   any Mortgage on or over all or any part of the interest of the Issuer or any Restricted Subsidiary in any joint venture, partnership or similar undertaking that is not fully consolidated in the financial statements of the Issuer (and instead is proportionately consolidated because it is jointly controlled by the Issuer and/or its Restricted Subsidiaries, on the one hand, and such other persons, on the other), including the revenues and assets derived by the Issuer or any Restricted Subsidiary from such joint venture, partnership or similar undertaking, or employed by the Issuer or any Restricted Subsidiary in such joint venture, partnership or similar undertaking, which is in favor of its co-venturers and/or the manager or operator of the joint venture, partnership or similar

- 34 -

undertaking as security for the due payment of amounts payable under or incurred to finance the business of such joint venture, partnership or similar undertaking;

(xi)    Mortgages arising in connection with any Project Financing; provided that such Mortgage only extends to entities or properties (which may include existing entities or properties at any pre-existing entity or site selected for expansion) which are the subject of such Project Financing, to any revenues for such entities or properties, or to any proceeds from claims belonging to the Issuer or any of its subsidiaries which arise from the operation, failure to meet specifications, failure to complete, exploitation, sale or loss of, or damage to, such entity or property;

(xii)    any Mortgage on any Principal Property or other assets of the Issuer or any Restricted Subsidiary created for the sole purpose of extending, renewing, altering or refunding any of the foregoing Mortgages (or any successive extension, renewal, alteration or refunding thereof), *provided* that the Indebtedness secured thereby will not exceed the principal amount of Indebtedness so secured at the time of such extension, renewal, alteration or refunding, plus an amount necessary to pay fees and expenses, including premiums, related to such extensions, renewals, alterations or refundings, and that such extension, renewal, alteration or refunding Mortgage will be limited to all or any part of the same Principal Property and improvements and additions to improvements thereon and/or shares of stock and Indebtedness of a Restricted Subsidiary which secured the Mortgage extended, renewed, altered or refunded either of such property or shares of stock or Indebtedness;

(xiii)    Mortgages on any Principal Property subject to Sale and Leaseback Transactions permitted under clauses (1) and (3) of Section 4.9; or

(xiv)    any Mortgage on any Principal Property or on any shares of stock or Indebtedness of the Issuer or any Restricted Subsidiary created, incurred, issued or assumed to secure Indebtedness of the Issuer or any Restricted Subsidiary, which would otherwise be subject to the foregoing restrictions, in an aggregate amount which, together with the aggregate principal amount of other Indebtedness secured by Mortgages on any Principal Property or on any shares of stock or Indebtedness of the Issuer or any Restricted Subsidiary then outstanding (excluding Indebtedness secured by Mortgages permitted under the foregoing exceptions) and the Attributable Debt in respect of all Sale and Leaseback Transactions entered into after the date of the Indenture (not including Attributable Debt in respect of any such Sale and Leaseback Transactions permitted under clauses (1) and (3) of Section 4.9 would not then exceed the greater of US$500 million or 15% of Consolidated Net Tangible Assets of the Issuer.

For the avoidance of doubt, a Mortgage permitted by this Section 4.8 need not be permitted solely by reference to a single clause permitting such Mortgage, but may be permitted in part by such clause and in part by one or more other clauses of this covenant otherwise permitting such Mortgage.

SECTION 4.9.   Limitation on Sale and Leaseback Transactions.  For so long as any of the Notes are outstanding hereunder, the Issuer shall not, and it shall not permit any

- 35 -

Restricted Subsidiary to, enter into any Sale and Leaseback Transaction unless (1) such transaction involves a lease or right to possession or use for a temporary period not to exceed three years following such transaction, by the end of which it is intended that the use of such property by the lessee will be discontinued; (2) immediately prior to the entering into of such transaction, the Issuer or such Restricted Subsidiary could create a Mortgage on Principal Property subject to the Sale and Leaseback Transaction securing Indebtedness in an amount equal to the Attributable Debt with respect to the particular Sale and Leaseback Transaction; or (3) the proceeds of such transaction within 360 days after such transaction, are applied to either (A) the payment of all or any part of the purchase price, cost of acquisition, cost of development, cost of expansion or cost of construction of a Principal Property or cost of improvements or additions to improvements thereon or (B) the retirement of indebtedness ranking at least ratably with the Notes.

SECTION 4.10.   Waiver of Certain Covenants.  The Issuer may omit in any particular instance to comply with any term, provision or condition set forth in Sections 4.6(a), (b) and (c) or 4.8, if before or after the time for such compliance the Holders of at least a majority in principal amount of the Outstanding Notes, by Act of such Holders, waive such compliance in such instance with such term, provision or condition, or generally waive compliance with such term, provision or condition, but no such waiver shall extend to or affect such term, provision or condition except to the extent so expressly waived, and, until such waiver shall become effective, the obligations of the Issuer and the duties of the Trustee in respect of any such term, provisions or condition shall remain in full force and effect.  The Issuer will promptly notify the Trustee in writing of any such waiver or the revocation of any such waiver.

## ARTICLE V

## CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 5.1.   Limitation on Consolidation, Merger or Transfer of Assets.  For so long as any of the Notes are Outstanding hereunder, the Issuer may not consolidate with or merge (including by way of a scheme of arrangement) into or with any other Person, or, directly or indirectly, sell, convey, transfer or lease its properties and assets as an entirety or substantially as an entirety to any Person (other than a Person satisfying the condition set forth in clause (i), below, that is directly or indirectly wholly owned by the Issuer), unless:

(i)    if the Issuer is not the continuing entity, the successor Person expressly assumes or assumes by operation of law all of the Issuer's obligations under the Notes and hereunder;

(ii)    after giving effect to such transaction, no Event of Default (as defined below) and no event which, after notice or lapse of time or both, would become an Event of Default, will have happened and be continuing; and

(iii)    the Issuer shall have delivered to the Trustee an Officer's Certificate and Opinion of Counsel, each stating that such merger, consolidation or transfer of assets complies with this Indenture and all conditions precedent to such merger, consolidation or transfer of assets have been satisfied.

- 36 -

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 68 of 189

The Trustee shall be entitled to conclusively rely on and shall accept such Officer's Certificate and Opinion of Counsel as sufficient evidence of the satisfaction of the conditions precedent set forth in this Section 5.1, in which event it shall be conclusive and binding on the Holders.

SECTION 5.2.   Successor Substituted.   Upon any merger or consolidation involving the Issuer, or upon sales or conveyances of the respective properties of the Issuer as an entirety or substantially as an entirety in accordance with Section 5.1 if the Issuer is not the continuing entity, the obligations of the Issuer under the Notes shall be assumed by the Person formed by such merger or consolidation or which shall have acquired such property (except in the case of an acquisition of such property, for any such Person that meets the condition set forth in Section 5.1(i), above, that is directly or indirectly wholly owned by the Issuer) and upon such assumptions such Person shall succeed to and be substituted for the Issuer, as the case may be, and then the Issuer, as the case may be, will be relieved from all obligations under the Notes, as the case may be (other than those that by their terms survive).

## ARTICLE VI

## EVENTS OF DEFAULT AND REMEDIES

SECTION 6.1.   Events of Default.   The term "Event of Default" means, when used herein, any one of the following events:

(1) The Issuer defaults in the payment of any installment of interest (including applicable Additional Amounts) upon any Note as and when the same shall become due and payable, and continuance of such Default for 30 days;

(2) The Issuer defaults in the payment of all or any part of the principal of or premium on any Note as and when the same shall become due and payable either at its Stated Maturity, upon any redemption, by declaration or otherwise;

(3) The Issuer defaults in the performance or breach of any covenant of the Issuer in respect of the Notes or this Indenture (other than those described in paragraphs (1) and (2) above), and continuance of such Default or breach for a period of 60 days after there has been given a written notice, by registered or certified mail, to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% in principal amount of the Outstanding Notes affected thereby, specifying such default or breach and requiring it to be remedied and stating that such notice is a notice of default ("Notice of Default") hereunder;

(4) any present or future Indebtedness of the Issuer or any Significant Subsidiary, other than the Notes, for or in respect of moneys borrowed is declared due and payable prior to its Stated Maturity as the result of any Event of Default (howsoever described); *provided* that the aggregate amount of the relevant Indebtedness in respect of which the event mentioned in this paragraph will have occurred (which Indebtedness has not been repaid or paid and as to which such Default has not been cured or such acceleration has not been rescinded or annulled) exceeds US$75,000,000 or its equivalent;

- 37 -

(5) (a) the entry of a decree or order for relief in respect of the Issuer by a court having competent jurisdiction in an involuntary case under any applicable bankruptcy, insolvency, rehabilitation or other similar law in effect on the date of the Notes or thereafter, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Issuer or any substantial part of its Principal Property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

(b) the commencement by the Issuer of a voluntary case under any applicable bankruptcy, insolvency, rehabilitation or other similar law in effect on the date of the Notes or thereafter, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law or to the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Issuer or of any substantial part of its Principal Property, or the mailing by the Issuer of an assignment for the benefit of its creditors, or the admission by the Issuer in writing of inability to pay its debts generally as they become due, or the taking of corporate action by the Issuer in furtherance of any such action.

A Default under Section 6.1(3) is not an Event of Default until the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes notify the Issuer of the Default and the Issuer does not cure such Default within the time specified after receipt of such notice.

SECTION 6.2.   <u>Acceleration of Maturity, Rescission and Amendment</u>.  If an Event of Default (other than an Event of Default specified in Section 6.1(5) occurs and is continuing, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of, and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in writing to the Issuer (and to the Trustee, if the notice is given by the Holders), stating that such notice is an "acceleration notice," and upon any such declaration such amounts shall become due and payable immediately.  If an Event of Default specified in Section 6.1(5) occurs and is continuing, then the principal of and premium, if any, and accrued and unpaid interest on all Notes shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

At any time after a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this Article, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Issuer and the Trustee may waive Defaults, rescind or annul such declaration if:

(i)   the Issuer has paid or deposited with the Trustee a sum sufficient to pay (a) all overdue interest on Outstanding Notes, (b) all unpaid principal of and premium, if any, on the Notes that have become due otherwise than by such declaration of acceleration, (c) to the extent that payment of such interest on the Notes is lawful, interest on such overdue interest (including any Additional Amounts) as provided herein and (d) all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

- 38 -

(ii)    all Events of Default have been cured or waived as provided in Section 6.13 other than the nonpayment of principal that has become due solely because of acceleration.

No such rescission or annulment referred to in this Section 6.2 shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

SECTION 6.3.   <u>Collection Suit by Trustee</u>.  If an Event of Default specified in Section 6.1(1) or 6.1(2) occurs, the Trustee, in its own name as trustee of an express trust, (i) may institute a judicial proceeding for the collection of the whole amount then due and payable on such Notes for principal and premium, if any, and interest (including Additional Amounts), and interest on any overdue principal and premium, if any, and, to the extent that payment of such interest (including Additional Amounts) shall be legally enforceable, upon any overdue installment of interest (including Additional Amounts), at the rate borne by the Notes, and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, (ii) may prosecute such proceeding to judgment or final decree and (iii) may enforce the same against the Issuer or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Issuer or any other obligor upon the Notes, wherever situated.

If an Event of Default occurs and is continuing, the Trustee may proceed to protect and enforce its rights and the rights of the Holders by any available proceeding at law or in equity, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

SECTION 6.4.   <u>Other Remedies</u>.  If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of or premium, if any, or interest (including Additional Amounts) on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

SECTION 6.5.   <u>Trustee May Enforce Claims Without Possession of Notes</u>.  All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Trustee shall be brought in its own name and as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Notes in respect of which such judgment has been recovered.

SECTION 6.6.   <u>Application of Money Collected</u>.  Any money collected by the Trustee pursuant to this Article VI shall be applied in the following order:

FIRST: to the Trustee for amounts due to it hereunder (including under Section 7.6);

SECOND: to Holders for amounts due and unpaid on the Notes for principal and premium, if any, and interest (including Additional Amounts), ratably, without preference

or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest (including Additional Amounts), respectively; and

THIRD: to the Issuer.

The Trustee may fix a record date and Payment Date for any payment to Holders pursuant to this Section 6.6.  At least 15 days before such record date, the Trustee shall give to each Holder and the Issuer a notice that states the record date, the payment date and amount to be paid.

SECTION 6.7.  <u>Limitation on Suits</u>.  A Holder may not pursue any remedy with respect to this Indenture or the Notes unless:

(i)    the Holder has previously given to the Trustee written notice stating that an Event of Default has occurred and is continuing;

(ii)    the Holders of at least 25% in principal amount of the Outstanding Notes have made a written request to the Trustee to pursue the remedy in respect of such Event of Default;

(iii)    such Holder or Holders have offered and provided to the Trustee security or indemnity reasonably satisfactory to the Trustee against any cost, loss, liability or expense to be incurred in compliance with such request;

(iv)    the Trustee does not comply with the request within 60 days after receipt of the request and the offer and provision of security or indemnity; and

(v)    no direction inconsistent with such written request has been given to the Trustee during such 60-day period by the Holders of a majority in principal amount of the Notes Outstanding.

A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder.

SECTION 6.8.  <u>Rights of Holders to Receive Principal, Premium and Interest</u>. Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal of and premium, if any, and interest on the Notes held by such Holder, on or after the respective Payment Dates expressed in the Notes, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

SECTION 6.9.  <u>Restoration of Rights and Remedies</u>.  If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceeding, the Issuer, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and

- 40 -

remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

SECTION 6.10.    Trustee May File Proofs of Claim.  The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due to the trustee hereunder) and the Holders allowed in any judicial proceedings relative to the Issuer, its creditors or its respective properties and, unless prohibited by law, applicable regulations or internal policies, may vote on behalf of the Holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.6.  Nothing herein shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

SECTION 6.11.    Delay or Omission Not Waiver.  No delay or omission of the Trustee or of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article VI or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

SECTION 6.12.    Control by Holders.  The Holders of a majority in aggregate principal amount of the Outstanding Notes may direct in writing the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee.  However, the Trustee shall be under no obligation to exercise any of its rights or powers under this Indenture at the request or direction of the Holders if such request or direction conflicts with any law or with this Indenture or, subject to Section 7.1, if the Trustee determines it is unduly prejudicial to the rights of other Holders (it being understood that, subject to Sections 7.1 and 7.2, the Trustee shall have no duty to ascertain whether or not such actions or forbearance are unduly prejudicial to such Holders) or would involve the Trustee in personal liability or expense; provided, however, that the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such request or direction.  Prior to taking any action hereunder, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all costs, losses, liabilities and expenses caused by taking or not taking such action.

SECTION 6.13.    Waiver of Past Defaults and Events of Default.  Subject to Section 6.2, the Holders of a majority in principal amount of the Outstanding Notes by notice to the Trustee may waive an existing Default or Event of Default and its consequences except (i) a Default or Event of Default in the payment of the principal of or premium, if any, or interest on a Note or (ii) a Default or Event of Default in respect of a provision that under Section 9.2 cannot

- 41 -

be amended without the consent of each Holder affected.  The Holders of all Outstanding Notes by notice to the Trustee may waive any Default or Event of Default in respect of a provision that under Section 9.2 cannot be amended without the consent of each Holder affected.  When a Default or Event of Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any consequent right.

SECTION 6.14.   <u>Rights and Remedies Cumulative</u>.  Except as otherwise provided with respect to the replacement of mutilated, defaced, destroyed, lost or stolen Notes in Section 2.8, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 6.15.   <u>Waiver of Stay or Extension Laws</u>.  The Issuer covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture or the Notes; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

## ARTICLE VII

## TRUSTEE AND AGENTS

SECTION 7.1.   <u>Duties of Trustee</u>.

(a)   If an Event of Default has occurred and is continuing and a Responsible Officer has actual knowledge thereof, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(b)   Except during the continuance of an Event of Default, (i) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and (ii) in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  However, in the case of any certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of the mathematical calculations or other facts stated therein).

- 42 -

INDEX NO. 654214/2020
RECEIVED NYSCEF: 09/02/2020

(c)    The Trustee may not be relieved from liability for its own gross negligence, bad faith or willful misconduct, except that:

(i)    this Section 7.1(c) does not limit the effect of Section 7.1(b);

(ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Trustee was grossly negligent in ascertaining the pertinent facts; and

(iii)    the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.7 or exercising any trust or power conferred upon the Trustee under this Indenture.

(d)    Neither the Trustee nor any Paying Agent shall be liable for interest on any money received by it except as the Trustee or such Paying Agent may agree in writing with the Issuer.

(e)    Money held in trust by the Trustee or any Paying Agent need not be segregated from other funds except to the extent required by law.

(f)    No provision of this Indenture shall require the Trustee or any Agent to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds and/or adequate indemnity against such risk or liability is not satisfactorily assured to it.

(g)    Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.1.

SECTION 7.2.   Rights of Trustee and Agents.

(a)    The Trustee and each Agent may rely upon, and shall be protected in acting or refraining from acting based upon, any document believed by it to be genuine and to have been signed or presented by the proper Person.  Neither the Trustee nor any Agent need investigate any fact or matter stated in any such document.

(b)    Before the Trustee or any Agent acts or refrains from acting, it may require an Officer's Certificate, the written advice of a qualified tax expert or an Opinion of Counsel.  Neither the Trustee nor any Agent shall be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate, the qualified tax expert's written advice or the Opinion of Counsel.

(c)    The Trustee and each Agent may act through agents and shall not be responsible for the willful misconduct or negligence of any agent appointed with due care by it.

- 43 -

(d)    Any request, direction, order or demand of the Issuer mentioned herein shall be sufficiently evidenced by an Officer's Certificate of the Issuer, (unless other evidence in respect thereof be herein specifically prescribed); and any resolution of the Board of Directors of the Issuer shall be evidenced to the Trustee or any Agent by a Board Resolution.

(e)    The Trustee shall not be under any obligation to exercise any of the trusts or powers vested in it by this Indenture at the request, order or direction of any of the Holders pursuant to the provisions of this Indenture, unless such Holders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities that might be incurred thereby.

(f)    Neither the Trustee nor any Agent shall be liable for any action taken or omitted by it in good faith and believed by it to be authorized or within the discretion, rights or powers conferred upon it by this Indenture; *provided* that the conduct of the Trustee or such Agent does not constitute gross negligence or willful misconduct.

(g)    The Trustee and any Agent may consult with counsel, and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(h)    Neither the Trustee nor any Agent shall be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of Indebtedness or other paper or document unless (with respect to the Trustee) requested in writing by the Holders of not less than a majority in aggregate principal amount of the Notes Outstanding; *provided* that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not satisfactorily assured to the Trustee by the security afforded to it by the terms of this Indenture, the Trustee may require indemnity satisfactory against such expenses or liabilities as a condition to so proceeding.  The reasonable expenses of every such investigation shall be paid by the Issuer or, if paid by the Trustee, shall be reimbursed by the Issuer upon demand.

(i)    Neither the Trustee nor any Paying Agent shall be required to invest, or shall be under any liability for interest, on any moneys at any time received by it pursuant to any of the provisions of this Indenture or the Notes except as the Trustee or any Paying Agent may otherwise agree with the Issuer.  Such moneys need not be segregated from other funds except to the extent required by mandatory provisions of law.

(j)    In no event shall the Trustee or any Agent be liable for punitive, special, indirect or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee or such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

- 44 -

(k)    The permissive rights of the Trustee or any Agent enumerated herein shall not be construed as duties of the Trustee or such Agent, as applicable.

(l)    The Trustee may request that the Issuer deliver an Officer's Certificate setting forth the names and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any Officer authorized to sign an Officer's Certificate, including any Officer specified as so authorized in any such certificate previously delivered and not superseded.

(m)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, each Agent and to each other agent, custodian and other Person employed to act hereunder.

(n)    The Trustee shall not be responsible or have any liability for delays or failures in performance resulting from circumstances beyond its control.  Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes, terrorist attacks or other disasters.

(o)    Notwithstanding anything contained herein to the contrary, the Trustee shall have no duty or responsibility to monitor the ratings of the Notes or to determine if a Below Investment Grade Ratings Event has occurred.

SECTION 7.3.    Individual Rights of Trustee and Agents.  The Trustee and any Agent or any other agent of the Issuer or of the Trustee, in its individual or any other capacity, may deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee, Agent or such other agent.

SECTION 7.4.    Trustee's Disclaimer.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Issuer's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Issuer in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication.

SECTION 7.5.    Notice of Defaults and Events of Default.  If a Default or Event of Default occurs and is continuing, and if it is known to a Responsible Officer, the Trustee shall give to each Holder notice of the Default or Event of Default within 90 days after a Responsible Officer acquires actual knowledge of such Default or Event of Default.  Except in the case of a Default or Event of Default in payment of principal of or premium, if any, or interest on any Note, the Trustee may withhold the notice and shall be protected from withholding the notice if and so long as a committee of Responsible Officers of the Trustee in good faith determines that withholding the notice is in the interests of Holders.  For all purposes of this Indenture and the Notes, the Trustee shall not be deemed to have knowledge of a Default or Event of Default unless (i) a Responsible Officer of the Trustee has actual knowledge thereof, or (ii) written notice of such Default or Event of Default has been given to the Trustee by the Issuer or any Holder at

- 45 -

the Corporate Trust Office of the Trustee, and any such notice references the Notes and this Indenture by the Issuer.

SECTION 7.6.   <u>Compensation and Indemnity</u>.  The Issuer agrees to pay to the Trustee and each Agent from time to time such compensation as shall be agreed upon in writing for its services.  The Trustee's compensation shall not be limited by any law regarding compensation of a trustee of an express trust.  The Issuer agrees to reimburse promptly the Trustee and each Agent upon request for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services.  Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's and each Agent's agents, counsel, accountants and experts.  Payments of any such expenses by the Issuer to the Trustee or any Agent, as the case may be, shall be made free and clear of and without withholding or deduction for or on account of any Taxes, unless such withholding or deduction is required by law.  In that event, the Issuer shall pay to the Trustee or any Paying Agent, as the case may be, such Additional Amounts as may be necessary in order that every net payment made by the Issuer to the Trustee and any Paying Agent, as the case may be, after deducting or withholding for or on account of any Taxes shall not be less than the amount then due and payable to the Trustee or any Agent, as the case may be; *provided*, *however*, that the foregoing obligation to pay Additional Amounts shall not apply to or in respect of (i) any tax, assessment or other governmental charge which would not have been imposed but for the existence of any present or former connection between the Trustee or such Agent, on the one hand, and Brazil, on the other hand, other than the mere receipt of payments of such expenses; (ii) any tax, duty, assessment or other governmental charge to the extent that such tax, duty, assessment or other governmental charge would not have been imposed but for the failure of the Trustee or such Paying Agent to comply with any certification, identification or other reporting requirements concerning the nationality, residence, identity or connection with Brazil of the Trustee or such Paying Agent if such compliance is required or imposed by law as a precondition to exemption from all or a part of such tax, duty, assessment or other governmental charge; (iii) any tax, assessment or other governmental charge which is payable other than by deduction or withholding from payments of any such expenses; or (iv) any combination of the above.  The Issuer shall indemnify and hold harmless each of the Trustee and any Agent for, from and against any and all loss, liability, damage, cost, claim or expense (including reasonable attorneys' fees and expenses) incurred by it without gross negligence, bad faith or willful misconduct on its part arising out of and in connection with the administration of this Indenture, the performance of its respective duties hereunder and/or the exercise of its rights hereunder, including the costs and expenses of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture.  The Issuer undertakes to indemnify each of the Trustee and each Agent and its respective affiliates against all losses, liabilities, including any and all tax liabilities, which, for the avoidance of doubt, shall include both Brazilian and Japanese taxes and associated penalties, costs, claims, actions, damages, expenses or demands, which any of them may incur or which may be made against any of them as a result of or in connection with the appointment of or the exercise of the powers and duties by the Trustee or any Paying Agent or its affiliates under this Indenture except as may result from its own gross negligence, bad faith or willful misconduct.  For the avoidance of doubt, the obligation in the preceding two sentences to indemnify the Trustee and the Agents shall not apply to or in respect of taxes incurred as a result of the receipt by the Trustee or the Agents of

- 46 -

Case 1:20-cv-08206-JPC  Document 1-1  Filed 10/02/20  Page 78 of 189

compensation for their services. The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder. The Issuer will defend the claim and the Trustee, at its sole discretion, may have separate counsel and the Issuer will pay the reasonable fees and expenses of such counsel; *provided*, *however*, that the Trustee may only employ separate counsel at the expense of the Issuer if in the reasonable judgment of the Trustee (i) a conflict of interest or the potential for a conflict of interest exists by reason of common representation or (ii) there are legal defenses available to the Trustee that are different from or are in addition to those available to the Issuer or if all parties commonly represented do not agree as to the action (or inaction) of counsel. The Issuer will not be required to pay for any settlement made without its consent, which consent shall not be unreasonably withheld.

To secure the payment obligations of the Issuer in this Section 7.6, the Trustee and each Agent shall have a lien prior to the Notes on all money or property held or collected by the Trustee or any Agent, except that held in trust to pay principal of and premium, if any, and interest on particular Notes.

The obligations of the Issuer pursuant to this Section 7.6 shall survive the resignation or removal of the Trustee, the payment of the Notes and the satisfaction and discharge of this Indenture. When the Trustee or any Agent incurs expenses after the occurrence of a Default or Event of Default specified in Section 6.1(5), the expenses are intended to constitute expenses of administration under the Bankruptcy Law.

The Issuer acknowledges that the Trustee and the Paying Agents make no representations as to the interpretation or characterization of the transactions herein undertaken for tax or any other purpose, in any jurisdiction. The Issuer represents that it has fully satisfied itself as to any tax impact of this Indenture before agreeing to the terms herein, and is responsible for any and all federal, state, local, income, franchise, withholding, value added, sales, use, transfer, stamp or other taxes imposed by any jurisdiction in respect of this Indenture.

The Issuer agrees to pay any and all stamp and other documentary taxes or duties which may be payable in connection with the execution, delivery, performance and enforcement of this Indenture by the Trustee and/or any Agents.

SECTION 7.7. <u>Replacement of Trustee</u>. The Trustee may resign at any time by so notifying the Issuer in writing. The Holders of a majority in principal amount of the Outstanding Notes may remove the Trustee by so notifying the Trustee in writing and may appoint a successor Trustee. The Issuer shall remove the Trustee if:

(i)  the Trustee fails to comply with Section 7.9;

(ii)  the Trustee is adjudged a bankrupt or insolvent;

(iii)  a receiver or other public officer takes charge of the Trustee or its property; or

(iv)  the Trustee otherwise becomes incapable of acting.

- 47 -

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee) the Issuer shall promptly appoint a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer.  Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee shall mail a notice of its succession to Holders.  The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.6.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuer or the Holders of a majority in principal amount of the Outstanding Notes may, at the expense of the Issuer, petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 7.9, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

Notwithstanding the replacement of the Trustee pursuant to this Section 7.7, the Issuer's obligations under Section 7.6 shall continue for the benefit of the retiring Trustee.

SECTION 7.8.  <u>Successor Trustee by Merger</u>.  Any corporation or banking association into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation or banking association resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation or banking association to which all or substantially all of the corporate trust business of the Trustee may be sold or otherwise transferred, shall be the successor trustee hereunder without any further act.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such adopted certificates shall have the full force of all provisions within the Notes or in this Indenture relating to the certificate of the Trustee.

SECTION 7.9.  <u>Eligibility; Disqualification</u>.  The Trustee hereunder shall at all times be a corporation, bank or trust company organized and doing business under the laws of the United States or any state thereof (i) which is authorized under such laws to exercise corporate trust power, (ii) is subject to supervision or examination by governmental authorities, (iii) shall have at all times a combined capital and surplus of at least U.S.$50,000,000 as set forth in its most recent published annual report of condition and (iv) shall have its Corporate Trust Office in The City of New York.  If at any time the Trustee shall cease to be eligible in

- 48 -

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 80 of 189

accordance with the provisions of this Section 7.9, it shall resign immediately in the manner and with the effect specified in Section 7.7.

SECTION 7.10.   Resignation of an Agent.  Any Agent may resign at any time by so notifying the Trustee and the Issuer in writing at least 30 days prior to the effectiveness of such resignation.

If an Agent resigns, the Issuer shall promptly appoint a successor Agent.

Any successor Agent shall have all the rights, powers and duties of its predecessor Agent under this Indenture.  The Trustee shall give a notice of any resignation or succession to Holders.

Notwithstanding the replacement of any Agent pursuant to this Section 7.10, the Issuer's obligations under Section 7.6 shall continue for the benefit of the resigning Agent.

## ARTICLE VIII

## DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.1.   Discharge of Liability on Notes.

(a)   When (i) the Issuer delivers to the Trustee all Outstanding Notes (other than Notes replaced pursuant to Section 2.8) for cancellation or (ii) all Outstanding Notes have become due and payable, whether on a Redemption Date as a result of the giving of a notice of redemption pursuant to Article III or at Stated Maturity of the Notes, and the Issuer deposits in trust, for the benefit of the Holders, with the Trustee funds sufficient to pay at Maturity all principal of the Outstanding Notes and interest thereon (other than Notes replaced pursuant to Section 2.8), and if in either case the Issuer pays all other sums payable hereunder by the Issuer, then this Indenture, and the obligations of the Issuer pursuant hereto, shall, subject to Sections 8.1(c) and 8.6, cease to be of further effect.  The Trustee shall acknowledge satisfaction and discharge of this Indenture (except with respect to the obligations of the Issuer specified in Section 8.1(c)) on demand of the Issuer accompanied by an Officer's Certificate and an Opinion of Counsel (each stating that all conditions precedent herein provided relating to the satisfaction and discharge of this Indenture have been complied with) and at the cost and expense of the Issuer.

(b)   Subject to Sections 8.1(c), 8.2 and 8.6, the Issuer at any time may terminate (i) its obligations under this Indenture and the Notes ("legal defeasance option") or (ii) its obligations under Sections 4.4, 4.6, 4.7, 4.8, 4.9, 4.10 and 5.1 and the operation of Section 6.1 ("covenant defeasance option").  The legal defeasance option may be exercised notwithstanding any prior exercise of the covenant defeasance option.

If the legal defeasance or the covenant defeasance option is exercised, payment of the Notes may not be accelerated because of an Event of Default with respect thereto.

Upon satisfaction of the conditions set forth herein and upon request of the Issuer, the Trustee shall acknowledge in writing the discharge of the obligations of the Issuer hereunder except those specified in Section 8.1(c).

(c)    Notwithstanding Section 8.1(b), the Issuer's obligations pursuant to Sections 2.3, 2.4, 2.5, 2.6, 2.7, 2.8, 4.5, 7.6, 7.7, 8.4, 8.5 and 8.6 shall survive until the Notes have been paid in full.  Thereafter, the obligations of the Issuer pursuant to Sections 7.6, 7.7, 8.4 and 8.5 shall survive.

SECTION 8.2.    Conditions to Defeasance.  The Issuer may exercise the legal defeasance option or the covenant defeasance option only if:

(a)    The Issuer irrevocably deposits or causes to be deposited with the Trustee as trust funds in trust, specifically pledged as security for, and dedicated solely to, the benefit of the Holders (the "defeasance trust") pursuant to an irrevocable trust and security agreement in form and substance satisfactory to the Trustee, money or Government Obligations, or a combination thereof, sufficient for the payment of principal of, and interest on the Outstanding Notes to and including the date irrevocably designated by the Issuer on or prior to the date of the deposit of such money or Government Obligations;

(b)    The Issuer delivers to the Trustee a certificate from an internationally recognized firm of independent accountants or investment bank expressing their opinion that the payments of principal of and premium, if any, and interest on the Notes when due and without reinvestment on the deposited Government Obligations plus any deposited money without investment and after payment of all federal, state and local taxes or other charges or assessments in respect thereof shall provide cash at such times and in such amounts as shall be sufficient to pay principal of and premium, if any, and interest on all the Notes when due at Maturity;

(c)    No Default or Event of Default has occurred and is continuing on the date of the deposit made in accordance with Section 8.2(a) and after giving effect thereto;

(d)    In the case of the legal defeasance option, the Issuer delivers to the Trustee an Opinion of Counsel, or a ruling received from or published by the U.S. Internal Revenue Service, to the effect that beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the exercise of such option and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same time as would have been the case if such option had not been exercised and which such opinion is based on a change of law or final and binding ruling from the U.S. Internal Revenue Service after the date hereof;

(e)    In the case of the covenant defeasance option, the Issuer delivers to the Trustee an Opinion of Counsel to the effect that the Holders shall not recognize income, gain or loss for U.S. federal income tax purposes as a result of such covenant defeasance and shall be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such covenant defeasance had not occurred; and

- 50 -

(f)   The Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes as contemplated by this Article VIII have been complied with.

Before or after a deposit, the Issuer may make arrangements satisfactory to the Trustee for the redemption of Notes at a future date in accordance with Article III.

SECTION 8.3.   Application of Trust Money.  The Trustee shall hold in trust money or Government Obligations deposited with it pursuant to Section 8.2.  It shall apply the deposited money and the money from Government Obligations through any Paying Agent and in accordance with this Indenture to the payment of principal of and premium, if any, and interest on the Notes.

SECTION 8.4.   Repayment to Company.  Upon termination of the trust established pursuant to Section 8.2, the Trustee and each Paying Agent shall promptly pay to the Issuer, upon request, any excess cash or Government Obligations held by them. Subject to Section 4.3, the Trustee and each Paying Agent shall pay to the Issuer, upon request, any money held by them for the payment of principal of or premium, if any, or interest on the Notes that remains unclaimed for two years after the due date for such payment of principal or premium, if any, or interest, and, thereafter, the Trustee and each Paying Agent, as the case may be, shall not be liable for payment of such amounts hereunder and the Holders shall be entitled to such recovery of such amounts only from the Issuer.

SECTION 8.5.   Indemnity for Governmental Obligations.  The Issuer shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited Government Obligations or the principal and interest received on such Government Obligations.

SECTION 8.6.   Reinstatement.  If the Trustee or any Paying Agent is unable to apply any money or Government Obligations in accordance with this Article VIII by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the obligations of the Issuer under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to this Article VIII until such time as the Trustee or such Paying Agent is permitted to apply all such money or Government Obligations in accordance with this Article VIII; *provided, however,* that, if the Issuer has made any payment of principal of or premium, if any, or interest on any Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Obligations held by the Trustee or such Paying Agent.

# ARTICLE IX

## AMENDMENTS

SECTION 9.1.   <u>Without Consent of Holders</u>.  The Issuer and the Trustee may amend or supplement this Indenture or the Notes, without notice to or the consent or vote of any Holder, for the following purposes:

(i)   to cure any ambiguity or to correct or supplement any provision contained in the text of this Indenture which may be defective or inconsistent with any other provision contained therein or to make such other provision in regard to matters or questions arising under this indenture as the Issuer may deem necessary or desirable and which will not adversely affect the interests of the Holders of the Notes in any material respect (*provided*, that any modification or amendment to conform language in the Indenture to that appearing in the section "Description of the Notes" in the final Offering Memorandum relating to the Notes dated October 26, 2012 shall be deemed not to adversely affect the interests of the Holders of the Notes in any material respect);

(ii)   to convey, transfer, assign, mortgage or pledge to the Trustee as security for the Notes any property or assets;

(iii)   to add to the covenants of the Issuer, such further covenants, restrictions, conditions or provisions for the protection of the Holders of Notes, and to make the occurrence, or the occurrence and continuance, of a Default in any such additional covenants, restrictions, conditions or provisions an Event of Default under this Indenture permitting the enforcement of all or any of the several remedies provided in this Indenture or the Notes; *provided* that, in respect of any such additional covenant, restriction, condition or provision, such supplemental indenture may provide for a particular period of grace after Default (which may be shorter or longer than that allowed in the case of other defaults) or may limit the remedies available to the Trustee upon such an Event of Default or may limit the right of Holders of a majority in aggregate principal amount of the applicable Outstanding Notes to waive such an Event of Default;

(iv)   to evidence and provide for the acceptance of appointment of a successor Trustee, Paying Agent, Registrar or Transfer Agent, as the case may be; or

(v)   to modify the restrictions on, and procedures for, resale and other transfers of the Notes pursuant to law or regulation relating to the resale or transfer of restricted securities generally.

Upon the written request of the Issuer, and upon receipt by the Trustee of the documents described in Section 9.5, the Trustee shall join with the Issuer in the execution of any supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects its own rights, duties or immunities under this Indenture or otherwise.

- 52 -

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 84 of 189

SECTION 9.2.   <u>With Consent of Holders</u>.  Except as specified in Section 9.1, the Issuer and the Trustee, together, may amend or supplement this Indenture or the Notes with the written consent of the Holders of at least a majority in aggregate principal amount of the Outstanding Notes for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or modifying in any manner the rights of the Holders under this Indenture; *provided, however,* that, without the consent of each Holder affected thereby, an amendment may not:

(i)    change the rate or time for payment of interest on any Note;

(ii)    change the principal or Stated Maturity of any Note;

(iii)    reduce the principal amount of or interest on any Note or Additional Amounts payable with respect thereto or reduce the amount payable thereon in the event of redemption or Default;

(iv)    change the currency of payment of principal of or interest on any Note or Additional Amounts payable with respect thereto;

(v)    change the obligation of the Issuer to pay Additional Amounts;

(vi)    impair the right to institute suit for the enforcement of any such payment on or with respect to any Note;

(vii)    waive a Default on the payment of principal, premium, if any, and interest on the Notes or this Indenture;

(viii)    reduce the principal amount of Notes whose Holders must consent to any amendment, supplement or waiver; or

(ix)    reduce the aggregate principal amount of any Note Outstanding necessary to modify or amend this Indenture or any such Notes or to waive any future compliance or past Default or reduce the quorum requirements or the percentage of aggregate principal amount of any Notes Outstanding required for the adoption of any action at a meeting of Holders of such Notes or reduce the percentage of the aggregate principal amount of such Notes Outstanding necessary to rescind or annul any declaration of the principal of and all accrued and unpaid interest on any Notes to be due and payable.

Upon the written request of the Issuer and upon the filing with the Trustee of evidence of the consent of the Holders as aforesaid, and upon receipt by the Trustee of the documents described in Section 9.5, the Trustee shall join with the Issuer in the execution of such supplemental indenture but the Trustee shall not be obligated to enter into any such supplemental indenture which affects its own rights, duties or immunities under this Indenture or otherwise.

The Issuer shall give to Holders (with a copy to the Trustee) prior written notice of any amendment proposed to be adopted under this Section 9.2.

Case 1:20-cv-08206-JPC  Document 1-1  Filed 10/02/20  Page 85 of 189

It shall not be necessary for the consent of the Holders under this Section 9.2 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.2 becomes effective, the Issuer shall give to Holders a notice briefly describing such amendment.  The failure to give such notice to all Holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.2.

SECTION 9.3.   Revocation and Effect of Consents and Waivers.

(a)   Any request, demand, authorization, direction, consent, notice, waiver or other Act of the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration or registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee, the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Trustee receives the written notice of revocation at least one Business Day prior to the date the amendment or waiver becomes effective.  After it becomes effective, an amendment or waiver shall bind every Holder.

(b)   The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action described above.  If a record date is fixed, then, notwithstanding Section 9.3(a), those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or effective for more than eleven months after such record date.

SECTION 9.4.   Notation on or Exchange of Notes.  If an amendment changes the terms of a Note, the Issuer may require the Holder to deliver the Note to the Trustee.  If so instructed by the Issuer, the Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the Holder.  Alternatively, if the Issuer so determines, the Issuer in exchange for the Note shall issue and the Trustee shall authenticate a new Note that reflects the changed terms.  Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment.

SECTION 9.5.   Trustee to Sign Amendments.  The Trustee shall sign any amendment authorized pursuant to this Article IX if the amendment, waiver or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee.  In signing such amendment, waiver or supplement, the Trustee shall be entitled to receive indemnity satisfactory to the Trustee and, subject to Section 7.1, shall be fully protected in relying upon an Officer's Certificate and an Opinion of Counsel provided pursuant to Section 11.3, each of which shall state, in addition to the statements required by Section 11.4, that such amendment, waiver or

supplemental indenture is authorized or permitted by this Indenture and that it shall be valid and binding upon the Issuer in accordance with its terms, as conclusive evidence of the foregoing.

SECTION 9.6.   Payment for Consent.  Neither the Issuer nor any of its Affiliates shall, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid or agreed to be paid to all Holders which so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

## ARTICLE X

## MEETINGS OF HOLDERS

SECTION 10.1.   Purposes for Which Meetings May Be Called.  A meeting of Holders may be called at any time and from time to time pursuant to the provisions of this Article XII for any of the following purposes:

(a)    to give any notice to the Issuer or the Trustee, or to give any directions to the Trustee, or to waive or to consent to the waiving of any Default or Event of Default hereunder and its consequences, or to take any other action authorized to be taken by Holders pursuant to any of the provisions of Article VI;

(b)    to remove the Trustee or appoint a successor Trustee pursuant to the provisions of Article VII;

(c)    to consent to an amendment, supplement or waiver pursuant to the provisions of Section 9.2; or

(d)    to take any other action authorized to be taken by or on behalf of the Holders of any specified aggregate principal amount of the Notes under any other provision of this Indenture, or authorized or permitted by law.

SECTION 10.2.   Manner of Calling Meetings.  The Trustee may at any time call a meeting of Holders to take any action specified in Section 10.1, to be held at such time and at such place in The City of New York, New York or elsewhere as the Trustee shall determine. Notice of every meeting of Holders, setting forth the time and place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given by the Trustee in accordance with Section 11.2, to the Issuer and the Holders not less than 10 nor more than 60 days prior to the date fixed for a meeting.

Any meeting of Holders shall be valid without notice if the Holders of all Outstanding Notes are present in Person or by proxy, or if notice is waived before or after the meeting by the Holders of all Outstanding Notes, and if the Issuer and the Trustee are either present by duly authorized representatives or have, before or after the meeting, waived notice.

SECTION 10.3.   Call of Meetings by Company or Holders.  In case at any time the Issuer, or the Holders of not less than 10% in aggregate principal amount of the Outstanding Notes shall have requested the Trustee to call a meeting of Holders to take any action specified in Section 10.1, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have given the notice of such meeting within 20 days after receipt of such request, then the Issuer or the Holders of Notes in the amount above specified may determine the time and place in The City of New York, New York or elsewhere for such meeting and may call such meeting for the purpose of taking such action, by giving or causing to be given notice thereof as provided in Section 11.2, or by causing to be made available to the newswire service of Bloomberg or if Bloomberg does not operate, any similar agency and, so long as the Notes continue to be listed on the Luxemburg Stock exchange and the rules and regulations of the Luxembourg Stock Exchange so require, the first such publication to be not less than 10 nor more than 60 days prior to the date fixed for the meeting.

SECTION 10.4.   Who May Attend and Vote at Meetings.  To be entitled to vote at any meeting of Holders, a Person shall (i) be a registered Holder of one or more Notes, or (ii) be a Person appointed by an instrument in writing as proxy for the registered Holder or Holders of Notes.  The only Persons who shall be entitled to be present or to speak at any meeting of Holders shall be the Persons entitled to vote at such meeting and their counsel and any representatives of the Trustee and its counsel and any representatives of the Issuer and its counsel.

SECTION 10.5.   Regulations May Be Made by Trustee; Conduct of the Meeting; Voting Rights; Adjournment.  Notwithstanding any other provision of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any action by or any meeting of Holders, in regard to proof of the holding of Notes and of the appointment of proxies, and in regard to the appointment and duties of inspectors of votes, and submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall think appropriate.  Such regulations may fix a record date and time for determining the Holders of record of Notes entitled to vote at such meeting, in which case those and only those Persons who are Holders of Notes at the record date and time so fixed, or their proxies, shall be entitled to vote at such meeting whether or not they shall be such Holders at the time of the meeting.

The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Issuer or the Holders as provided in Section 10.3, in which case the Issuer or the Holders calling the meeting, as the case may be, shall in like manner appoint a temporary chairman.  A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the Holders of a majority in principal amount of the Notes represented at the meeting and entitled to vote.

At any meeting each Holder or proxy shall, subject to the provisions of Section 10.4, be entitled to one vote for each U.S.$1,000 principal amount of Notes held or represented by him or her; *provided, however,* that no vote shall be cast or counted at any meeting in respect of any Notes challenged as not Outstanding and ruled by the chairman of the meeting to be not Outstanding.  The chairman may adjourn any such meeting if he is unable to determine whether any Holder or proxy shall be entitled to vote at such meeting.  The chairman of the meeting shall

- 56 -

have no right to vote other than by virtue of Notes held by him or instruments in writing as aforesaid duly designating him as the proxy to vote on behalf of other Holders. Any meeting of Holders duly called pursuant to the provisions of Section 10.2 or 10.3 may be adjourned from time to time by vote of the Holders of a majority in aggregate principal amount of the Outstanding Notes represented at the meeting and entitled to vote, and the meeting may be held as so adjourned without further notice.

SECTION 10.6.   Voting at the Meeting and Record to Be Kept.  The vote upon any resolution submitted to any meeting of Holders shall be by written ballots on which shall be subscribed the signatures of the Holders of Notes or/of their representatives by proxy and the principal amount of the Notes voted by the ballot. The permanent chairman of the meeting shall appoint two inspectors of votes, who shall count all votes cast at the meeting for or against any resolution and shall make and file with the secretary of the meeting their verified written reports in duplicate of all votes cast at the meeting. A record in duplicate of the proceedings of each meeting of Holders shall be prepared by the secretary of the meeting and there shall be attached to such record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavits by one or more Persons having knowledge of the facts, setting forth a copy of the notice of the meeting and showing that such notice was given as provided in Section 10.2. The record shall be signed and verified by the affidavits of the permanent chairman and the secretary of the meeting and one of the duplicates shall be delivered to the Issuer and the other to the Trustee to be preserved by the Trustee, the latter to have attached thereto the ballots voted at the meeting.

Any record so signed and verified shall be conclusive evidence of the matters therein stated.

SECTION 10.7.   Exercise of Rights of Trustee or Holders May Not Be Hindered or Delayed by Call of Meeting.  Nothing contained in this Article X shall be deemed or construed to authorize or permit, by reason of any call of a meeting of Holders or any rights expressly or impliedly conferred hereunder to make such call, any hindrance or delay in the exercise of any right or rights conferred upon or reserved to the Trustee or to the Holders under any of the provisions of this Indenture or of the Notes.

SECTION 10.8.   Procedures Not Exclusive.  The procedures set forth in this Article X are not exclusive and the rights and obligations of the Issuer, the Trustee and the Holders under other Articles of this Indenture (including Articles VI, VII, VIII and IX) shall in no way be limited by the provisions of this Article X.

## ARTICLE XI

## MISCELLANEOUS

SECTION 11.1.   Provisions of Indenture and Notes for the Sole Benefit of Parties and Holders of Notes.  Nothing in this Indenture or the Notes, expressed or implied, shall give to any Person other than the parties hereto and their successors hereunder and the Holders of the Notes any benefit or any legal or equitable right, remedy or claim under this Indenture or the Notes.

- 57 -

SECTION 11.2.   Notices.  Any request, demand, authorization, direction, consent, notice, waiver or other communication or document provided or permitted by this Indenture to be made upon, given, provided or furnished to, or filed with, any party to this Indenture shall be in English and in writing and shall, except as otherwise expressly provided herein, be deemed to have been received only upon actual receipt thereof by prepaid first class mail, courier or facsimile transmission, addressed to the relevant party as follows:

> To the Issuer:
>
> Samarco S.A.
> Rua Paraíba, 1122, 9th and 10th floors
> Belo Horizonte, MG 30130-918
> Brazil
> Attention: Leonardo Gandara
> Facsimile: +55 31 3269-8601
>
> To the Trustee:
>
> The Bank of New York Mellon, as Trustee
> 101 Barclay Street, Floor 4 East
> New York, New York  10286
> U.S.A.
> Attention: International Corporate Trust
> Telephone: (212) 815-5218
> Facsimile: (212) 815-5802/5803

Any party by notice to the other parties may designate additional or different addresses for subsequent notices or communications.

Where this Indenture provides for the giving of notice to Holders, such notice shall be deemed to have been given upon (i) the mailing of first class mail, postage prepaid, of such notice to Holders of Notes not held in global form at their respective addresses as they appear in the Register; and (ii) giving notice Holders of Global Notes to the Depositary, in accordance with its Applicable Procedures as in effect from time to time.  For so long as the Notes are listed on the Official List of and the rules of the Luxembourg Stock Exchange so require, the Issuer will publish notices in English on the website of the Luxembourg Stock Exchange (www.bourse.lu) or in English in a leading newspaper of general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*) or, if that is not practicable, in another English language daily newspaper of general circulation in Europe.  Any such notice shall be deemed to have been delivered on the date of first publication.  All notices to the Holders shall be at the expense of the Issuer.

The Issuer shall also cause all other such publications of such notices as may be required from time to time by applicable Brazilian law.

In respect of this Indenture, the Trustee shall not have any duty or obligation to verify or confirm that the Person sending instructions, directions, reports, notices or other

- 58 -

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 90 of 189

communications or information by electronic transmission is, in fact, a Person authorized to give such instructions, directions, reports, notices or other communications or information on behalf of the party purporting to send such electronic transmission; and the Trustee shall not have any liability for any losses, liabilities, costs or expenses incurred or sustained by any party as a result of such reliance upon or compliance with such instructions, directions, reports, notices or other communications or information.  Each other party agrees to assume all risks arising out of the use of electronic methods, including any non-secure method, such as, but without limitation, by facsimile or electronic mail, to submit instructions, directions, reports, notices or other communications or information to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, notices, reports or other communications or information, and the risk of interception and misuse by third parties.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is given to a Holder in the manner provided above, it is duly given, whether or not the addressee receives it.

SECTION 11.3.  Officer's Certificate and Opinion of Counsel as to Conditions Precedent.  Upon any request or application by the Issuer to the Trustee to take or refrain from taking any action under this Indenture, the Issuer shall furnish to the Trustee:

(i)    an Officer's Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 11.4) stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(ii)    an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 11.4) stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 11.4.  Statements Required in Officer's Certificate or Opinion of Counsel.  Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture shall include substantially:

(i)    a statement that each Person making or rendering such Officer's Certificate or Opinion of Counsel has read such covenant or condition and the related definitions;

(ii)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officer's Certificate or Opinion of Counsel are based;

(iii)    a statement that, in the opinion of each such Person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(iv)    a statement as to whether or not, in the opinion of each such Person, such covenant or condition has been complied with.

- 59 -

SECTION 11.5.   Rules by Trustee, Registrar, Paying Agent and Transfer Agents. The Trustee may make reasonable rules for action by or a meeting of Holders.  The Registrar, the Paying Agents and the Transfer Agents may make reasonable rules for their functions.

SECTION 11.6.   Currency Indemnity.  U.S. Dollars are the sole currency of account and payment for all sums payable by the Issuer under or in connection with this Indenture and the Notes, including damages.  Any amount received or recovered in a currency other than U.S. Dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer or otherwise) by any recipient in respect of any sum expressed to be due to it from the Issuer shall only constitute a discharge of the Issuer to the extent of the U.S. Dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the recipient under this Indenture or any Notes, the Issuer shall indemnify such recipient against any loss sustained by it as a result; and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such recipient and each Holder shall, by accepting Notes, be deemed to have agreed to repay such excess.  In any event, the Issuer shall indemnify the recipient against the cost of making any such purchase.  For the purposes of this Section 11.6, it shall be sufficient for the recipient to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of U.S. Dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).  These indemnities constitute a separate and independent obligation from the other obligations of the Issuer shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Holder of Notes and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Notes.

SECTION 11.7.   No Recourse Against Others.  No director, officer, employee, direct or indirect shareholder or incorporator, as such, of the Issuer or the Trustee shall have any liability for any obligations of the Issuer or the Trustee, respectively, under this Indenture or the Notes or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder shall waive and release all such liability.  The waiver and release shall be part of the consideration for the issue of the Notes.

SECTION 11.8.   Legal Holidays.  In any case where any Payment Date shall not be a Business Day, then (notwithstanding any other provision of this Indenture or of the Notes) payment of interest or premium, if any, or principal need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the Payment Date; *provided* that no interest shall accrue for the period from and after such Payment Date.

- 60 -

SECTION 11.9.   Governing Law; Waiver of Jury Trial.

**THIS INDENTURE AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THEREOF.**

**EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING AMONG THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTION CONTEMPLATED HEREBY OR THEREBY.**

SECTION 11.10.   Consent to Jurisdiction; Waiver of Immunities

(a)   Each of the parties hereto hereby irrevocably submits to the non-exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York, New York with respect to actions brought in respect of any suit, action or proceeding or arbitral award arising out of or relating to this Indenture or the Notes or any transaction contemplated hereby or thereby (a "Proceeding"), and irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  Each of the parties hereto irrevocably waives, to the fullest extent it may do so under applicable law, any objection which it may now or hereafter have to the laying of the venue of any such Proceeding brought in any such court and any claim that any such Proceeding brought in any such court has been brought in an inconvenient forum.  The Issuer irrevocably appoints Law Debenture Corporate Services Inc. (the "Process Agent"), with an office at 400 Madison Avenue, 4th Fl., New York, New York 10017, as its authorized agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any Proceeding.  If for any reason such Person shall cease to be such agent for service of process, the Issuer shall forthwith appoint a new agent of recognized standing for service of process in the State of New York and deliver to the Trustee a copy of the new agent's acceptance of that appointment within 30 days.  Nothing herein shall affect the right of the Trustee, any Agent or any Holder to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the Issuer in any other court of competent jurisdiction.

(b)   The Issuer hereby irrevocably appoints the Process Agent as its agent to receive, on behalf of itself and its property, service of copies of the summons and complaint and any other process which may be served in any such suit, action or proceeding brought in such New York State or U.S. federal court sitting in the Borough of Manhattan in The City of New York, New York.  Such service shall be made by delivering by hand a copy of such process to the Issuer in care of the Process Agent at the address specified above.  The Issuer hereby irrevocably authorizes and directs the Process Agent to accept such service on its behalf.  Failure of the Process Agent to give notice to the Issuer or failure of the Issuer to receive notice of such service of process shall not affect in any way the validity of such service on the Process Agent or the Issuer.  As an alternative method of service, the Issuer also irrevocably consents to the service of any and all process in any such Proceeding by the delivery by hand of copies of such process to the Issuer at its address specified in Section 11.2

- 61 -

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 93 of 189

or at any other address previously furnished in writing by the Issuer to the Trustee.  The Issuer covenants and agrees that it shall take any and all reasonable action, including the execution and filing of any and all documents, that may be necessary to continue the designation of the Process Agent above in full force and effect during the term of the Notes, and to cause the Process Agent to continue to act as such.

(c)     Nothing in this Section 11.10 shall affect the right of any party, including the Trustee, any Agent, any Holder or any other Person, to serve legal process in any other manner permitted by law or affect the right of any party to bring any action or proceeding against any other party or its property in the courts of other competent jurisdictions.

(d)     The Issuer irrevocably agrees that, in any proceedings anywhere (whether for an injunction, specific performance or otherwise), no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such proceedings, from attachment (whether in aid of execution, before judgment or otherwise) of its assets or from execution of judgment shall be claimed by it or on its behalf or with respect to its assets, except to the extent required by applicable law, any such immunity being irrevocably waived, to the fullest extent permitted by applicable law.  The Issuer irrevocably agrees that, where permitted by applicable law, it and its assets are, and shall be, subject to such proceedings, attachment or execution in respect of its obligations under this Indenture or the Notes.

SECTION 11.11.   Successors and Assigns.  All covenants and agreements of the Issuer in this Indenture and the Notes shall bind its respective successors and assigns, whether so expressed or not.  All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 11.12.   Multiple Originals.  The parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Indenture.

SECTION 11.13.   Severability Clause.  In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  To the extent permitted by applicable law, the parties hereby waive any provision of law which renders any term or provision hereof invalid or unenforceable in any respect.

SECTION 11.14.   Tax Purposes.  The Issuer agree to treat, and each Holder of a Note (or a beneficial ownership interest therein) by accepting a Note (or a beneficial ownership interest therein) shall be deemed to have agreed to treat, and all such parties shall treat, the Notes as debt for all U.S. federal, state and local income and franchise tax purposes.

SECTION 11.15.   Patriot Act.  The parties hereto acknowledge that, in accordance with Section 326 of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended, modified or supplemented from time to time, the "USA Patriot Act"), the Trustee, like all financial institutions, is required to obtain, verify and record information that identifies each person or legal entity that opens an account.  The parties to this Indenture agree that they will provide the Trustee with such information as the Trustee may request in order for the Trustee to satisfy the requirements of the USA Patriot Act.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

SAMARCO MINERAÇÃO,
as Issuer

By: _____
Name: ROBERTO L. NUNES CARVALHO
Title: CHIEF COMMERCIAL OFFICER

By: _____
Name: EDUARDO BAHIA
Title: CHIEF FINANCIAL OFFICER

Witnesses:

By: _____
Name: WAGNER DE ALMEIDA PAIVA

By: _____
Name:

*(Signature Page to Indenture)*

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 96 of 189

THE BANK OF NEW YORK MELLON,
as Trustee, Registrar, Transfer Agent and
Paying Agent

By: _____

Name: John T. Needham, Jr.
Title: Vice President

*(Signature Page to Indenture)*

THE BANK OF NEW YORK MELLON
TRUST (JAPAN), LTD.,
as Principal Paying Agent

By: _____
Name:   John T. Needham Jr.
Title:   Attorney-in-fact

*(Signature Page to Indenture)*

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 98 of 189

EXHIBIT A

FORM OF NOTE

[FACE OF NOTE]

*[Include if Note is a Global Note:* UNLESS THIS GLOBAL NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK LIMITED PURPOSE TRUST COMPANY ("DTC"), TO THE COMPANY NAMED HEREIN (THE "COMPANY") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE IN WHOLE SHALL BE LIMITED TO TRANSFERS TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC OR BY DTC OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY AND TRANSFERS OF THIS GLOBAL NOTE IN PART SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE AND REFERRED TO ON THE REVERSE HEREOF.]

*[Include following Securities Act Legend if Note is a Restricted Global Note, or a Note issued in exchange therefor, as required under this Indenture:* THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF SAMARCO MINERAÇÃO S.A. THAT THIS NOTE OR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (I) TO SAMARCO MINERAÇÃO S.A., (II) SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A) IN ACCORDANCE WITH RULE 144A, (III) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, (IV) PURSUANT TO ANOTHER APPLICABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE), OR (V) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AND IN EACH OF SUCH CASES IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. AS A CONDITION TO THE REGISTRATION OF TRANSFER OF THIS NOTE PURSUANT TO CLAUSE (IV) ABOVE,

A-1

SAMARCO MINERAÇÃO S.A. OR THE TRUSTEE MAY REQUIRE DELIVERY OF ANY DOCUMENTATION OR OTHER EVIDENCE THAT SAMARCO MINERAÇÃO, S.A., IN ITS SOLE DISCRETION, DEEMS NECESSARY OR APPROPRIATE TO EVIDENCE COMPLIANCE WITH THE EXEMPTION REFERRED TO IN SUCH CLAUSE (IV) AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, REPRESENTS AND AGREES THAT IT SHALL NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

THIS LEGEND MAY BE REMOVED SOLELY IN THE DISCRETION AND AT THE DIRECTION OF SAMARCO MINERAÇÃO S.A.]

[*Include following Securities Act Legend if Note is Regulation S Global Note, or a Note issued in exchange therefor, in accordance with this Indenture:* THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION.]

A-2

Case 1:20-cv-08206-JPC  Document 1-1  Filed 10/02/20  Page 100 of 189

**SAMARCO MINERAÇÃO S.A.**

4.125% Notes due 2022

[RESTRICTED GLOBAL NOTE]
[REGULATION S GLOBAL NOTE]
[CERTIFICATED NOTE]

No. [R-1] [S-1]

CUSIP No. [    ]
ISIN No. [    ]
COMMON CODE.  [    ]

Principal Amount
U.S.$_____

      Samarco Mineração S.A., a closely held company incorporated under the laws of Brazil (the "Company," which term includes any successor corporation hereunder referred to on the reverse hereof), for value received, hereby promises to pay to CEDE & CO., or registered assigns, U.S.$_____, as adjusted in accordance with the Schedule of Increases and Decreases on the Reverse of this Note, on [    ], 2022 (the "Principal Payment Date") upon presentment and surrender of this Note, on such date or dates as the then relevant principal sum may become payable in accordance with the provisions hereof and in the Indenture.

      Interest on the outstanding principal amount and premium, if any, shall be borne at the rate of 4.125% per annum payable semi-annually in arrears on each May 1 and November 1 of each year (each such date an "Interest Payment Date"), commencing on May 1, 2013 until payment of said principal amount and premium, if any, has been made or duly provided for in full together with such other amounts as may be payable, all subject to and in accordance with the terms and conditions set forth herein and in the Indenture; *provided, however,* that in the event that the Issuer shall at any time default on the payment of principal, premium, if any, interest or such other amounts as any may be payable in respect of the Notes, the Issuer shall pay interest on overdue principal and premium, if any, at the rate borne by the Notes plus 1% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

      Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

A-3

        Unless the certificate of authentication herein has been executed by the Trustee or Authenticating Agent by the manual signature of one of its authorized signatories, this Note shall not be entitled to any benefit hereunder or be valid or obligatory for any purpose.

        IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

Dated:

                     SAMARCO MINERAÇÃO S.A.

                     By: _____
                          Name:
                          Title:

Witnesses:

By: _____
Name:

By: _____
Name:

A-4

TRUSTEE'S CERTIFICATE OF
AUTHENTICATION

This is one of the Notes
referred to in the within
mentioned Indenture.

THE BANK OF NEW YORK MELLON,
as Trustee

By: _____
 Authorized Signatory

A-5

STATE OF NEW YORK          )
                          )
COUNTY OF NEW YORK          )

       On this       day of          , before me, a notary public within and for said county, personally appeared             to me personally known who being duly sworn, did say that he/she is the          of        , one of the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said persons.

**By:** _____

**Title: Notary Public, State of New York**

No.

Qualified in

Commission Expires

A-6

[FORM OF REVERSE SIDE OF NOTE][1]

4.125% Notes due 2022

TERMS AND CONDITIONS OF THE NOTES

      This Note is one of a duly authorized issue of 4.125% Notes due 2022 of the Issuer.  The Notes constitute senior unsecured obligations of the Issuer, initially limited to an aggregate principal amount of U.S.$1,000,000,000, and mature at 100% of the principal amount on November 1, 2022 (the "Principal Payment Date"), unless earlier redeemed.

      1.    Indenture. The Notes are, and shall be, issued under an Indenture, dated as of October 31, 2012 (the "Indenture"), among Samarco Mineração S.A., The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent (the "Trustee") and The Bank of New York Mellon Trust (Japan) Ltd., as Principal Paying Agent.  The terms of the Notes include those stated in the Indenture.  The Holders of the Notes shall be entitled to the benefit of, be bound by and be deemed to have notice of, all provisions of the Indenture.  Reference is hereby made to the Indenture and all supplemental indentures thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee, each Agent and the Holders of the Notes and the terms upon which the Notes, are, and are to be, authenticated and delivered.  All terms used in this Note that are defined in the Indenture shall have the meanings assigned to them in the Indenture.  Copies of the Indenture and each Global Note shall be available for inspection during normal business hours at the offices of the Trustee and each Paying Agent.

      The Issuer may from time to time, without the consent of the Holders of the Notes, create and issue additional Notes having the same terms and conditions as the Notes in all respects, except for issue date, issue price and the first payment of interest thereon.  Additional Notes issued in this manner shall be consolidated with and shall form a single series with the previously Outstanding Notes.

      The Indenture imposes certain limitations on the creation of Mortgages by the Issuer or its Subsidiaries and consolidation, merger and certain other transactions involving the Issuer.  In addition, the Indenture requires the maintenance of the existence of the Issuer and its Subsidiaries and includes reporting requirements applicable to the Issuer.

      2.    Interest. The Notes bear interest at the rate per annum shown above from October 31, 2012, or from the most recent Interest Payment Date (as defined below) to which interest has been paid or provided for, payable semi-annually in arrears on May 1 and November 1 of each year (each such date, an "Interest Payment Date"), commencing on May 1, 2013.  Interest on the Notes shall be computed on the basis of a 360-day year comprised of twelve 30-day months.  The Issuer shall pay interest on overdue principal and premium, if any, at the rate borne by the Notes plus 1% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

---

[1] To be conformed to Indenture.

A-7

3. _Principal._ Unless previously redeemed or purchased and cancelled, the Notes shall be repaid at 100% of the principal amount thereof on the Principal Payment Date.

4. _Method of Payment._ Payments of interest in respect of each Note shall be made on each Interest Payment Date to the Person in whose name such Note is registered in the Register at the close of business on April 15 or October 15 (whether or not a Business Day), as the case may be (each, a "Record Date"), next preceding such Interest Payment Date.  Payment of principal and premium, if any, in respect of each Note on the Principal Payment Date shall be made to the Person in whose name such Note is registered in the Register at the close of business on the day (whether or not a Business Day) immediately preceding the Principal Payment Date.

Payments of interest, as well as principal and premium, if any, in respect of each Note shall be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears in the Register.  Upon written notice from a Holder of such Note received by any Paying Agent at least 15 Business Days prior to an Interest Payment Date or the Principal Payment Date, as the case may be, such payment may be made by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York.

All payments on this Note are subject in all cases to any applicable tax or other laws and regulations, but without prejudice to the provisions of Paragraph 6 hereof.  Except as provided in Section 2.8 of the Indenture, no fees, commissions or expenses shall be charged to the Holders in respect of such payments.

If the Payment Date in respect of any Note is not a Business Day at the place in which it is presented for payment, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place and shall not be entitled to any further interest or other payment in respect of any such delay.

If the amount of principal or premium, if any, or interest which is due on the Notes is not paid in full, the Registrar shall annotate the Register with a record of the amount of principal, premium or interest, if any, in fact paid.

5. _Registrar, Paying Agent and Transfer Agent._ The Trustee shall act as Registrar, Transfer Agent and Paying Agent.  The Issuer may appoint and change any Registrar, Paying Agent or Transfer Agent without notice.  Upon the issue of Certificated Notes, the Issuer will appoint and maintain a Luxembourg Paying Agent for so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of such exchange so require.  In such event, an announcement shall be made through the Luxembourg Stock Exchange and shall include all material information with respect to the delivery of the Certificated Notes, including details of the Luxembourg Paying Agent.

6. _Additional Amounts._ All payments by the Issuer in respect of the Notes shall be made without withholding or deduction for or on account of any and all present or future Taxes by or for the account of the applicable Issuer Jurisdiction (as defined below), unless such withholding or deduction is required by law.  If the Issuer is required by the applicable Issuer Jurisdiction to deduct or withhold Taxes, the Issuer will pay to a

A-8

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 106 of 189

Holder of a Note or the beneficial owner thereof such additional amounts ("Additional Amounts") as may be necessary so that the net amount received by such Holder or beneficial owner will not be less than the amount such Holder or beneficial owner would have received if such Taxes had not been withheld or deducted; *provided*, *however,* that the Issuer shall not be required to pay any Additional Amounts for or on account of:

(i)      any Taxes that would not have been so imposed, assessed, levied or collected but for the fact that the Holder of the Note (or a fiduciary, settlor, beneficiary, member or shareholder of, or possessor of a power over, such Holder, if such Holder is an estate, trust, partnership or corporation) is or has been a domiciliary, national or resident of, or engaging or having been engaged in a trade or business or maintaining or having maintained a permanent establishment or being or having been physically present in the jurisdiction in which such Taxes have been imposed, assessed, levied or collected or otherwise having or having had some connection with such jurisdiction, other than the mere holding or ownership of, or the collection of principal of, and interest on a Note;

(ii)     any  Taxes that would not have been so imposed, assessed, levied or collected but for the fact that, where presentation is required in order to receive payment, the Note was presented more than 30 days after the date on which such payment became due and payable or was provided for, whichever is later, except to the extent that the Holder or beneficial owner thereof would have been entitled to Additional Amounts had the Note been presented for payment on any day during such 30-day period;

(iii)    any Taxes that would not have been so imposed, assessed, levied or collected but for the failure by the Holder or the beneficial owner of the Note to comply (following a written request addressed to the Holder or beneficial owner, as applicable), with any certification, identification or other reporting requirements concerning the nationality, residence or identity of such Holder or beneficial owner or its connection with the applicable Issuer Jurisdiction if compliance is required by statute, regulation or administrative practice of such Issuer Jurisdiction as a condition to relief or exemption from such Taxes;

(iv)    any estate, inheritance, gift, sales, transfer, excise, personal property or similar Taxes;

(v)     any withholding or deduction imposed on a payment to or for the benefit of an individual that is required to be made pursuant to European Union Directive 2003/48/EC, any law implementing this Directive or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings, or any law implementing or complying with, or introduced in order to conform to, such Directive;

(vi)    any withholding or deduction that is imposed on the Note that is presented for payment, where presentation is required, by or on behalf of a Holder who would have been able to avoid such withholding or deduction by presenting such Note to another Paying Agent in a member state of the European Union;

A-9

(vii)   any Taxes that are payable otherwise than by deduction or withholding from payments on or in respect of the Note; or

(viii) any combination of the above.

The Issuer will also pay any present or future stamp, court or documentary taxes or any other excise taxes, charges or similar levies which arise in any jurisdiction from or through which payment is made or on behalf of the Issuer (including the jurisdiction of the Paying Agent) on the execution, delivery, registrations, or the making of payments in respect of the Notes and the Indenture, excluding any such taxes, charges or similar levies imposed by any jurisdiction outside of any Issuer Jurisdiction.

No Additional Amounts shall be paid in respect of any payment in respect of the Notes to any Holder or beneficial owner of the Notes that is a fiduciary, a partnership, a limited liability company or any Person other than the sole beneficial owner of such payment to the extent such payment would be required by the laws of the Issuer Jurisdiction to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary, a member of such partnership, an interest holder in such limited liability company or a beneficial owner that would not have been entitled to such amounts had such beneficiary, settlor, member, interest holder or beneficial owner been the Holder of such Notes.

If requested in writing by the Trustee, the Issuer shall use reasonable efforts to obtain certified copies of tax receipts evidencing the payment of any Taxes so withheld or deducted from the Issuer Jurisdiction's taxing authority imposing such tax, and if certified copies are unavailable, the Issuer shall use reasonable efforts to obtain other evidence satisfactory to the Trustee, and the Trustee shall make such certified copies or other evidence available to the Holders or the Paying Agents, upon request to the Trustee.

7.    No Conversion. The Notes shall not be convertible into any securities of the Issuer or any of their Affiliates.

8.    Open Market Purchases. The Issuer or any of their Affiliates may at any time purchase Notes in the open market or otherwise at any price.  All Notes so purchased and Notes that have been redeemed (i) may not be resold, except in compliance with applicable requirements or exemptions under any relevant securities and other laws and (ii) at the option of the Issuer, may be delivered to the Trustee for cancellation or remain Outstanding.

9.    Redemption.

(a)   Except as described in Section 3.1 and Section 3.8 of the Indenture and this Paragraph 9, the Notes may not be redeemed prior to their Stated Maturity.

(b)   The Notes shall be redeemable, at the option of the Issuer or any successor, in whole, but not in part, upon giving not less than 30 nor more than 60 days' notice to the Holders at any time, at 100% of the principal amount thereof, plus accrued and unpaid interest thereon, to, but excluding, the Redemption Date, if , as a result of any change in, expiration of or amendment to the laws of the Issuer Jurisdiction (or of any political subdivision or taxing authority thereof or therein) or any regulations or rulings promulgated

A-10

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 108 of 189

thereunder or any change in the official interpretation or official application of such laws, regulations or rulings, or any change in the official application or interpretation of, or any execution of or amendment to, any treaty or treaties affecting taxation to which the Issuer Jurisdiction (or such political subdivision or taxing authority) is a party, which change, amendment, expiration or treaty becomes effective on or after October 31, 2012, the Issuer is or would be obligated on the next succeeding due date for a payment with respect to the Notes to pay Additional Amounts in excess of those attributable to Brazilian withholding tax on the basis of a statutory rate of 15%, and such obligation cannot be avoided by the use of reasonable measures available to the Issuer; *provided*, *however* (i) no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer or any successor, as the case may be, would be obligated to pay such Additional Amounts and (ii) at the time such notice of redemption is given, such obligation to pay such Additional Amounts remains in effect.

Prior to giving any notice of redemption pursuant to the preceding paragraph, the Issuer or any successor shall deliver to the Trustee an Officer's Certificate stating that the Issuer is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of redemption have occurred.  The Trustee shall accept such certificate as sufficient evidence of the satisfaction of the conditions precedent set forth in clauses (i) and (ii) of the preceding paragraph of this Paragraph 9(b), in which event it shall be conclusive and binding on the Holders.

(c)    The Notes shall be redeemable, at the option of the Issuer, in whole or in part, at any time and from time to time, at a Redemption Price equal to the greater of the following amounts, plus accrued and unpaid interest on the principal amount of the Notes to be redeemed, to the Redemption Date:

(i)    100% of the principal amount of the Notes to be redeemed; and

(ii)    as determined by the Independent Investment Banker, the sum of the present values of the applicable Remaining Scheduled Payments, discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months or in the case of an incomplete month, the number of days elapsed) at the Treasury Rate plus 35 basis points.

For purposes of this Paragraph 9(c), the following terms have the following meanings:

"Treasury Rate" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Comparable Treasury Issue" means the United States Treasury security selected by the Independent Investment Banker having an actual or interpolated maturity comparable to the remaining term of the Notes to be redeemed that would be utilized, at the time of selection

A-11

and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of the Notes.

"Comparable Treasury Price" means, with respect to any Redemption Date, (A) the arithmetic average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest of such Reference Treasury Dealer Quotations, or (B) if the Independent Investment Banker for the Notes obtains fewer than four such Reference Treasury Dealer Quotations, the arithmetic average of all Reference Treasury Dealer Quotations for such Redemption Date.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Issuer.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any Redemption Date, the arithmetic average, as determined by the Independent Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 3:30 p.m., New York City time, on the third Business Day preceding such Redemption Date.

"Reference Treasury Dealer" means each of Citigroup Global Capital Markets Inc., HSBC Securities (USA) Inc. and J.P. Morgan Securities LLC, their respective successors and two other nationally recognized investment banking firms that are Primary Treasury Dealers specified from time to time by the Issuer; *provided*, however, that if any of the foregoing shall cease to be a primary U.S. Government securities dealer in the United States (a "Primary Treasury Dealer"), the Issuer shall substitute therefor another nationally recognized investment banking firm that is a Primary Treasury Dealer.

"Remaining Scheduled Payments" means, with respect to each Note to be redeemed, the remaining scheduled payments of the principal thereof and interest thereon that would be due after the applicable Redemption Date but for such redemption; *provided*, *however*, that, if such Redemption Date is not an Interest Payment Date, the amount of the next succeeding scheduled interest payment thereon will be reduced by the amount of interest accrued thereon to such Redemption Date.

(d)    Notice of any redemption will be given in accordance with Section 11.2 of the Indenture at least 30 days but not more than 60 days before the Redemption Date. Unless the Issuer defaults in the payment of the Redemption Price, on and after any Redemption Date, interest will cease to accrue on the Notes or any portion thereof called for redemption.

(e)    If a Change of Control Repurchase Event occurs, unless the Issuer has exercised its option to redeem the Notes under Section 3.1 and Paragraph 9 of the Notes, the Issuer shall make an offer to each Holder of Notes to repurchase all or any part of the Holder's Notes pursuant to the offer described below (the "Offer to Purchase") at a price in cash (the "Offer to Purchase Payment") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon and Additional Amounts, if any, to, but not including, the Offer to

Purchase Payment Date.  Within 30 days following any Change of Control Repurchase Event or, at the option of the Issuer, prior to any Change of Control, but after the public announcement of the Change of Control, the Issuer will give notice as described in Section 11.2 of the Indenture, to each Holder (with a copy to the Trustee) containing the information specified in Section 3.8(a) of the Indenture.

   (i)   On the Business Day prior to the Offer to Purchase Payment Date, the Issuer shall, to the extent lawful, deposit with a Paying Agent an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof so tendered;

   (ii)   On the Offer to Purchase Payment Date following a Change of Control Repurchase Event, the Issuer will, to the extent lawful, (I) accept for payment for all Notes properly tendered and not withdrawn pursuant to the Offer to Purchase and (II) deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

   (iii)   Notwithstanding Section 3.8(a) of the Indenture or this Paragraph 9(e), the Issuer shall not be required to make an Offer to Purchase upon a Change of Control Repurchase Event that results in a Below Investment Grade Ratings Event if (i) a third party makes an offer to purchase in the manner, at the times and otherwise in compliance with the requirements set forth in this Paragraph 10 applicable to an Offer to Purchase made by the Issuer and such third party purchases all Notes properly tendered and not withdrawn under such offer, or (ii) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.4 of the Indenture, unless and until there is a default in payment of the applicable Redemption Price.  Notwithstanding anything to the contrary contained herein or in the Notes, an Offer to Purchase may be made in advance of a Change of Control Repurchase Event, conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

   (iv)   The Issuer will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under Section 3.8 of the Indenture or this Paragraph 9(e) of the Notes by virtue thereof.

   10.   Denominations; Transfer; Exchange. The Notes are in fully registered form without coupons attached in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof.  A Holder may transfer or exchange Notes in accordance with the Indenture.  The Trustee or Transfer Agent, as the case may be, may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.

A-13

The Trustee or Transfer Agent, as the case may be, need not register the transfer or exchange of any Notes for a period of 15 days preceding a Redemption Date or between a Record Date and the related Payment Date.

11.  <u>Persons Deemed Owners</u>. The registered Holder of this Note may be treated as the owner thereof for all purposes.

12.  <u>Unclaimed Money</u>. Subject to applicable law, the Trustee and each Paying Agent shall pay to the Issuer upon request any monies held by them for the payment of principal, premium, if any, or interest that remains unclaimed for two years, and thereafter, Holders entitled to such monies must look to the Issuer for payment as general creditors.

13.  <u>Defeasance</u>. Subject to the terms of the Indenture, the Issuer at any time may terminate some or all of their obligations under the Indenture or the Notes if the Issuer irrevocably deposits in trust with the Trustee money or Government Obligations sufficient for the payment of principal of, and interest on all the Outstanding Notes to and including the date irrevocably designated by the Issuer on or prior to the date of the deposit of such money or Government Obligations.

14.  <u>Amendment; Waiver</u>. Subject to certain exceptions set forth in the Indenture and the Notes may be amended or supplemented with the written consent of the Holders of at least a majority in principal amount of the Outstanding Notes, and an existing Default or Event of Default and its consequences or compliance with Sections 4.6(a), (b) and (c), and 4.8 of the Indenture may be waived with the consent of the Holders of at least a majority in principal amount of the Outstanding Notes.  However, without the consent of each Holder affected thereby, an amendment may not:

(v)  change the rate or time for payment of interest on any Note;

(vi)  change the principal or Stated Maturity of any Note;

(vii)  reduce the principal amount of or interest on any Note or Additional Amounts payable with respect thereto or reduce the amount payable thereon in the event of redemption or Default;

(viii)  change the currency of payment of principal of or interest on any Note or Additional Amounts payable with respect thereto;

(ix)  change the obligation of the Issuer to pay Additional Amounts;

(x)  impair the right to institute suit for the enforcement of any such payment on or with respect to any Note;

(xi)  waive a Default on the payment of principal, premium, if any, and interest on the Notes or the Indenture;

(xii)  reduce the principal amount of Notes whose Holders must consent to any amendment, supplement or waiver;

A-14

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 112 of 189

(xiii)    reduce the aggregate principal amount of any Note Outstanding necessary to modify or amend the Indenture or any such Notes or to waive any future compliance or past Default or reduce the quorum requirements or the percentage of aggregate principal amount of any Notes outstanding required for the adoption of any action at a meeting of holders of such Notes or reduce the percentage of the aggregate principal amount of such Notes outstanding necessary to rescind or annul any declaration of the principal of and all accrued and unpaid interest on any Notes to be due and payable.

The Issuer and the Trustee may, without notice to or the consent or vote of any Holder of the Notes, amend or supplement the Indenture or the Notes, for the following purposes:

(xiv)    to cure any ambiguity or to correct or supplement any provision contained in the Indenture which may be defective or inconsistent with any other provision contained therein or to make such other provision in regard to matters or questions arising under the Indenture as the Issuer may deem necessary or desirable and which will not adversely affect the interests of the Holders of the Notes in any material respect (*provided*, that any modification or amendment to conform language in the Indenture to that appearing in the section "Description of the Notes" in the final Offering Memorandum relating to the Notes dated October 26, 2012 shall be deemed not to adversely affect the interests of the Holders of the Notes in any material respect);

(xv)    to convey, transfer, assign, mortgage or pledge to the Trustee as security for the Notes any property or assets;

(xvi)    to add to the covenants of the Issuer, such further covenants, restrictions, conditions or provisions for the protection of the Holders of Notes, and to make the occurrence, or the occurrence and continuance, of a Default in any such additional covenants, restrictions, conditions or provisions an Event of Default under the Indenture permitting the enforcement of all or any of the several remedies provided in the Indenture or the Notes; *provided* that, in respect of any such additional covenant, restriction, condition or provision, such supplemental indenture may provide for a particular period of grace after Default (which may be shorter or longer than that allowed in the case of other Defaults) or may limit the remedies available to the Trustee upon such an Event of Default or may limit the right of Holders of a majority in aggregate principal amount of the applicable Outstanding Notes to waive such an Event of Default;

(xvii)    to evidence and provide for the acceptance of appointment of a successor Trustee, Principal Paying Agent, Registrar or Transfer Agent, as the case may be; or

(xviii)    to modify the restrictions on, and procedures for, resale and other transfers of the Notes pursuant to law or regulation relating to the resale or transfer of restricted securities generally.

A-15

15. <u>Defaults and Remedies.</u> An "Event of Default" occurs if:

(1) The Issuer defaults in the payment of any installment of interest (including applicable Additional Amounts) upon any Note as and when the same shall become due and payable, and continuance of such Default for 30 days;

(2) The Issuer defaults in the payment of all or any part of the principal of or premium on any Note as and when the same shall become due and payable either at its Stated Maturity, upon any redemption, by declaration or otherwise;

(3) The Issuer defaults in the performance or breach of any covenant of the Issuer in respect of the Notes or the Indenture (other than those described in paragraphs (1) and (2) above), and continuance of such default or breach for a period of 60 days after there has been given a written notice, by registered or certified mail, to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% in principal amount of the Outstanding Notes affected thereby, specifying such default or breach and requiring it to be remedied and stating that such notice is a notice of default ("Notice of Default") under the Indenture;

(4) any present or future Indebtedness of the Issuer or any Significant Subsidiary, other than the Notes, for or in respect of moneys borrowed is declared due and payable prior to its Stated Maturity as the result of any Event of Default (howsoever described); *provided* that the aggregate amount of the relevant Indebtedness in respect of which the event mentioned in this paragraph will have occurred (which Indebtedness has not been repaid or paid and as to which such default has not been cured or such acceleration has not been rescinded or annulled) exceeds US$75,000,000 or its equivalent;

(5) (a) the entry of a decree or order for relief in respect of the Issuer by a court having competent jurisdiction in an involuntary case under any applicable bankruptcy, insolvency, rehabilitation or other similar law in effect on the date of the Notes or thereafter, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Issuer or any substantial part of its Principal Property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

(b) the commencement by the Issuer of a voluntary case under any applicable bankruptcy, insolvency, rehabilitation or other similar law in effect on the date of the Notes or thereafter, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law or to the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Issuer or of any substantial part of its Principal Property, or the mailing by the Issuer of an assignment for the benefit of its creditors, or the admission by the Issuer in writing of inability to pay its debts generally as they become due, or the taking of corporate action by the Issuer in furtherance of any such action.

A Default under clause (3) above is not an Event of Default until the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes notify the Issuer of the

A-16

Default and the Issuer does not cure such Default within the time specified after receipt of such notice.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) a Responsible Officer of the Trustee has actual knowledge of such Default or Event of Default or (ii) written notice of such Default or Event of Default has been given to the Trustee by the Issuer or any Holder and received by the Trustee.

If an Event of Default (other than an Event of Default specified in clause (5) above) occurs and is continuing, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and premium, if any, and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in writing to the Issuer (and to the Trustee, if the notice is given by the Holders), stating that such notice is an "acceleration notice," and upon any such declaration such amounts shall become due and payable immediately.  If an Event of Default specified in clause (5) above occurs and is continuing, then the principal of and premium, if any, and accrued and unpaid interest on all Notes shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

The Trustee shall be under no obligation to exercise any of its rights or powers under the Indenture at the request or direction of the Holders, unless such Holders shall have offered to the Trustee indemnity reasonably satisfactory to it.  Subject to such provision for the indemnification of the Trustee, the Holders of a majority in aggregate principal amount of the Outstanding Notes shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

At any time after a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this Article, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Issuer and the Trustee may rescind or annul such declaration if: (i)   the Issuer has paid or deposited with the Trustee a sum sufficient to pay (a) all overdue interest on Outstanding Notes, (b) all unpaid principal of and premium, if any, on the Notes that have become due otherwise than by such declaration of acceleration, (c) to the extent that payment of such interest on the Notes is lawful, interest on such overdue interest (including any Additional Amounts) as provided herein and (d) all sums paid or advanced by the Trustee under the Indenture and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and (ii) all Events of Default have been cured or waived as provided in Section 6.13 of the Indenture other than the nonpayment of principal that has become due solely because of acceleration.

No such rescission or annulment referred to in the preceding paragraph shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

16.    <u>Trustee Dealings with the Issuer</u>. The Trustee in its individual or any other capacity, may deal with and collect obligations owed to it by the Issuer or its Affiliates and may

A-17

otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.

17.  <u>Governing Law.</u> THE INDENTURE AND THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

18.  <u>No Recourse Against Others</u>. No director, officer, employee, direct or indirect shareholder or incorporator, as such, of the Issuer or the Trustee shall have any liability for any obligations of the Issuer or the Trustee, respectively, hereunder or the Notes or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder waives and releases all such liability.  The waiver and release are part of the consideration for the issue of the Notes.

19.  <u>CUSIP and ISIN Numbers</u>. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP or ISIN numbers, as applicable, to be printed on the Notes and has directed the Trustee to use CUSIP or ISIN numbers, as applicable, in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer shall furnish to any Holder upon written request and without charge a copy of the Indenture, which includes the form of this Note.  Requests may be made to:

SAMARCO MINERAÇÃO S.A.
Rua Paraíba, 1122, 9th and 10th floors
Belo Horizonte, MG 30130-918
Brazil

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE**

The following increases or decreases in this Global Note have been made:

| Date of Increase or Decrease | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee |
| --- | --- | --- | --- | --- |

A-19

EXHIBIT B

FORM OF
TRANSFER NOTICE

FOR VALUE RECEIVED, the undersigned Holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

Please print or typewrite name and address, including postal zip code, of assignee

_____

this Note and all rights hereunder, hereby irrevocably constituting and appointing

_____attorney to transfer said Note on the books of Samarco Mineração S.A. with full power of substitution in the premises.

_____

In connection with any transfer of this Note occurring prior to the date [which is one year after the original issue date of the Notes,]$^{*}$ [which is on or prior to the 40th day after the Closing Date (as defined in the Indenture governing the Notes),]$^{**}$ the undersigned confirms that:

**[Check one]**

☐    (a) This Note is being transferred to a person whom the Holder reasonably believes is a qualified institutional buyer (as defined in Rule 144A under the U.S. Securities Act of 1933, as amended (the "Securities Act"), in a transaction meeting the requirement of Rule 144A;

☐    (b) This Note is being transferred in an offshore transaction in accordance with Rule 904 under the Securities Act;

☐    (c) This Note is being transferred pursuant to an exemption from registration under the Securities Act (if available);

_____

$^{*}$    *Include in Restricted Note.*
$^{**}$    *Include in Regulation S Note.*

☐   (d) This Note is being transferred pursuant to an effective registration statement under the Securities Act; or

☐   (e) This Note is being transferred to Samarco Mineração S.A.,

in each of cases (a) through (e) above, in accordance with any applicable securities laws of any State of the United States.

If none of the foregoing boxes is checked, the Transfer Agent shall not be obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Section 2.7 of the Indenture shall have been satisfied.

Date: _____

_____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of this instrument in every particular, without alteration, enlargement or any other change whatever.

B-2

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 119 of 189

EXHIBIT C

## FORM OF CERTIFICATE
## FOR TRANSFER FROM RESTRICTED GLOBAL
## NOTE TO REGULATION S
## GLOBAL NOTE

The Bank of New York Mellon
101 Barclay Street, Floor 4 East
New York, New York  10286
Attn:  International Corporate Trust

> Re:    4.125% Notes due 2022 (the "Notes")

Reference is hereby made to the Indenture, dated October 31, 2012 (the "Indenture"), among Samarco Mineração S.A., The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent and The Bank of New York Mellon Trust (Japan), Ltd., as Principal Paying Agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of Notes which are held in the form of [a beneficial interest in the Restricted Global Note (CUSIP No. [     ]) with the Depositary in the name of the undersigned] [a Certificated Note sold in reliance on Rule 144A].

The undersigned has requested a transfer of such [beneficial interest] [Certificated Note] to a Person who shall take delivery thereof in the form of [a beneficial interest of equal principal amount in the Regulation S Global Note (ISIN No. [     ]) to be held with [Euroclear]* [Clearstream]* through the Depositary] [a Certificated Note of equal principal amount not sold in reliance on Regulation S].  In connection with such transfer, the undersigned does hereby certify that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and the Notes and pursuant to and in accordance with Rule 903 or 904 of Regulation S under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and, accordingly, the undersigned further certifies that:

---

\*      *Indicate appropriate clearing system.*

C-1

(1)     the offer of the Notes was not made to a U.S. Person (as defined under Regulation S);

[(2)     at the time the buy order was originated, the transferee was outside the United States or the undersigned and any Person acting on behalf of the undersigned reasonably believed that the transferee was outside the United States;]*

[(2)     the transaction was executed in, on or through the facilities of a designated offshore securities market and neither the undersigned nor any Person acting on behalf of the undersigned knows that the transaction was prearranged with a buyer in the United States;]*

(3)     no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable;

(4)     the undersigned is not the Issuer, a distributor, an affiliate of either the Issuer or a distributor, or a Person acting on behalf of any of the foregoing; and

(5)     the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act.

This certificate and the statements contained herein are made for your benefit and for the benefit of Samarco Mineração S.A.  Terms used in this certificate and not otherwise defined in the Indenture have the meanings set forth in Regulation S.

[INSERT NAME OF TRANSFEROR]

By: _____
        Name:
        Title:

Dated: _____, __

cc:     Samarco Mineração S.A.

---

*        *Insert one of the two provisions.*

C-2

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 121 of 189

EXHIBIT D

## FORM OF TRANSFER CERTIFICATE
## FOR TRANSFER FROM REGULATION S GLOBAL
## NOTE TO RESTRICTED GLOBAL
## NOTE

The Bank of New York Mellon
101 Barclay Street, Floor 4 East
New York, New York  10286
Attn:  International Corporate Trust

Re:    <u>4.125% Notes due 2022 (the "Notes")</u>

Reference is hereby made to the Indenture, dated October 31, 2012 (the "Indenture"), among Samarco Mineração S.A., and The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent and The Bank of New York Mellon Trust (Japan), Ltd., as Principal Paying Agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of Notes which are held in the form of [a beneficial interest in the Regulation S Global Note (ISIN No. [     ]) with the Depositary in the name of the undersigned] [a Certificated Note sold in reliance on Regulation S].

The undersigned has requested a transfer of such [beneficial interest] [Certificated Note] to a Person who shall take delivery thereof in the form of [a beneficial interest in the Restricted Global Note (CUSIP No. [     ]) to be held through the Depositary] [a Certificated Note sold in reliance on Rule 144A].  In connection with such transfer, the undersigned does hereby confirm that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and the Notes and pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended, and accordingly, the undersigned represents that:

D-1

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 122 of 189

(1)      the Notes are being transferred to a transferee that the undersigned reasonably believes is purchasing the Notes for its own account or one or more accounts with respect to which the transferee exercises sole investment discretion; and

(2)      the transferee and any such account is a "qualified institutional buyer" within the meaning of Rule 144A, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

This certificate and the statements contained herein are made for your benefit and for the benefit of Samarco Mineração S.A.

[NAME OF UNDERSIGNED]

By: _____
      Name:
      Title:

Dated: _____, ___

cc:      Samarco Mineração S.A.

D-2

EXHIBIT E

FORM OF CERTIFICATE FOR REMOVAL
OF THE SECURITIES ACT LEGEND ON A NOTE

The Bank of New York Mellon
101 Barclay Street, Floor 4 East
New York, New York  10286
Attn:  International Corporate Trust

Re:        <u>4.125% Notes due 2022</u>

Reference is hereby made to the Indenture, dated October 31, 2012 (the "Indenture"), among Samarco Mineração S.A., The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent and The Bank of New York Mellon Trust (Japan), Ltd., as Principal Paying Agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of Notes which are held in the form of [a beneficial interest in a Global Note (CUSIP No. [    ]) with the Depositary bearing a Securities Act Legend]* [[a] Certificated Note(s) in the name of the undersigned bearing a Securities Act Legend.]*  (the "Notes")

The undersigned has requested for the Securities Act Legend on the Note(s) to be removed.

In connection with such [transfer][or][removal] the undersigned does hereby certify that such [transfer][removal] has been effected only (i) in an offshore transaction in accordance with Rule 904 under the Securities Act, (ii) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if available) or (iii) pursuant to an effective registration statement under the Securities Act, in each of cases (i) through (iii) in accordance with any applicable securities laws of any State of the United States.

---

*          ***Indicate form in which Notes are held.***

E-1

This certificate and the statements contained herein are made for your benefit and for the benefit of Samarco Mineração S.A.

[NAME OF UNDERSIGNED]

By: _____
        Name:
        Title:

Dated: _____, ____

cc:     Samarco Mineração S.A.

E-2

# EXHIBIT 2

UNLESS THIS GLOBAL NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK LIMITED PURPOSE TRUST COMPANY ("DTC"), TO THE COMPANY NAMED HEREIN (THE "COMPANY") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE IN WHOLE SHALL BE LIMITED TO TRANSFERS TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC OR BY DTC OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY AND TRANSFERS OF THIS GLOBAL NOTE IN PART SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE AND REFERRED TO ON THE REVERSE HEREOF.

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS.  THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF SAMARCO MINERAÇÃO S.A. THAT THIS NOTE OR ANY INTEREST OR PARTICIPATION HEREIN MAY BE  OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (I) TO SAMARCO MINERAÇÃO S.A., (II) SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A) IN ACCORDANCE WITH RULE 144A, (III) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, (IV) PURSUANT TO ANOTHER APPLICABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE), OR (V) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AND IN EACH OF SUCH CASES IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION.  AS A CONDITION TO THE REGISTRATION OF TRANSFER OF THIS NOTE PURSUANT TO CLAUSE (IV) ABOVE, SAMARCO MINERAÇÃO S.A. OR THE TRUSTEE MAY REQUIRE DELIVERY OF ANY DOCUMENTATION OR OTHER EVIDENCE THAT SAMARCO MINERAÇÃO, S.A., IN ITS SOLE DISCRETION, DEEMS NECESSARY OR APPROPRIATE TO EVIDENCE COMPLIANCE WITH THE EXEMPTION REFERRED TO IN SUCH CLAUSE (IV) AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION.  THE HOLDER HEREOF, BY PURCHASING THIS NOTE, REPRESENTS AND AGREES THAT IT SHALL NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

SPAULO-1-37632-v2

A-1

95-40532171

FILED: NEW YORK COUNTY CLERK 09/02/2020 06:58 PM
NYSCEF DOC. NO. 4

INDEX NO. 654214/2020
RECEIVED NYSCEF: 09/02/2020

THIS LEGEND MAY BE REMOVED SOLELY IN THE DISCRETION AND
AT THE DIRECTION OF SAMARCO MINERAÇÃO S.A.

A-2

# SAMARCO MINERAÇÃO S.A.

4.125% Notes due 2022

RESTRICTED GLOBAL NOTE

No. R-1

CUSIP No. 79586K AA9                                      Principal Amount
ISIN No. US79586KAA97                                    U.S.$489,495,000
COMMON CODE. 083563770

Samarco Mineração S.A., a closely held company incorporated under the laws of Brazil (the "Company," which term includes any successor corporation hereunder referred to on the reverse hereof), for value received, hereby promises to pay to CEDE & CO., or registered assigns, U.S.$489,495,000, as adjusted in accordance with the Schedule of Increases and Decreases on the Reverse of this Note, on November 1, 2022 (the "Principal Payment Date") upon presentment and surrender of this Note, on such date or dates as the then relevant principal sum may become payable in accordance with the provisions hereof and in the Indenture.

Interest on the outstanding principal amount and premium, if any, shall be borne at the rate of 4.125% per annum payable semi-annually in arrears on each May 1 and November 1 of each year (each such date an "Interest Payment Date"), commencing on May 1, 2013 until payment of said principal amount and premium, if any, has been made or duly provided for in full together with such other amounts as may be payable, all subject to and in accordance with the terms and conditions set forth herein and in the Indenture; *provided, however,* that in the event that the Issuer shall at any time default on the payment of principal, premium, if any, interest or such other amounts as any may be payable in respect of the Notes, the Issuer shall pay interest on overdue principal and premium, if any, at the rate borne by the Notes plus 1% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

A-3

Unless the certificate of authentication herein has been executed by the Trustee or Authenticating Agent by the manual signature of one of its authorized signatories, this Note shall not be entitled to any benefit hereunder or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

Dated:

SAMARCO MINERAÇÃO S.A.

By: _____
Name: ROBERTO _____ DE CARVALHO
Title: CHIEF _____ OFFICER

By: _____
Name: EDUARDO BAHIA
Title: CHIEF FINANCING OFFICER

Witnesses:

By: _____
Name: WAGNER DE ALMEIDA PAIVA

By: _____
Name:

*(Signature Page to Restricted Global Note)*

TRUSTEE'S CERTIFICATE OF
AUTHENTICATION

This is one of the Notes
referred to in the within
mentioned Indenture.

THE BANK OF NEW YORK MELLON,
as Trustee

By: _____
Authorized Officer

*(Signature Page to Restricted Global Note)*

4.125% Notes due 2022

TERMS AND CONDITIONS OF THE NOTES

This Note is one of a duly authorized issue of 4.125% Notes due 2022 of the Issuer. The Notes constitute senior unsecured obligations of the Issuer, initially limited to an aggregate principal amount of U.S.$1,000,000,000, and mature at 100% of the principal amount on November 1, 2022 (the "Principal Payment Date"), unless earlier redeemed.

1.    Indenture. The Notes are, and shall be, issued under an Indenture, dated as of October 31, 2012 (the "Indenture"), among Samarco Mineração S.A., The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent (the "Trustee") and The Bank of New York Mellon Trust (Japan) Ltd., as Principal Paying Agent. The terms of the Notes include those stated in the Indenture. The Holders of the Notes shall be entitled to the benefit of, be bound by and be deemed to have notice of, all provisions of the Indenture. Reference is hereby made to the Indenture and all supplemental indentures thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee, each Agent and the Holders of the Notes and the terms upon which the Notes, are, and are to be, authenticated and delivered. All terms used in this Note that are defined in the Indenture shall have the meanings assigned to them in the Indenture. Copies of the Indenture and each Global Note shall be available for inspection during normal business hours at the offices of the Trustee and each Paying Agent.

The Issuer may from time to time, without the consent of the Holders of the Notes, create and issue additional Notes having the same terms and conditions as the Notes in all respects, except for issue date, issue price and the first payment of interest thereon. Additional Notes issued in this manner shall be consolidated with and shall form a single series with the previously Outstanding Notes.

The Indenture imposes certain limitations on the creation of Mortgages by the Issuer or its Subsidiaries and consolidation, merger and certain other transactions involving the Issuer. In addition, the Indenture requires the maintenance of the existence of the Issuer and its Subsidiaries and includes reporting requirements applicable to the Issuer.

2.    Interest. The Notes bear interest at the rate per annum shown above from October 31, 2012, or from the most recent Interest Payment Date (as defined below) to which interest has been paid or provided for, payable semi-annually in arrears on May 1 and November 1 of each year (each such date, an "Interest Payment Date"), commencing on May 1, 2013. Interest on the Notes shall be computed on the basis of a 360-day year comprised of twelve 30-day months. The Issuer shall pay interest on overdue principal and premium, if any, at the rate borne by the Notes plus 1% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

3.    Principal. Unless previously redeemed or purchased and cancelled, the Notes shall be repaid at 100% of the principal amount thereof on the Principal Payment Date.

A-7

4.   <u>Method of Payment</u>. Payments of interest in respect of each Note shall be made on each Interest Payment Date to the Person in whose name such Note is registered in the Register at the close of business on April 15 or October 15 (whether or not a Business Day), as the case may be (each, a "Record Date"), next preceding such Interest Payment Date.  Payment of principal and premium, if any, in respect of each Note on the Principal Payment Date shall be made to the Person in whose name such Note is registered in the Register at the close of business on the day (whether or not a Business Day) immediately preceding the Principal Payment Date.

Payments of interest, as well as principal and premium, if any, in respect of each Note shall be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears in the Register.  Upon written notice from a Holder of such Note received by any Paying Agent at least 15 Business Days prior to an Interest Payment Date or the Principal Payment Date, as the case may be, such payment may be made by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York.

All payments on this Note are subject in all cases to any applicable tax or other laws and regulations, but without prejudice to the provisions of Paragraph 6 hereof.  Except as provided in Section 2.8 of the Indenture, no fees, commissions or expenses shall be charged to the Holders in respect of such payments.

If the Payment Date in respect of any Note is not a Business Day at the place in which it is presented for payment, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place and shall not be entitled to any further interest or other payment in respect of any such delay.

If the amount of principal or premium, if any, or interest which is due on the Notes is not paid in full, the Registrar shall annotate the Register with a record of the amount of principal, premium or interest, if any, in fact paid.

5.   <u>Registrar, Paying Agent and Transfer Agent</u>.      The Trustee shall act as Registrar, Transfer Agent and Paying Agent.  The Issuer may appoint and change any Registrar, Paying Agent or Transfer Agent without notice.  Upon the issue of Certificated Notes, the Issuer will appoint and maintain a Luxembourg Paying Agent for so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of such exchange so require.  In such event, an announcement shall be made through the Luxembourg Stock Exchange and shall include all material information with respect to the delivery of the Certificated Notes, including details of the Luxembourg Paying Agent.

6.   <u>Additional Amounts.</u> All payments by the Issuer in respect of the Notes shall be made without withholding or deduction for or on account of any and all present or future Taxes by or for the account of the applicable Issuer Jurisdiction (as defined below), unless such withholding or deduction is required by law.  If the Issuer is required by the applicable Issuer Jurisdiction to deduct or withhold Taxes, the Issuer will pay to a Holder of a Note or the beneficial owner thereof such additional amounts ("Additional Amounts") as may be necessary so that the net amount received by such Holder or beneficial owner will not be less than the amount such Holder or beneficial owner would

A-8

have received if such Taxes had not been withheld or deducted; *provided, however,* that the Issuer shall not be required to pay any Additional Amounts for or on account of:

(i)     any Taxes that would not have been so imposed, assessed, levied or collected but for the fact that the Holder of the Note (or a fiduciary, settlor, beneficiary, member or shareholder of, or possessor of a power over, such Holder, if such Holder is an estate, trust, partnership or corporation) is or has been a domiciliary, national or resident of, or engaging or having been engaged in a trade or business or maintaining or having maintained a permanent establishment or being or having been physically present in the jurisdiction in which such Taxes have been imposed, assessed, levied or collected or otherwise having or having had some connection with such jurisdiction, other than the mere holding or ownership of, or the collection of principal of, and interest on a Note;

(ii)    any  Taxes that would not have been so imposed, assessed, levied or collected but for the fact that, where presentation is required in order to receive payment, the Note was presented more than 30 days after the date on which such payment became due and payable or was provided for, whichever is later, except to the extent that the Holder or beneficial owner thereof would have been entitled to Additional Amounts had the Note been presented for payment on any day during such 30-day period;

(iii)   any Taxes that would not have been so imposed, assessed, levied or collected but for the failure by the Holder or the beneficial owner of the Note to comply (following a written request addressed to the Holder or beneficial owner, as applicable), with any certification, identification or other reporting requirements concerning the nationality, residence or identity of such Holder or beneficial owner or its connection with the applicable Issuer Jurisdiction if compliance is required by statute, regulation or administrative practice of such Issuer Jurisdiction as a condition to relief or exemption from such Taxes;

(iv)    any estate, inheritance, gift, sales, transfer, excise, personal property or similar Taxes;

(v)     any withholding or deduction imposed on a payment to or for the benefit of an individual that is required to be made pursuant to European Union Directive 2003/48/EC, any law implementing this Directive or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings, or any law implementing or complying with, or introduced in order to conform to, such Directive;

(vi)    any withholding or deduction that is imposed on the Note that is presented for payment, where presentation is required, by or on behalf of a Holder who would have been able to avoid such withholding or deduction by presenting such Note to another Paying Agent in a member state of the European Union;

(vii)   any Taxes that are payable otherwise than by deduction or withholding from payments on or in respect of the Note; or

(viii) any combination of the above.

A-9

The Issuer will also pay any present or future stamp, court or documentary taxes or any other excise taxes, charges or similar levies which arise in any jurisdiction from or through which payment is made or on behalf of the Issuer (including the jurisdiction of the Paying Agent) on the execution, delivery, registrations, or the making of payments in respect of the Notes and the Indenture, excluding any such taxes, charges or similar levies imposed by any jurisdiction outside of any Issuer Jurisdiction.

No Additional Amounts shall be paid in respect of any payment in respect of the Notes to any Holder or beneficial owner of the Notes that is a fiduciary, a partnership, a limited liability company or any Person other than the sole beneficial owner of such payment to the extent such payment would be required by the laws of the Issuer Jurisdiction to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary, a member of such partnership, an interest holder in such limited liability company or a beneficial owner that would not have been entitled to such amounts had such beneficiary, settlor, member, interest holder or beneficial owner been the Holder of such Notes.

If requested in writing by the Trustee, the Issuer shall use reasonable efforts to obtain certified copies of tax receipts evidencing the payment of any Taxes so withheld or deducted from the Issuer Jurisdiction's taxing authority imposing such tax, and if certified copies are unavailable, the Issuer shall use reasonable efforts to obtain other evidence satisfactory to the Trustee, and the Trustee shall make such certified copies or other evidence available to the Holders or the Paying Agents, upon request to the Trustee.

7.    <u>No Conversion</u>. The Notes shall not be convertible into any securities of the Issuer or any of their Affiliates.

8.    <u>Open Market Purchases</u>. The Issuer or any of their Affiliates may at any time purchase Notes in the open market or otherwise at any price. All Notes so purchased and Notes that have been redeemed (i) may not be resold, except in compliance with applicable requirements or exemptions under any relevant securities and other laws and (ii) at the option of the Issuer, may be delivered to the Trustee for cancellation or remain Outstanding.

9.    <u>Redemption</u>.

(a)    Except as described in Section 3.1 and Section 3.8 of the Indenture and this Paragraph 9, the Notes may not be redeemed prior to their Stated Maturity.

(b)    The Notes shall be redeemable, at the option of the Issuer or any successor, in whole, but not in part, upon giving not less than 30 nor more than 60 days' notice to the Holders at any time, at 100% of the principal amount thereof, plus accrued and unpaid interest thereon, to, but excluding, the Redemption Date, if , as a result of any change in, expiration of or amendment to the laws of the Issuer Jurisdiction (or of any political subdivision or taxing authority thereof or therein) or any regulations or rulings promulgated thereunder or any change in the official interpretation or official application of such laws, regulations or rulings, or any change in the official application or interpretation of, or any execution of or amendment to, any treaty or treaties affecting taxation to which the Issuer Jurisdiction (or such political subdivision or taxing authority) is a party, which change,

A-10

amendment, expiration or treaty becomes effective on or after October 31, 2012, the Issuer is or would be obligated on the next succeeding due date for a payment with respect to the Notes to pay Additional Amounts in excess of those attributable to Brazilian withholding tax on the basis of a statutory rate of 15%, and such obligation cannot be avoided by the use of reasonable measures available to the Issuer; *provided*, *however* (i) no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer or any successor, as the case may be, would be obligated to pay such Additional Amounts and (ii) at the time such notice of redemption is given, such obligation to pay such Additional Amounts remains in effect.

Prior to giving any notice of redemption pursuant to the preceding paragraph, the Issuer or any successor shall deliver to the Trustee an Officer's Certificate stating that the Issuer is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of redemption have occurred. The Trustee shall accept such certificate as sufficient evidence of the satisfaction of the conditions precedent set forth in clauses (i) and (ii) of the preceding paragraph of this Paragraph 9(b), in which event it shall be conclusive and binding on the Holders.

(c)    The Notes shall be redeemable, at the option of the Issuer, in whole or in part, at any time and from time to time, at a Redemption Price equal to the greater of the following amounts, plus accrued and unpaid interest on the principal amount of the Notes to be redeemed, to the Redemption Date:

(i)    100% of the principal amount of the Notes to be redeemed; and

(ii)    as determined by the Independent Investment Banker, the sum of the present values of the applicable Remaining Scheduled Payments, discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months or in the case of an incomplete month, the number of days elapsed) at the Treasury Rate plus 35 basis points.

For purposes of this Paragraph 9(c), the following terms have the following meanings:

"Treasury Rate" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Comparable Treasury Issue" means the United States Treasury security selected by the Independent Investment Banker having an actual or interpolated maturity comparable to the remaining term of the Notes to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of the Notes.

"Comparable Treasury Price" means, with respect to any Redemption Date, (A) the arithmetic average of the Reference Treasury Dealer Quotations for such Redemption Date,

A-11

after excluding the highest and lowest of such Reference Treasury Dealer Quotations, or (B) if the Independent Investment Banker for the Notes obtains fewer than four such Reference Treasury Dealer Quotations, the arithmetic average of all Reference Treasury Dealer Quotations for such Redemption Date.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Issuer.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any Redemption Date, the arithmetic average, as determined by the Independent Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 3:30 p.m., New York City time, on the third Business Day preceding such Redemption Date.

"Reference Treasury Dealer" means each of Citigroup Global Capital Markets Inc., HSBC Securities (USA) Inc. and J.P. Morgan Securities LLC, their respective successors and two other nationally recognized investment banking firms that are Primary Treasury Dealers specified from time to time by the Issuer; *provided*, however, that if any of the foregoing shall cease to be a primary U.S. Government securities dealer in the United States (a "Primary Treasury Dealer"), the Issuer shall substitute therefor another nationally recognized investment banking firm that is a Primary Treasury Dealer.

"Remaining Scheduled Payments" means, with respect to each Note to be redeemed, the remaining scheduled payments of the principal thereof and interest thereon that would be due after the applicable Redemption Date but for such redemption; *provided*, *however*, that, if such Redemption Date is not an Interest Payment Date, the amount of the next succeeding scheduled interest payment thereon will be reduced by the amount of interest accrued thereon to such Redemption Date.

(d)    Notice of any redemption will be given in accordance with Section 11.2 of the Indenture at least 30 days but not more than 60 days before the Redemption Date. Unless the Issuer defaults in the payment of the Redemption Price, on and after any Redemption Date, interest will cease to accrue on the Notes or any portion thereof called for redemption.

(e)    If a Change of Control Repurchase Event occurs, unless the Issuer has exercised its option to redeem the Notes under Section 3.1 and Paragraph 9 of the Notes, the Issuer shall make an offer to each Holder of Notes to repurchase all or any part of the Holder's Notes pursuant to the offer described below (the "Offer to Purchase") at a price in cash (the "Offer to Purchase Payment") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon and Additional Amounts, if any, to, but not including, the Offer to Purchase Payment Date.  Within 30 days following any Change of Control Repurchase Event or, at the option of the Issuer, prior to any Change of Control, but after the public announcement of the Change of Control, the Issuer will give notice as described in Section 11.2 of the Indenture, to each Holder (with a copy to the Trustee) containing the information specified in Section 3.8(a) of the Indenture.

A-12

(i)  On the Business Day prior to the Offer to Purchase Payment Date, the Issuer shall, to the extent lawful, deposit with a Paying Agent an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof so tendered;

(ii)  On the Offer to Purchase Payment Date following a Change of Control Repurchase Event, the Issuer will, to the extent lawful, (I) accept for payment for all Notes properly tendered and not withdrawn pursuant to the Offer to Purchase and (II) deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

(iii)  Notwithstanding Section 3.8(a) of the Indenture or this Paragraph 9(e), the Issuer shall not be required to make an Offer to Purchase upon a Change of Control Repurchase Event that results in a Below Investment Grade Ratings Event if (i) a third party makes an offer to purchase in the manner, at the times and otherwise in compliance with the requirements set forth in this Paragraph 10 applicable to an Offer to Purchase made by the Issuer and such third party purchases all Notes properly tendered and not withdrawn under such offer, or (ii) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.4 of the Indenture, unless and until there is a default in payment of the applicable Redemption Price.  Notwithstanding anything to the contrary contained herein or in the Notes, an Offer to Purchase may be made in advance of a Change of Control Repurchase Event, conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(iv)  The Issuer will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under Section 3.8 of the Indenture or this Paragraph 9(e) of the Notes by virtue thereof.

10.  <u>Denominations; Transfer; Exchange.</u>The Notes are in fully registered form without coupons attached in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof.  A Holder may transfer or exchange Notes in accordance with the Indenture.  The Trustee or Transfer Agent, as the case may be, may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.

The Trustee or Transfer Agent, as the case may be, need not register the transfer or exchange of any Notes for a period of 15 days preceding a Redemption Date or between a Record Date and the related Payment Date.

11.  <u>Persons Deemed Owners</u>. The registered Holder of this Note may be treated as the owner thereof for all purposes.

12.  <u>Unclaimed Money</u>. Subject to applicable law, the Trustee and each Paying

A-13

Agent shall pay to the Issuer upon request any monies held by them for the payment of principal, premium, if any, or interest that remains unclaimed for two years, and thereafter, Holders entitled to such monies must look to the Issuer for payment as general creditors.

       13.   <u>Defeasance</u>. Subject to the terms of the Indenture, the Issuer at any time may terminate some or all of their obligations under the Indenture or the Notes if the Issuer irrevocably deposits in trust with the Trustee money or Government Obligations sufficient for the payment of principal of, and interest on all the Outstanding Notes to and including the date irrevocably designated by the Issuer on or prior to the date of the deposit of such money or Government Obligations.

       14.   <u>Amendment; Waiver</u>. Subject to certain exceptions set forth in the Indenture or the Notes may be amended or supplemented with the written consent of the Holders of at least a majority in principal amount of the Outstanding Notes, and an existing Default or Event of Default and its consequences or compliance with Sections 4.6(a), (b) and (c), and 4.8 of the Indenture may be waived with the consent of the Holders of at least a majority in principal amount of the Outstanding Notes.  However, without the consent of each Holder affected thereby, an amendment may not:

       (v)   change the rate or time for payment of interest on any Note;

       (vi)   change the principal or Stated Maturity of any Note;

       (vii)   reduce the principal amount of or interest on any Note or Additional Amounts payable with respect thereto or reduce the amount payable thereon in the event of redemption or Default;

       (viii)   change the currency of payment of principal of or interest on any Note or Additional Amounts payable with respect thereto;

       (ix)   change the obligation of the Issuer to pay Additional Amounts;

       (x)   impair the right to institute suit for the enforcement of any such payment on or with respect to any Note;

       (xi)   waive a Default on the payment of principal, premium, if any, and interest on the Notes or the Indenture;

       (xii)   reduce the principal amount of Notes whose Holders must consent to any amendment, supplement or waiver;

       (xiii)   reduce the aggregate principal amount of any Note Outstanding necessary to modify or amend the Indenture or any such Notes or to waive any future compliance or past Default or reduce the quorum requirements or the percentage of aggregate principal amount of any Notes outstanding required for the adoption of any action at a meeting of holders of such Notes or reduce the percentage of the aggregate principal amount of such Notes outstanding necessary to rescind or annul any declaration of the principal of and all accrued and unpaid interest on any Notes to be due and payable.

A-14

The Issuer and the Trustee may, without notice to or the consent or vote of any Holder of the Notes, amend or supplement the Indenture or the Notes, for the following purposes:

(xiv)    to cure any ambiguity or to correct or supplement any provision contained in the Indenture which may be defective or inconsistent with any other provision contained therein or to make such other provision in regard to matters or questions arising under the Indenture as the Issuer may deem necessary or desirable and which will not adversely affect the interests of the Holders of the Notes in any material respect (*provided*, that any modification or amendment to conform language in the Indenture to that appearing in the section "Description of the Notes" in the final Offering Memorandum relating to the Notes dated October 26, 2012 shall be deemed not to adversely affect the interests of the Holders of the Notes in any material respect);

(xv)    to convey, transfer, assign, mortgage or pledge to the Trustee as security for the Notes any property or assets;

(xvi)    to add to the covenants of the Issuer, such further covenants, restrictions, conditions or provisions for the protection of the Holders of Notes, and to make the occurrence, or the occurrence and continuance, of a Default in any such additional covenants, restrictions, conditions or provisions an Event of Default under the Indenture permitting the enforcement of all or any of the several remedies provided in the Indenture or the Notes; *provided* that, in respect of any such additional covenant, restriction, condition or provision, such supplemental indenture may provide for a particular period of grace after Default (which may be shorter or longer than that allowed in the case of other Defaults) or may limit the remedies available to the Trustee upon such an Event of Default or may limit the right of Holders of a majority in aggregate principal amount of the applicable Outstanding Notes to waive such an Event of Default;

(xvii)    to evidence and provide for the acceptance of appointment of a successor Trustee, Principal Paying Agent, Registrar or Transfer Agent, as the case may be; or

(xviii)    to modify the restrictions on, and procedures for, resale and other transfers of the Notes pursuant to law or regulation relating to the resale or transfer of restricted securities generally.

15.    <u>Defaults and Remedies.</u> An "Event of Default" occurs if:

(1) The Issuer defaults in the payment of any installment of interest (including applicable Additional Amounts) upon any Note as and when the same shall become due and payable, and continuance of such Default for 30 days;

(2) The Issuer defaults in the payment of all or any part of the principal of or premium on any Note as and when the same shall become due and payable either at its Stated Maturity, upon any redemption, by declaration or otherwise;

(3) The Issuer defaults in the performance or breach of any covenant of the Issuer in respect of the Notes or the Indenture (other than those described in paragraphs (1) and

A-15

(2) above), and continuance of such default or breach for a period of 60 days after there has been given a written notice, by registered or certified mail, to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% in principal amount of the Outstanding Notes affected thereby, specifying such default or breach and requiring it to be remedied and stating that such notice is a notice of default ("Notice of Default") under the Indenture;

(4) any present or future Indebtedness of the Issuer or any Significant Subsidiary, other than the Notes, for or in respect of moneys borrowed is declared due and payable prior to its Stated Maturity as the result of any Event of Default (howsoever described); *provided* that the aggregate amount of the relevant Indebtedness in respect of which the event mentioned in this paragraph will have occurred (which Indebtedness has not been repaid or paid and as to which such default has not been cured or such acceleration has not been rescinded or annulled) exceeds US$75,000,000 or its equivalent;

(5) (a) the entry of a decree or order for relief in respect of the Issuer by a court having competent jurisdiction in an involuntary case under any applicable bankruptcy, insolvency, rehabilitation or other similar law in effect on the date of the Notes or thereafter, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Issuer or any substantial part of its Principal Property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

(b) the commencement by the Issuer of a voluntary case under any applicable bankruptcy, insolvency, rehabilitation or other similar law in effect on the date of the Notes or thereafter, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law or to the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Issuer or of any substantial part of its Principal Property, or the mailing by the Issuer of an assignment for the benefit of its creditors, or the admission by the Issuer in writing of inability to pay its debts generally as they become due, or the taking of corporate action by the Issuer in furtherance of any such action.

A Default under clause (3) above is not an Event of Default until the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes notify the Issuer of the Default and the Issuer does not cure such Default within the time specified after receipt of such notice.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) a Responsible Officer of the Trustee has actual knowledge of such Default or Event of Default or (ii) written notice of such Default or Event of Default has been given to the Trustee by the Issuer or any Holder and received by the Trustee.

If an Event of Default (other than an Event of Default specified in clause (5) above) occurs and is continuing, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and premium, if any, and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in

A-16

writing to the Issuer (and to the Trustee, if the notice is given by the Holders), stating that such notice is an "acceleration notice," and upon any such declaration such amounts shall become due and payable immediately. If an Event of Default specified in clause (5) above occurs and is continuing, then the principal of and premium, if any, and accrued and unpaid interest on all Notes shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

The Trustee shall be under no obligation to exercise any of its rights or powers under the Indenture at the request or direction of the Holders, unless such Holders shall have offered to the Trustee indemnity reasonably satisfactory to it. Subject to such provision for the indemnification of the Trustee, the Holders of a majority in aggregate principal amount of the Outstanding Notes shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

At any time after a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this Article, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Issuer and the Trustee may rescind or annul such declaration if: (i)  the Issuer has paid or deposited with the Trustee a sum sufficient to pay (a) all overdue interest on Outstanding Notes, (b) all unpaid principal of and premium, if any, on the Notes that have become due otherwise than by such declaration of acceleration, (c) to the extent that payment of such interest on the Notes is lawful, interest on such overdue interest (including any Additional Amounts) as provided herein and (d) all sums paid or advanced by the Trustee under the Indenture and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and (ii) all Events of Default have been cured or waived as provided in Section 6.13 of the Indenture other than the nonpayment of principal that has become due solely because of acceleration.

No such rescission or annulment referred to in the preceding paragraph shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

16.    Trustee Dealings with the Issuer. The Trustee in its individual or any other capacity, may deal with and collect obligations owed to it by the Issuer or its Affiliates and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.

17.    Governing Law. THE INDENTURE AND THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

A-17

18.    <u>No Recourse Against Others</u>. No director, officer, employee, direct or indirect shareholder or incorporator, as such, of the Issuer or the Trustee shall have any liability for any obligations of the Issuer or the Trustee, respectively, hereunder or the Notes or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder waives and releases all such liability.  The waiver and release are part of the consideration for the issue of the Notes.

19.    <u>CUSIP and ISIN Numbers</u>. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP or ISIN numbers, as applicable, to be printed on the Notes and has directed the Trustee to use CUSIP or ISIN numbers, as applicable, in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer shall furnish to any Holder upon written request and without charge a copy of the Indenture, which includes the form of this Note.  Requests may be made to:

SAMARCO MINERAÇÃO S.A.
Rua Paraíba, 1122, 9th and 10th floors
Belo Horizonte, MG 30130-918
Brazil

A-18

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE**

The following increases or decreases in this Global Note have been made:

| Date of Increase or Decrease | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |

A-19

# EXHIBIT 3

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 145 of 189

UNLESS THIS GLOBAL NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK LIMITED PURPOSE TRUST COMPANY ("DTC"), TO THE COMPANY NAMED HEREIN (THE "COMPANY") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE IN WHOLE SHALL BE LIMITED TO TRANSFERS TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC OR BY DTC OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY AND TRANSFERS OF THIS GLOBAL NOTE IN PART SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE AND REFERRED TO ON THE REVERSE HEREOF.

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS.  THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION.

A-1

**SAMARCO MINERAÇÃO S.A.**

4.125% Notes due 2022

REGULATION S GLOBAL NOTE

No. S-1

CUSIP No. P84050 AA4                                              Principal Amount
ISIN No. USP84050AA46                                            U.S.$500,000,000
COMMON CODE.  083563745

      Samarco Mineração S.A., a closely held company incorporated under the laws of Brazil (the "Company," which term includes any successor corporation hereunder referred to on the reverse hereof), for value received, hereby promises to pay to CEDE & CO., or registered assigns, U.S.$500,000,000, as adjusted in accordance with the Schedule of Increases and Decreases on the Reverse of this Note, on November 1, 2022 (the "Principal Payment Date") upon presentment and surrender of this Note, on such date or dates as the then relevant principal sum may become payable in accordance with the provisions hereof and in the Indenture.

      Interest on the outstanding principal amount and premium, if any, shall be borne at the rate of 4.125% per annum payable semi-annually in arrears on each May 1 and November 1 of each year (each such date an "Interest Payment Date"), commencing on May 1, 2013 until payment of said principal amount and premium, if any, has been made or duly provided for in full together with such other amounts as may be payable, all subject to and in accordance with the terms and conditions set forth herein and in the Indenture; *provided, however,* that in the event that the Issuer shall at any time default on the payment of principal, premium, if any, interest or such other amounts as any may be payable in respect of the Notes, the Issuer shall pay interest on overdue principal and premium, if any, at the rate borne by the Notes plus 1% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

      Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

A-2

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 147 of 189

Unless the certificate of authentication herein has been executed by the Trustee or Authenticating Agent by the manual signature of one of its authorized signatories, this Note shall not be entitled to any benefit hereunder or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

Dated:

SAMARCO MINERAÇÃO S.A.

By: _____
Name: ROBERTO L. NUNES CAMACHO
Title: CHIEF COMMERCIAL OFFICER

By: _____
Name: EDUARDO BAHIA
Title: CHIEF FINANCIAL OFFICER

Witnesses:

By: _____
Name: WAGNER DE ALMEIDA VAVA

By: _____
Name:

*(Signature Page to Regulation S Global Note)*

TRUSTEE'S CERTIFICATE OF
AUTHENTICATION

This is one of the Notes
referred to in the within
mentioned Indenture.

THE BANK OF NEW YORK MELLON,
as Trustee

By: _____
Authorized Officer

*(Signature Page to Regulation S Global Note)*

4.125% Notes due 2022

TERMS AND CONDITIONS OF THE NOTES

This Note is one of a duly authorized issue of 4.125% Notes due 2022 of the Issuer. The Notes constitute senior unsecured obligations of the Issuer, initially limited to an aggregate principal amount of U.S.$1,000,000,000, and mature at 100% of the principal amount on November 1, 2022 (the "Principal Payment Date"), unless earlier redeemed.

1.    Indenture. The Notes are, and shall be, issued under an Indenture, dated as of October 31, 2012 (the "Indenture"), among Samarco Mineração S.A., The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent (the "Trustee") and The Bank of New York Mellon Trust (Japan) Ltd., as Principal Paying Agent. The terms of the Notes include those stated in the Indenture. The Holders of the Notes shall be entitled to the benefit of, be bound by and be deemed to have notice of, all provisions of the Indenture. Reference is hereby made to the Indenture and all supplemental indentures thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee, each Agent and the Holders of the Notes and the terms upon which the Notes, are, and are to be, authenticated and delivered. All terms used in this Note that are defined in the Indenture shall have the meanings assigned to them in the Indenture. Copies of the Indenture and each Global Note shall be available for inspection during normal business hours at the offices of the Trustee and each Paying Agent.

The Issuer may from time to time, without the consent of the Holders of the Notes, create and issue additional Notes having the same terms and conditions as the Notes in all respects, except for issue date, issue price and the first payment of interest thereon. Additional Notes issued in this manner shall be consolidated with and shall form a single series with the previously Outstanding Notes.

The Indenture imposes certain limitations on the creation of Mortgages by the Issuer or its Subsidiaries and consolidation, merger and certain other transactions involving the Issuer. In addition, the Indenture requires the maintenance of the existence of the Issuer and its Subsidiaries and includes reporting requirements applicable to the Issuer.

2.    Interest. The Notes bear interest at the rate per annum shown above from October 31, 2012, or from the most recent Interest Payment Date (as defined below) to which interest has been paid or provided for, payable semi-annually in arrears on May 1 and November 1 of each year (each such date, an "Interest Payment Date"), commencing on May 1, 2013. Interest on the Notes shall be computed on the basis of a 360-day year comprised of twelve 30-day months. The Issuer shall pay interest on overdue principal and premium, if any, at the rate borne by the Notes plus 1% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

3.    Principal. Unless previously redeemed or purchased and

A-6

cancelled, the Notes shall be repaid at 100% of the principal amount thereof on the Principal Payment Date.

       4.     <u>Method of Payment</u>. Payments of interest in respect of each Note shall be made on each Interest Payment Date to the Person in whose name such Note is registered in the Register at the close of business on April 15 or October 15 (whether or not a Business Day), as the case may be (each, a "Record Date"), next preceding such Interest Payment Date. Payment of principal and premium, if any, in respect of each Note on the Principal Payment Date shall be made to the Person in whose name such Note is registered in the Register at the close of business on the day (whether or not a Business Day) immediately preceding the Principal Payment Date.

       Payments of interest, as well as principal and premium, if any, in respect of each Note shall be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears in the Register. Upon written notice from a Holder of such Note received by any Paying Agent at least 15 Business Days prior to an Interest Payment Date or the Principal Payment Date, as the case may be, such payment may be made by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York.

       All payments on this Note are subject in all cases to any applicable tax or other laws and regulations, but without prejudice to the provisions of Paragraph 6 hereof. Except as provided in Section 2.8 of the Indenture, no fees, commissions or expenses shall be charged to the Holders in respect of such payments.

       If the Payment Date in respect of any Note is not a Business Day at the place in which it is presented for payment, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place and shall not be entitled to any further interest or other payment in respect of any such delay.

       If the amount of principal or premium, if any, or interest which is due on the Notes is not paid in full, the Registrar shall annotate the Register with a record of the amount of principal, premium or interest, if any, in fact paid.

       5.     <u>Registrar, Paying Agent and Transfer Agent</u>.     The Trustee shall act as Registrar, Transfer Agent and Paying Agent. The Issuer may appoint and change any Registrar, Paying Agent or Transfer Agent without notice. Upon the issue of Certificated Notes, the Issuer will appoint and maintain a Luxembourg Paying Agent for so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of such exchange so require. In such event, an announcement shall be made through the Luxembourg Stock Exchange and shall include all material information with respect to the delivery of the Certificated Notes, including details of the Luxembourg Paying Agent.

       6.     <u>Additional Amounts.</u> All payments by the Issuer in respect of the Notes shall be made without withholding or deduction for or on account of any and all present or future Taxes by or for the account of the applicable Issuer Jurisdiction (as defined below), unless such withholding or deduction is required by law. If the Issuer is required by the applicable Issuer Jurisdiction to deduct or withhold Taxes, the Issuer will pay to a Holder of a Note or the beneficial owner

A-7

thereof such additional amounts ("Additional Amounts") as may be necessary so that the net amount received by such Holder or beneficial owner will not be less than the amount such Holder or beneficial owner would have received if such Taxes had not been withheld or deducted; *provided, however,* that the Issuer shall not be required to pay any Additional Amounts for or on account of:

(i)     any Taxes that would not have been so imposed, assessed, levied or collected but for the fact that the Holder of the Note (or a fiduciary, settlor, beneficiary, member or shareholder of, or possessor of a power over, such Holder, if such Holder is an estate, trust, partnership or corporation) is or has been a domiciliary, national or resident of, or engaging or having been engaged in a trade or business or maintaining or having maintained a permanent establishment or being or having been physically present in the jurisdiction in which such Taxes have been imposed, assessed, levied or collected or otherwise having or having had some connection with such jurisdiction, other than the mere holding or ownership of, or the collection of principal of, and interest on a Note;

(ii)    any  Taxes that would not have been so imposed, assessed, levied or collected but for the fact that, where presentation is required in order to receive payment, the Note was presented more than 30 days after the date on which such payment became due and payable or was provided for, whichever is later, except to the extent that the Holder or beneficial owner thereof would have been entitled to Additional Amounts had the Note been presented for payment on any day during such 30-day period;

(iii)   any Taxes that would not have been so imposed, assessed, levied or collected but for the failure by the Holder or the beneficial owner of the Note to comply (following a written request addressed to the Holder or beneficial owner, as applicable), with any certification, identification or other reporting requirements concerning the nationality, residence or identity of such Holder or beneficial owner or its connection with the applicable Issuer Jurisdiction if compliance is required by statute, regulation or administrative practice of such Issuer Jurisdiction as a condition to relief or exemption from such Taxes;

(iv)    any estate, inheritance, gift, sales, transfer, excise, personal property or similar Taxes;

(v)     any withholding or deduction imposed on a payment to or for the benefit of an individual that is required to be made pursuant to European Union Directive 2003/48/EC, any law implementing this Directive or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings, or any law implementing or complying with, or introduced in order to conform to, such Directive;

(vi)    any withholding or deduction that is imposed on the Note that is presented for payment, where presentation is required, by or on behalf of a Holder who would have been able to avoid such withholding or deduction by presenting such Note to another Paying Agent in a member state of the European Union;

A-8

(vii)    any Taxes that are payable otherwise than by deduction or withholding from payments on or in respect of the Note; or

(viii) any combination of the above.

The Issuer will also pay any present or future stamp, court or documentary taxes or any other excise taxes, charges or similar levies which arise in any jurisdiction from or through which payment is made or on behalf of the Issuer (including the jurisdiction of the Paying Agent) on the execution, delivery, registrations, or the making of payments in respect of the Notes and the Indenture, excluding any such taxes, charges or similar levies imposed by any jurisdiction outside of any Issuer Jurisdiction.

No Additional Amounts shall be paid in respect of any payment in respect of the Notes to any Holder or beneficial owner of the Notes that is a fiduciary, a partnership, a limited liability company or any Person other than the sole beneficial owner of such payment to the extent such payment would be required by the laws of the Issuer Jurisdiction to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary, a member of such partnership, an interest holder in such limited liability company or a beneficial owner that would not have been entitled to such amounts had such beneficiary, settlor, member, interest holder or beneficial owner been the Holder of such Notes.

If requested in writing by the Trustee, the Issuer shall use reasonable efforts to obtain certified copies of tax receipts evidencing the payment of any Taxes so withheld or deducted from the Issuer Jurisdiction's taxing authority imposing such tax, and if certified copies are unavailable, the Issuer shall use reasonable efforts to obtain other evidence satisfactory to the Trustee, and the Trustee shall make such certified copies or other evidence available to the Holders or the Paying Agents, upon request to the Trustee.

7.    <u>No Conversion</u>. The Notes shall not be convertible into any securities of the Issuer or any of their Affiliates.

8.    <u>Open Market Purchases</u>. The Issuer or any of their Affiliates may at any time purchase Notes in the open market or otherwise at any price. All Notes so purchased and Notes that have been redeemed (i) may not be resold, except in compliance with applicable requirements or exemptions under any relevant securities and other laws and (ii) at the option of the Issuer, may be delivered to the Trustee for cancellation or remain Outstanding.

9.    <u>Redemption</u>.

(a)    Except as described in Section 3.1 and Section 3.8 of the Indenture and this Paragraph 9, the Notes may not be redeemed prior to their Stated Maturity.

(b)    The Notes shall be redeemable, at the option of the Issuer or any successor, in whole, but not in part, upon giving not less than 30 nor more than 60 days' notice to the Holders at any time, at 100% of the principal amount thereof, plus accrued and unpaid interest thereon, to, but excluding, the Redemption Date, if, as a

A-9

result of any change in, expiration of or amendment to the laws of the Issuer Jurisdiction (or of any political subdivision or taxing authority thereof or therein) or any regulations or rulings promulgated thereunder or any change in the official interpretation or official application of such laws, regulations or rulings, or any change in the official application or interpretation of, or any execution of or amendment to, any treaty or treaties affecting taxation to which the Issuer Jurisdiction (or such political subdivision or taxing authority) is a party, which change, amendment, expiration or treaty becomes effective on or after October 31, 2012, the Issuer is or would be obligated on the next succeeding due date for a payment with respect to the Notes to pay Additional Amounts in excess of those attributable to Brazilian withholding tax on the basis of a statutory rate of 15%, and such obligation cannot be avoided by the use of reasonable measures available to the Issuer; *provided, however* (i) no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer or any successor, as the case may be, would be obligated to pay such Additional Amounts and (ii) at the time such notice of redemption is given, such obligation to pay such Additional Amounts remains in effect.

Prior to giving any notice of redemption pursuant to the preceding paragraph, the Issuer or any successor shall deliver to the Trustee an Officer's Certificate stating that the Issuer is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of redemption have occurred. The Trustee shall accept such certificate as sufficient evidence of the satisfaction of the conditions precedent set forth in clauses (i) and (ii) of the preceding paragraph of this Paragraph 9(b), in which event it shall be conclusive and binding on the Holders.

(c)     The Notes shall be redeemable, at the option of the Issuer, in whole or in part, at any time and from time to time, at a Redemption Price equal to the greater of the following amounts, plus accrued and unpaid interest on the principal amount of the Notes to be redeemed, to the Redemption Date:

(i)     100% of the principal amount of the Notes to be redeemed; and

(ii)     as determined by the Independent Investment Banker, the sum of the present values of the applicable Remaining Scheduled Payments, discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months or in the case of an incomplete month, the number of days elapsed) at the Treasury Rate plus 35 basis points.

For purposes of this Paragraph 9(c), the following terms have the following meanings:

"Treasury Rate" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Comparable Treasury Issue" means the United States Treasury security selected by the Independent Investment Banker having an actual or interpolated

A-10

maturity comparable to the remaining term of the Notes to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of the Notes.

"Comparable Treasury Price" means, with respect to any Redemption Date, (A) the arithmetic average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest of such Reference Treasury Dealer Quotations, or (B) if the Independent Investment Banker for the Notes obtains fewer than four such Reference Treasury Dealer Quotations, the arithmetic average of all Reference Treasury Dealer Quotations for such Redemption Date.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Issuer.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any Redemption Date, the arithmetic average, as determined by the Independent Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 3:30 p.m., New York City time, on the third Business Day preceding such Redemption Date.

"Reference Treasury Dealer" means each of Citigroup Global Capital Markets Inc., HSBC Securities (USA) Inc. and J.P. Morgan Securities LLC, their respective successors and two other nationally recognized investment banking firms that are Primary Treasury Dealers specified from time to time by the Issuer; *provided*, however, that if any of the foregoing shall cease to be a primary U.S. Government securities dealer in the United States (a "Primary Treasury Dealer"), the Issuer shall substitute therefor another nationally recognized investment banking firm that is a Primary Treasury Dealer.

"Remaining Scheduled Payments" means, with respect to each Note to be redeemed, the remaining scheduled payments of the principal thereof and interest thereon that would be due after the applicable Redemption Date but for such redemption; *provided*, *however*, that, if such Redemption Date is not an Interest Payment Date, the amount of the next succeeding scheduled interest payment thereon will be reduced by the amount of interest accrued thereon to such Redemption Date.

(d)    Notice of any redemption will be given in accordance with Section 11.2 of the Indenture at least 30 days but not more than 60 days before the Redemption Date.  Unless the Issuer defaults in the payment of the Redemption Price, on and after any Redemption Date, interest will cease to accrue on the Notes or any portion thereof called for redemption.

(e)    If a Change of Control Repurchase Event occurs, unless the Issuer has exercised its option to redeem the Notes under Section 3.1 and Paragraph 9 of the Notes, the Issuer shall make an offer to each Holder of Notes to repurchase all or any part of the Holder's Notes pursuant to the offer described below (the "Offer to Purchase") at a price in cash (the "Offer to Purchase Payment") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon and Additional

A-11

Amounts, if any, to, but not including, the Offer to Purchase Payment Date. Within 30 days following any Change of Control Repurchase Event or, at the option of the Issuer, prior to any Change of Control, but after the public announcement of the Change of Control, the Issuer will give notice as described in Section 11.2 of the Indenture, to each Holder (with a copy to the Trustee) containing the information specified in Section 3.8(a) of the Indenture.

(i)     On the Business Day prior to the Offer to Purchase Payment Date, the Issuer shall, to the extent lawful, deposit with a Paying Agent an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof so tendered;

(ii)     On the Offer to Purchase Payment Date following a Change of Control Repurchase Event, the Issuer will, to the extent lawful, (I) accept for payment for all Notes properly tendered and not withdrawn pursuant to the Offer to Purchase and (II) deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

(iii)     Notwithstanding Section 3.8(a) of the Indenture or this Paragraph 9(e), the Issuer shall not be required to make an Offer to Purchase upon a Change of Control Repurchase Event that results in a Below Investment Grade Ratings Event if (i) a third party makes an offer to purchase in the manner, at the times and otherwise in compliance with the requirements set forth in this Paragraph 10 applicable to an Offer to Purchase made by the Issuer and such third party purchases all Notes properly tendered and not withdrawn under such offer, or (ii) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.4 of the Indenture, unless and until there is a default in payment of the applicable Redemption Price. Notwithstanding anything to the contrary contained herein or in the Notes, an Offer to Purchase may be made in advance of a Change of Control Repurchase Event, conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(iv)     The Issuer will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under Section 3.8 of the Indenture or this Paragraph 9(e) of the Notes by virtue thereof.

10.     <u>Denominations; Transfer; Exchange.</u>The Notes are in fully registered form without coupons attached in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof. A Holder may transfer or exchange Notes in accordance with the Indenture. The Trustee or Transfer Agent, as the case may be, may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.

A-12

The Trustee or Transfer Agent, as the case may be, need not register the transfer or exchange of any Notes for a period of 15 days preceding a Redemption Date or between a Record Date and the related Payment Date.

11. Persons Deemed Owners. The registered Holder of this Note may be treated as the owner thereof for all purposes.

12. Unclaimed Money. Subject to applicable law, the Trustee and each Paying Agent shall pay to the Issuer upon request any monies held by them for the payment of principal, premium, if any, or interest that remains unclaimed for two years, and thereafter, Holders entitled to such monies must look to the Issuer for payment as general creditors.

13. Defeasance. Subject to the terms of the Indenture, the Issuer at any time may terminate some or all of their obligations under the Indenture or the Notes if the Issuer irrevocably deposits in trust with the Trustee money or Government Obligations sufficient for the payment of principal of and interest on all the Outstanding Notes to and including the date irrevocably designated by the Issuer on or prior to the date of the deposit of such money or Government Obligations.

14. Amendment; Waiver. Subject to certain exceptions set forth in the Indenture or the Notes may be amended or supplemented with the written consent of the Holders of at least a majority in principal amount of the Outstanding Notes, and an existing Default or Event of Default and its consequences or compliance with Sections 4.6(a), (b) and (c), and 4.8 of the Indenture may be waived with the consent of the Holders of at least a majority in principal amount of the Outstanding Notes. However, without the consent of each Holder affected thereby, an amendment may not:

(v)    change the rate or time for payment of interest on any Note;

(vi)    change the principal or Stated Maturity of any Note;

(vii)    reduce the principal amount of or interest on any Note or Additional Amounts payable with respect thereto or reduce the amount payable thereon in the event of redemption or Default;

(viii)    change the currency of payment of principal of or interest on any Note or Additional Amounts payable with respect thereto;

(ix)    change the obligation of the Issuer to pay Additional Amounts;

(x)    impair the right to institute suit for the enforcement of any such payment on or with respect to any Note;

(xi)    waive a Default on the payment of principal, premium, if any, and interest on the Notes or the Indenture;

(xii)    reduce the principal amount of Notes whose Holders must consent to any amendment, supplement or waiver;

(xiii)    reduce the aggregate principal amount of any Note Outstanding necessary to modify or amend the Indenture or any such Notes or to waive any

A-13

future compliance or past Default or reduce the quorum requirements or the percentage of aggregate principal amount of any Notes outstanding required for the adoption of any action at a meeting of holders of such Notes or reduce the percentage of the aggregate principal amount of such Notes outstanding necessary to rescind or annul any declaration of the principal of and all accrued and unpaid interest on any Notes to be due and payable.

The Issuer and the Trustee may, without notice to or the consent or vote of any Holder of the Notes, amend or supplement the Indenture or the Notes, for the following purposes:

(xiv)    to cure any ambiguity or to correct or supplement any provision contained in the Indenture which may be defective or inconsistent with any other provision contained therein or to make such other provision in regard to matters or questions arising under the Indenture as the Issuer may deem necessary or desirable and which will not adversely affect the interests of the Holders of the Notes in any material respect (*provided*, that any modification or amendment to conform language in the Indenture to that appearing in the section "Description of the Notes" in the final Offering Memorandum relating to the Notes dated October 26, 2012 shall be deemed not to adversely affect the interests of the Holders of the Notes in any material respect);

(xv)    to convey, transfer, assign, mortgage or pledge to the Trustee as security for the Notes any property or assets;

(xvi)    to add to the covenants of the Issuer, such further covenants, restrictions, conditions or provisions for the protection of the Holders of Notes, and to make the occurrence, or the occurrence and continuance, of a Default in any such additional covenants, restrictions, conditions or provisions an Event of Default under the Indenture permitting the enforcement of all or any of the several remedies provided in the Indenture or the Notes; *provided* that, in respect of any such additional covenant, restriction, condition or provision, such supplemental indenture may provide for a particular period of grace after Default (which may be shorter or longer than that allowed in the case of other Defaults) or may limit the remedies available to the Trustee upon such an Event of Default or may limit the right of Holders of a majority in aggregate principal amount of the applicable Outstanding Notes to waive such an Event of Default;

(xvii)    to evidence and provide for the acceptance of appointment of a successor Trustee, Principal Paying Agent, Registrar or Transfer Agent, as the case may be; or

(xviii)    to modify the restrictions on, and procedures for, resale and other transfers of the Notes pursuant to law or regulation relating to the resale or transfer of restricted securities generally.

15.    <u>Defaults and Remedies.</u> An "Event of Default" occurs if:

(1) The Issuer defaults in the payment of any installment of interest (including applicable Additional Amounts) upon any Note as and when the same shall become due and payable, and continuance of such Default for 30 days;

A-14

(2) The Issuer defaults in the payment of all or any part of the principal of or premium on any Note as and when the same shall become due and payable either at its Stated Maturity, upon any redemption, by declaration or otherwise;

(3) The Issuer defaults in the performance or breach of any covenant of the Issuer in respect of the Notes or the Indenture (other than those described in paragraphs (1) and (2) above), and continuance of such default or breach for a period of 60 days after there has been given a written notice, by registered or certified mail, to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% in principal amount of the Outstanding Notes affected thereby, specifying such default or breach and requiring it to be remedied and stating that such notice is a notice of default ("Notice of Default") under the Indenture;

(4) any present or future Indebtedness of the Issuer or any Significant Subsidiary, other than the Notes, for or in respect of moneys borrowed is declared due and payable prior to its Stated Maturity as the result of any Event of Default (howsoever described); *provided* that the aggregate amount of the relevant Indebtedness in respect of which the event mentioned in this paragraph will have occurred (which Indebtedness has not been repaid or paid and as to which such default has not been cured or such acceleration has not been rescinded or annulled) exceeds US$75,000,000 or its equivalent;

(5) (a) the entry of a decree or order for relief in respect of the Issuer by a court having competent jurisdiction in an involuntary case under any applicable bankruptcy, insolvency, rehabilitation or other similar law in effect on the date of the Notes or thereafter, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Issuer or any substantial part of its Principal Property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

(b) the commencement by the Issuer of a voluntary case under any applicable bankruptcy, insolvency, rehabilitation or other similar law in effect on the date of the Notes or thereafter, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law or to the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Issuer or of any substantial part of its Principal Property, or the mailing by the Issuer of an assignment for the benefit of its creditors, or the admission by the Issuer in writing of inability to pay its debts generally as they become due, or the taking of corporate action by the Issuer in furtherance of any such action.

A Default under clause (3) above is not an Event of Default until the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes notify the Issuer of the Default and the Issuer does not cure such Default within the time specified after receipt of such notice.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) a Responsible Officer of the Trustee has actual knowledge of such Default or Event of

A-15

Default or (ii) written notice of such Default or Event of Default has been given to the Trustee by the Issuer or any Holder and received by the Trustee.

If an Event of Default (other than an Event of Default specified in clause (5) above) occurs and is continuing, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and premium, if any, and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in writing to the Issuer (and to the Trustee, if the notice is given by the Holders), stating that such notice is an "acceleration notice," and upon any such declaration such amounts shall become due and payable immediately.  If an Event of Default specified in clause (5) above occurs and is continuing, then the principal of and premium, if any, and accrued and unpaid interest on all Notes shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

The Trustee shall be under no obligation to exercise any of its rights or powers under the Indenture at the request or direction of the Holders, unless such Holders shall have offered to the Trustee indemnity reasonably satisfactory to it. Subject to such provision for the indemnification of the Trustee, the Holders of a majority in aggregate principal amount of the Outstanding Notes shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

At any time after a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this Article, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Issuer and the Trustee may rescind or annul such declaration if: (i)   the Issuer has paid or deposited with the Trustee a sum sufficient to pay (a) all overdue interest on Outstanding Notes, (b) all unpaid principal of and premium, if any, on the Notes that have become due otherwise than by such declaration of acceleration, (c) to the extent that payment of such interest on the Notes is lawful, interest on such overdue interest (including any Additional Amounts) as provided herein and (d) all sums paid or advanced by the Trustee under the Indenture and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and (ii) all Events of Default have been cured or waived as provided in Section 6.13 of the Indenture other than the nonpayment of principal that has become due solely because of acceleration.

No such rescission or annulment referred to in the preceding paragraph shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

16.    Trustee Dealings with the Issuer. The Trustee in its individual or any other capacity, may deal with and collect obligations owed to it by the Issuer or its Affiliates and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.

17.    Governing Law. THE INDENTURE AND THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

A-16

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 160 of 189

18.  <u>No Recourse Against Others.</u> No director, officer, employee, direct or indirect shareholder or incorporator, as such, of the Issuer or the Trustee shall have any liability for any obligations of the Issuer or the Trustee, respectively, hereunder or the Notes or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder waives and releases all such liability.  The waiver and release are part of the consideration for the issue of the Notes.

19.  <u>CUSIP and ISIN Numbers</u>. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP or ISIN numbers, as applicable, to be printed on the Notes and has directed the Trustee to use CUSIP or ISIN numbers, as applicable, in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer shall furnish to any Holder upon written request and without charge a copy of the Indenture, which includes the form of this Note.  Requests may be made to:

SAMARCO MINERAÇÃO S.A.
Rua Paraíba, 1122, 9th and 10th floors
Belo Horizonte, MG 30130-918
Brazil

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE**

The following increases or decreases in this Global Note have been made:

| Date of Increase or Decrease | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |

A-18

EXHIBIT 4

UNLESS THIS GLOBAL NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK LIMITED PURPOSE TRUST COMPANY ("DTC"), TO THE COMPANY NAMED HEREIN (THE "COMPANY") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE IN WHOLE SHALL BE LIMITED TO TRANSFERS TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC OR BY DTC OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY AND TRANSFERS OF THIS GLOBAL NOTE IN PART SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE AND REFERRED TO ON THE REVERSE HEREOF.

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS.  THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION.

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 164 of 189

## SAMARCO MINERAÇÃO S.A.

4.125% Notes due 2022

### REGULATION S GLOBAL NOTE

No. S-2

CUSIP No. P84050 AA4                                          Principal Amount
ISIN No. USP84050AA46                                       U.S.$10,505,000
COMMON CODE.  083563745

        Samarco Mineração S.A., a closely held company incorporated under the laws of Brazil (the "Company," which term includes any successor corporation hereunder referred to on the reverse hereof), for value received, hereby promises to pay to CEDE & CO., or registered assigns, U.S.$10,505,000, as adjusted in accordance with the Schedule of Increases and Decreases on the Reverse of this Note, on November 1, 2022 (the "Principal Payment Date") upon presentment and surrender of this Note, on such date or dates as the then relevant principal sum may become payable in accordance with the provisions hereof and in the Indenture.

        Interest on the outstanding principal amount and premium, if any, shall be borne at the rate of 4.125% per annum payable semi-annually in arrears on each May 1 and November 1 of each year (each such date an "Interest Payment Date"), commencing on May 1, 2013 until payment of said principal amount and premium, if any, has been made or duly provided for in full together with such other amounts as may be payable, all subject to and in accordance with the terms and conditions set forth herein and in the Indenture; *provided, however,* that in the event that the Issuer shall at any time default on the payment of principal, premium, if any, interest or such other amounts as any may be payable in respect of the Notes, the Issuer shall pay interest on overdue principal and premium, if any, at the rate borne by the Notes plus 1% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

        Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication herein has been executed by the Trustee or Authenticating Agent by the manual signature of one of its authorized signatories, this Note shall not be entitled to any benefit hereunder or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

Dated:

SAMARCO MINERAÇÃO S.A.

By: _____
Name: ROGÉRIO L. NUNES CAMACHO
Title: CHIEF COMMERCIAL OFFICER

By: _____
Name:        EDUARDO BAHIA
Title:        CHIEF FINANCIAL OFFICER

Witnesses:

By: _____
Name: WAGNER DE ALMEIDA PAIVA

By: _____
Name:

*(Signature Page to Regulation S Global Note)*

TRUSTEE'S CERTIFICATE OF
AUTHENTICATION

This is one of the Notes
referred to in the within
mentioned Indenture.

THE BANK OF NEW YORK MELLON,
as Trustee

By: _____
Authorized Officer

*(Signature Page to Regulation S Global Note)*

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 167 of 189

4.125% Notes due 2022

TERMS AND CONDITIONS OF THE NOTES

This Note is one of a duly authorized issue of 4.125% Notes due 2022 of the Issuer.  The Notes constitute senior unsecured obligations of the Issuer, initially limited to an aggregate principal amount of U.S.$1,000,000,000, and mature at 100% of the principal amount on November 1, 2022 (the "Principal Payment Date"), unless earlier redeemed.

1.     Indenture. The Notes are, and shall be, issued under an Indenture, dated as of October 31, 2012 (the "Indenture"), among Samarco Mineração S.A., The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent (the "Trustee") and The Bank of New York Mellon Trust (Japan) Ltd., as Principal Paying Agent.  The terms of the Notes include those stated in the Indenture.  The Holders of the Notes shall be entitled to the benefit of, be bound by and be deemed to have notice of, all provisions of the Indenture.  Reference is hereby made to the Indenture and all supplemental indentures thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee, each Agent and the Holders of the Notes and the terms upon which the Notes, are, and are to be, authenticated and delivered.  All terms used in this Note that are defined in the Indenture shall have the meanings assigned to them in the Indenture.  Copies of the Indenture and each Global Note shall be available for inspection during normal business hours at the offices of the Trustee and each Paying Agent.

The Issuer may from time to time, without the consent of the Holders of the Notes, create and issue additional Notes having the same terms and conditions as the Notes in all respects, except for issue date, issue price and the first payment of interest thereon.  Additional Notes issued in this manner shall be consolidated with and shall form a single series with the previously Outstanding Notes.

The Indenture imposes certain limitations on the creation of Mortgages by the Issuer or its Subsidiaries and consolidation, merger and certain other transactions involving the Issuer.  In addition, the Indenture requires the maintenance of the existence of the Issuer and its Subsidiaries and includes reporting requirements applicable to the Issuer.

2.     Interest. The Notes bear interest at the rate per annum shown above from October 31, 2012, or from the most recent Interest Payment Date (as defined below) to which interest has been paid or provided for, payable semi-annually in arrears on May 1 and November 1 of each year (each such date, an "Interest Payment Date"), commencing on May 1, 2013.  Interest on the Notes shall be computed on the basis of a 360-day year comprised of twelve 30-day months.  The Issuer shall pay interest on overdue principal and premium, if any, at the rate borne by the Notes plus 1% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

3.     Principal. Unless previously redeemed or purchased and

cancelled, the Notes shall be repaid at 100% of the principal amount thereof on the Principal Payment Date.

4. <u>Method of Payment</u>. Payments of interest in respect of each Note shall be made on each Interest Payment Date to the Person in whose name such Note is registered in the Register at the close of business on April 15 or October 15 (whether or not a Business Day), as the case may be (each, a "Record Date"), next preceding such Interest Payment Date. Payment of principal and premium, if any, in respect of each Note on the Principal Payment Date shall be made to the Person in whose name such Note is registered in the Register at the close of business on the day (whether or not a Business Day) immediately preceding the Principal Payment Date.

Payments of interest, as well as principal and premium, if any, in respect of each Note shall be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears in the Register. Upon written notice from a Holder of such Note received by any Paying Agent at least 15 Business Days prior to an Interest Payment Date or the Principal Payment Date, as the case may be, such payment may be made by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York.

All payments on this Note are subject in all cases to any applicable tax or other laws and regulations, but without prejudice to the provisions of Paragraph 6 hereof. Except as provided in Section 2.8 of the Indenture, no fees, commissions or expenses shall be charged to the Holders in respect of such payments.

If the Payment Date in respect of any Note is not a Business Day at the place in which it is presented for payment, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place and shall not be entitled to any further interest or other payment in respect of any such delay.

If the amount of principal or premium, if any, or interest which is due on the Notes is not paid in full, the Registrar shall annotate the Register with a record of the amount of principal, premium or interest, if any, in fact paid.

5. <u>Registrar, Paying Agent and Transfer Agent</u>. The Trustee shall act as Registrar, Transfer Agent and Paying Agent. The Issuer may appoint and change any Registrar, Paying Agent or Transfer Agent without notice. Upon the issue of Certificated Notes, the Issuer will appoint and maintain a Luxembourg Paying Agent for so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of such exchange so require. In such event, an announcement shall be made through the Luxembourg Stock Exchange and shall include all material information with respect to the delivery of the Certificated Notes, including details of the Luxembourg Paying Agent.

6. <u>Additional Amounts.</u> All payments by the Issuer in respect of the Notes shall be made without withholding or deduction for or on account of any and all present or future Taxes by or for the account of the applicable Issuer Jurisdiction (as defined below), unless such withholding or deduction is required by law. If the Issuer is required by the applicable Issuer Jurisdiction to deduct or withhold Taxes, the Issuer will pay to a Holder of a Note or the beneficial owner

thereof such additional amounts ("Additional Amounts") as may be necessary so that the net amount received by such Holder or beneficial owner will not be less than the amount such Holder or beneficial owner would have received if such Taxes had not been withheld or deducted; *provided, however,* that the Issuer shall not be required to pay any Additional Amounts for or on account of:

(i)      any Taxes that would not have been so imposed, assessed, levied or collected but for the fact that the Holder of the Note (or a fiduciary, settlor, beneficiary, member or shareholder of, or possessor of a power over, such Holder, if such Holder is an estate, trust, partnership or corporation) is or has been a domiciliary, national or resident of, or engaging or having been engaged in a trade or business or maintaining or having maintained a permanent establishment or being or having been physically present in the jurisdiction in which such Taxes have been imposed, assessed, levied or collected or otherwise having or having had some connection with such jurisdiction, other than the mere holding or ownership of, or the collection of principal of, and interest on a Note;

(ii)      any  Taxes that would not have been so imposed, assessed, levied or collected but for the fact that, where presentation is required in order to receive payment, the Note was presented more than 30 days after the date on which such payment became due and payable or was provided for, whichever is later, except to the extent that the Holder or beneficial owner thereof would have been entitled to Additional Amounts had the Note been presented for payment on any day during such 30-day period;

(iii)      any Taxes that would not have been so imposed, assessed, levied or collected but for the failure by the Holder or the beneficial owner of the Note to comply (following a written request addressed to the Holder or beneficial owner, as applicable), with any certification, identification or other reporting requirements concerning the nationality, residence or identity of such Holder or beneficial owner or its connection with the applicable Issuer Jurisdiction if compliance is required by statute, regulation or administrative practice of such Issuer Jurisdiction as a condition to relief or exemption from such Taxes;

(iv)      any estate, inheritance, gift, sales, transfer, excise, personal property or similar Taxes;

(v)      any withholding or deduction imposed on a payment to or for the benefit of an individual that is required to be made pursuant to European Union Directive 2003/48/EC, any law implementing this Directive or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings, or any law implementing or complying with, or introduced in order to conform to, such Directive;

(vi)      any withholding or deduction that is imposed on the Note that is presented for payment, where presentation is required, by or on behalf of a Holder who would have been able to avoid such withholding or deduction by presenting such Note to another Paying Agent in a member state of the European Union;

(vii)   any Taxes that are payable otherwise than by deduction or withholding from payments on or in respect of the Note; or

(viii) any combination of the above.

The Issuer will also pay any present or future stamp, court or documentary taxes or any other excise taxes, charges or similar levies which arise in any jurisdiction from or through which payment is made or on behalf of the Issuer (including the jurisdiction of the Paying Agent) on the execution, delivery, registrations, or the making of payments in respect of the Notes and the Indenture, excluding any such taxes, charges or similar levies imposed by any jurisdiction outside of any Issuer Jurisdiction.

No Additional Amounts shall be paid in respect of any payment in respect of the Notes to any Holder or beneficial owner of the Notes that is a fiduciary, a partnership, a limited liability company or any Person other than the sole beneficial owner of such payment to the extent such payment would be required by the laws of the Issuer Jurisdiction to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary, a member of such partnership, an interest holder in such limited liability company or a beneficial owner that would not have been entitled to such amounts had such beneficiary, settlor, member, interest holder or beneficial owner been the Holder of such Notes.

If requested in writing by the Trustee, the Issuer shall use reasonable efforts to obtain certified copies of tax receipts evidencing the payment of any Taxes so withheld or deducted from the Issuer Jurisdiction's taxing authority imposing such tax, and if certified copies are unavailable, the Issuer shall use reasonable efforts to obtain other evidence satisfactory to the Trustee, and the Trustee shall make such certified copies or other evidence available to the Holders or the Paying Agents, upon request to the Trustee.

7.     No Conversion. The Notes shall not be convertible into any securities of the Issuer or any of their Affiliates.

8.     Open Market Purchases. The Issuer or any of their Affiliates may at any time purchase Notes in the open market or otherwise at any price. All Notes so purchased and Notes that have been redeemed (i) may not be resold, except in compliance with applicable requirements or exemptions under any relevant securities and other laws and (ii) at the option of the Issuer, may be delivered to the Trustee for cancellation or remain Outstanding.

9.     Redemption.

(a)   Except as described in Section 3.1 and Section 3.8 of the Indenture and this Paragraph 9, the Notes may not be redeemed prior to their Stated Maturity.

(b)   The Notes shall be redeemable, at the option of the Issuer or any successor, in whole, but not in part, upon giving not less than 30 nor more than 60 days' notice to the Holders at any time, at 100% of the principal amount thereof, plus accrued and unpaid interest thereon, to, but excluding, the Redemption Date, if, as a

result of any change in, expiration of or amendment to the laws of the Issuer Jurisdiction (or of any political subdivision or taxing authority thereof or therein) or any regulations or rulings promulgated thereunder or any change in the official interpretation or official application of such laws, regulations or rulings, or any change in the official application or interpretation of, or any execution of or amendment to, any treaty or treaties affecting taxation to which the Issuer Jurisdiction (or such political subdivision or taxing authority) is a party, which change, amendment, expiration or treaty becomes effective on or after October 31, 2012, the Issuer is or would be obligated on the next succeeding due date for a payment with respect to the Notes to pay Additional Amounts in excess of those attributable to Brazilian withholding tax on the basis of a statutory rate of 15%, and such obligation cannot be avoided by the use of reasonable measures available to the Issuer; *provided*, *however* (i) no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer or any successor, as the case may be, would be obligated to pay such Additional Amounts and (ii) at the time such notice of redemption is given, such obligation to pay such Additional Amounts remains in effect.

Prior to giving any notice of redemption pursuant to the preceding paragraph, the Issuer or any successor shall deliver to the Trustee an Officer's Certificate stating that the Issuer is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of redemption have occurred. The Trustee shall accept such certificate as sufficient evidence of the satisfaction of the conditions precedent set forth in clauses (i) and (ii) of the preceding paragraph of this Paragraph 9(b), in which event it shall be conclusive and binding on the Holders.

(c)     The Notes shall be redeemable, at the option of the Issuer, in whole or in part, at any time and from time to time, at a Redemption Price equal to the greater of the following amounts, plus accrued and unpaid interest on the principal amount of the Notes to be redeemed, to the Redemption Date:

(i)     100% of the principal amount of the Notes to be redeemed; and

(ii)     as determined by the Independent Investment Banker, the sum of the present values of the applicable Remaining Scheduled Payments, discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months or in the case of an incomplete month, the number of days elapsed) at the Treasury Rate plus 35 basis points.

For purposes of this Paragraph 9(c), the following terms have the following meanings:

"Treasury Rate" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Comparable Treasury Issue" means the United States Treasury security selected by the Independent Investment Banker having an actual or interpolated

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 172 of 189

maturity comparable to the remaining term of the Notes to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of the Notes.

"Comparable Treasury Price" means, with respect to any Redemption Date, (A) the arithmetic average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest of such Reference Treasury Dealer Quotations, or (B) if the Independent Investment Banker for the Notes obtains fewer than four such Reference Treasury Dealer Quotations, the arithmetic average of all Reference Treasury Dealer Quotations for such Redemption Date.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Issuer.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any Redemption Date, the arithmetic average, as determined by the Independent Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 3:30 p.m., New York City time, on the third Business Day preceding such Redemption Date.

"Reference Treasury Dealer" means each of Citigroup Global Capital Markets Inc., HSBC Securities (USA) Inc. and J.P. Morgan Securities LLC, their respective successors and two other nationally recognized investment banking firms that are Primary Treasury Dealers specified from time to time by the Issuer; *provided, however*, that if any of the foregoing shall cease to be a primary U.S. Government securities dealer in the United States (a "Primary Treasury Dealer"), the Issuer shall substitute therefor another nationally recognized investment banking firm that is a Primary Treasury Dealer.

"Remaining Scheduled Payments" means, with respect to each Note to be redeemed, the remaining scheduled payments of the principal thereof and interest thereon that would be due after the applicable Redemption Date but for such redemption; *provided, however*, that, if such Redemption Date is not an Interest Payment Date, the amount of the next succeeding scheduled interest payment thereon will be reduced by the amount of interest accrued thereon to such Redemption Date.

(d)    Notice of any redemption will be given in accordance with Section 11.2 of the Indenture at least 30 days but not more than 60 days before the Redemption Date.  Unless the Issuer defaults in the payment of the Redemption Price, on and after any Redemption Date, interest will cease to accrue on the Notes or any portion thereof called for redemption.

(e)    If a Change of Control Repurchase Event occurs, unless the Issuer has exercised its option to redeem the Notes under Section 3.1 and Paragraph 9 of the Notes, the Issuer shall make an offer to each Holder of Notes to repurchase all or any part of the Holder's Notes pursuant to the offer described below (the "Offer to Purchase") at a price in cash (the "Offer to Purchase Payment") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon and Additional

Amounts, if any, to, but not including, the Offer to Purchase Payment Date. Within 30 days following any Change of Control Repurchase Event or, at the option of the Issuer, prior to any Change of Control, but after the public announcement of the Change of Control, the Issuer will give notice as described in Section 11.2 of the Indenture, to each Holder (with a copy to the Trustee) containing the information specified in Section 3.8(a) of the Indenture.

(i)    On the Business Day prior to the Offer to Purchase Payment Date, the Issuer shall, to the extent lawful, deposit with a Paying Agent an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof so tendered;

(ii)    On the Offer to Purchase Payment Date following a Change of Control Repurchase Event, the Issuer will, to the extent lawful, (I) accept for payment for all Notes properly tendered and not withdrawn pursuant to the Offer to Purchase and (II) deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

(iii)    Notwithstanding Section 3.8(a) of the Indenture or this Paragraph 9(e), the Issuer shall not be required to make an Offer to Purchase upon a Change of Control Repurchase Event that results in a Below Investment Grade Ratings Event if (i) a third party makes an offer to purchase in the manner, at the times and otherwise in compliance with the requirements set forth in this Paragraph 10 applicable to an Offer to Purchase made by the Issuer and such third party purchases all Notes properly tendered and not withdrawn under such offer, or (ii) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.4 of the Indenture, unless and until there is a default in payment of the applicable Redemption Price. Notwithstanding anything to the contrary contained herein or in the Notes, an Offer to Purchase may be made in advance of a Change of Control Repurchase Event, conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(iv)    The Issuer will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under Section 3.8 of the Indenture or this Paragraph 9(e) of the Notes by virtue thereof.

10.    Denominations; Transfer; Exchange. The Notes are in fully registered form without coupons attached in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof. A Holder may transfer or exchange Notes in accordance with the Indenture. The Trustee or Transfer Agent, as the case may be, may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.

The Trustee or Transfer Agent, as the case may be, need not register the transfer or exchange of any Notes for a period of 15 days preceding a Redemption Date or between a Record Date and the related Payment Date.

11.    Persons Deemed Owners. The registered Holder of this Note may be treated as the owner thereof for all purposes.

12.    Unclaimed Money. Subject to applicable law, the Trustee and each Paying Agent shall pay to the Issuer upon request any monies held by them for the payment of principal, premium, if any, or interest that remains unclaimed for two years, and thereafter, Holders entitled to such monies must look to the Issuer for payment as general creditors.

13.    Defeasance. Subject to the terms of the Indenture, the Issuer at any time may terminate some or all of their obligations under the Indenture or the Notes if the Issuer irrevocably deposits in trust with the Trustee money or Government Obligations sufficient for the payment of principal of, and interest on all the Outstanding Notes to and including the date irrevocably designated by the Issuer on or prior to the date of the deposit of such money or Government Obligations.

14.    Amendment; Waiver. Subject to certain exceptions set forth in the Indenture or the Notes may be amended or supplemented with the written consent of the Holders of at least a majority in principal amount of the Outstanding Notes, and an existing Default or Event of Default and its consequences or compliance with Sections 4.6(a), (b) and (c), and 4.8 of the Indenture may be waived with the consent of the Holders of at least a majority in principal amount of the Outstanding Notes.  However, without the consent of each Holder affected thereby, an amendment may not:

(v)    change the rate or time for payment of interest on any Note;

(vi)    change the principal or Stated Maturity of any Note;

(vii)    reduce the principal amount of or interest on any Note or Additional Amounts payable with respect thereto or reduce the amount payable thereon in the event of redemption or Default;

(viii)    change the currency of payment of principal of or interest on any Note or Additional Amounts payable with respect thereto;

(ix)    change the obligation of the Issuer to pay Additional Amounts;

(x)    impair the right to institute suit for the enforcement of any such payment on or with respect to any Note;

(xi)    waive a Default on the payment of principal, premium, if any, and interest on the Notes or the Indenture;

(xii)    reduce the principal amount of Notes whose Holders must consent to any amendment, supplement or waiver;

(xiii)    reduce the aggregate principal amount of any Note Outstanding necessary to modify or amend the Indenture or any such Notes or to waive any

future compliance or past Default or reduce the quorum requirements or the percentage of aggregate principal amount of any Notes outstanding required for the adoption of any action at a meeting of holders of such Notes or reduce the percentage of the aggregate principal amount of such Notes outstanding necessary to rescind or annul any declaration of the principal of and all accrued and unpaid interest on any Notes to be due and payable.

The Issuer and the Trustee may, without notice to or the consent or vote of any Holder of the Notes, amend or supplement the Indenture or the Notes, for the following purposes:

(xiv)   to cure any ambiguity or to correct or supplement any provision contained in the Indenture which may be defective or inconsistent with any other provision contained therein or to make such other provision in regard to matters or questions arising under the Indenture as the Issuer may deem necessary or desirable and which will not adversely affect the interests of the Holders of the Notes in any material respect (*provided*, that any modification or amendment to conform language in the Indenture to that appearing in the section "Description of the Notes" in the final Offering Memorandum relating to the Notes dated October 26, 2012 shall be deemed not to adversely affect the interests of the Holders of the Notes in any material respect);

(xv)   to convey, transfer, assign, mortgage or pledge to the Trustee as security for the Notes any property or assets;

(xvi)   to add to the covenants of the Issuer, such further covenants, restrictions, conditions or provisions for the protection of the Holders of Notes, and to make the occurrence, or the occurrence and continuance, of a Default in any such additional covenants, restrictions, conditions or provisions an Event of Default under the Indenture permitting the enforcement of all or any of the several remedies provided in the Indenture or the Notes; *provided* that, in respect of any such additional covenant, restriction, condition or provision, such supplemental indenture may provide for a particular period of grace after Default (which may be shorter or longer than that allowed in the case of other Defaults) or may limit the remedies available to the Trustee upon such an Event of Default or may limit the right of Holders of a majority in aggregate principal amount of the applicable Outstanding Notes to waive such an Event of Default;

(xvii)   to evidence and provide for the acceptance of appointment of a successor Trustee, Principal Paying Agent, Registrar or Transfer Agent, as the case may be; or

(xviii)   to modify the restrictions on, and procedures for, resale and other transfers of the Notes pursuant to law or regulation relating to the resale or transfer of restricted securities generally.

15.    Defaults and Remedies. An "Event of Default" occurs if:

(1) The Issuer defaults in the payment of any installment of interest (including applicable Additional Amounts) upon any Note as and when the same shall become due and payable, and continuance of such Default for 30 days;

(2) The Issuer defaults in the payment of all or any part of the principal of or premium on any Note as and when the same shall become due and payable either at its Stated Maturity, upon any redemption, by declaration or otherwise;

(3) The Issuer defaults in the performance or breach of any covenant of the Issuer in respect of the Notes or the Indenture (other than those described in paragraphs (1) and (2) above), and continuance of such default or breach for a period of 60 days after there has been given a written notice, by registered or certified mail, to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% in principal amount of the Outstanding Notes affected thereby, specifying such default or breach and requiring it to be remedied and stating that such notice is a notice of default ("Notice of Default") under the Indenture;

(4) any present or future Indebtedness of the Issuer or any Significant Subsidiary, other than the Notes, for or in respect of moneys borrowed is declared due and payable prior to its Stated Maturity as the result of any Event of Default (howsoever described); *provided* that the aggregate amount of the relevant Indebtedness in respect of which the event mentioned in this paragraph will have occurred (which Indebtedness has not been repaid or paid and as to which such default has not been cured or such acceleration has not been rescinded or annulled) exceeds US$75,000,000 or its equivalent;

(5) (a) the entry of a decree or order for relief in respect of the Issuer by a court having competent jurisdiction in an involuntary case under any applicable bankruptcy, insolvency, rehabilitation or other similar law in effect on the date of the Notes or thereafter, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Issuer or any substantial part of its Principal Property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

(b) the commencement by the Issuer of a voluntary case under any applicable bankruptcy, insolvency, rehabilitation or other similar law in effect on the date of the Notes or thereafter, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law or to the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Issuer or of any substantial part of its Principal Property, or the mailing by the Issuer of an assignment for the benefit of its creditors, or the admission by the Issuer in writing of inability to pay its debts generally as they become due, or the taking of corporate action by the Issuer in furtherance of any such action.

A Default under clause (3) above is not an Event of Default until the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes notify the Issuer of the Default and the Issuer does not cure such Default within the time specified after receipt of such notice.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) a Responsible Officer of the Trustee has actual knowledge of such Default or Event of

Default or (ii) written notice of such Default or Event of Default has been given to the Trustee by the Issuer or any Holder and received by the Trustee.

If an Event of Default (other than an Event of Default specified in clause (5) above) occurs and is continuing, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and premium, if any, and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in writing to the Issuer (and to the Trustee, if the notice is given by the Holders), stating that such notice is an "acceleration notice," and upon any such declaration such amounts shall become due and payable immediately.  If an Event of Default in clause (5) above occurs and is continuing, then the principal of and premium, if any, and accrued and unpaid interest on all Notes shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

The Trustee shall be under no obligation to exercise any of its rights or powers under the Indenture at the request or direction of the Holders, unless such Holders shall have offered to the Trustee indemnity reasonably satisfactory to it. Subject to such provision for the indemnification of the Trustee, the Holders of a majority in aggregate principal amount of the Outstanding Notes shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

At any time after a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this Article, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Issuer and the Trustee may rescind or annul such declaration if: (i)   the Issuer has paid or deposited with the Trustee a sum sufficient to pay (a) all overdue interest on Outstanding Notes, (b) all unpaid principal of and premium, if any, on the Notes that have become due otherwise than by such declaration of acceleration, (c) to the extent that payment of such interest on the Notes is lawful, interest on such overdue interest (including any Additional Amounts) as provided herein and (d) all sums paid or advanced by the Trustee under the Indenture and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and (ii) all Events of Default have been cured or waived as provided in Section 6.13 of the Indenture other than the nonpayment of principal that has become due solely because of acceleration.

No such rescission or annulment referred to in the preceding paragraph shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

16.   Trustee Dealings with the Issuer. The Trustee in its individual or any other capacity, may deal with and collect obligations owed to it by the Issuer or its Affiliates and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.

17.   Governing Law. THE INDENTURE AND THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

18.    No Recourse Against Others. No director, officer, employee, direct or indirect shareholder or incorporator, as such, of the Issuer or the Trustee shall have any liability for any obligations of the Issuer or the Trustee, respectively, hereunder or the Notes or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder waives and releases all such liability.  The waiver and release are part of the consideration for the issue of the Notes.

19.    CUSIP and ISIN Numbers.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP or ISIN numbers, as applicable, to be printed on the Notes and has directed the Trustee to use CUSIP or ISIN numbers, as applicable, in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer shall furnish to any Holder upon written request and without charge a copy of the Indenture, which includes the form of this Note.  Requests may be made to:

SAMARCO MINERAÇÃO S.A.
Rua Paraíba, 1122, 9th and 10th floors
Belo Horizonte, MG 30130-918
Brazil

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 179 of 189

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE**

The following increases or decreases in this Global Note have been made:

| Date of Increase or Decrease | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee |
| --- | --- | --- | --- | --- |
| _____ | _____ | _____ | _____ | _____ |

# EXHIBIT 5

| New York | Paris |
|---|---|
| Northern California | Madrid |
| Washington DC | Hong Kong |
| São Paulo | Beijing |
| London | Tokyo |

# Davis Polk

**Timothy Graulich**

Davis Polk & Wardwell LLP     212 450 4639 tel
450 Lexington Avenue     timothy.graulich@davispolk.com
New York, NY 10017

August 31, 2020

**Re:     Acceleration Notice and Reservation of Rights**

Samarco S.A.
Rua Paraíba, 1122
9th and 10th Floors
Belo Horizonte, MG 30130-918
Brazil
Attention: Leonardo Gandara
Facsimile: +55 31 3269-8601

Ladies and Gentlemen:

I write on behalf of the Bank of New York Mellon, which serves as Trustee under that certain Indenture, dated as of October 31, 2012, among the Samarco Mineração S.A. (the"**Company**"), as Issuer, the Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent, and the Bank of New York Mellon Trust (Japan), Ltd., as Principal Paying Agent (the "**Indenture**").  The Bank of New York Mellon is represented by Davis Polk & Wardwell LLP in this matter.

Please note that an Event of Default has occurred with respect to the 4.125% senior notes due 2022 (the "**Notes**"), and is continuing under Section 6.1(1) of the Indenture due to default in payment of interest (including applicable Additional Amounts) as and when the same became due and payable in November 2016, and continuance of such Default for 30 days (the "**Specified Event of Default**").

Pursuant to Section 6.2 of the Indenture and this Letter, which shall constitute an acceleration notice for the purposes of Section 6.2, the Bank of New York Mellon, as Trustee, hereby declares all unpaid principal of, and accrued and unpaid interest on all Notes to be due and payable immediately. The Bank of New York Mellon, as Trustee, hereby demands that you make immediate payment to the Bank of New York Mellon, as Trustee, of the amounts specified in this paragraph, without further notice or demand.  The Bank of New York Mellon, as Trustee, expressly reserves any and all rights and remedies available under the Indenture.

This Letter may be executed and delivered by facsimile with the same force and effect as if it were manually executed and delivered.

*[signature page follows]*

INDEX NO. 654214/2020
Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 182 of 189
RECEIVED NYSCEF: 09/02/2020

Regards,

By: Timothy Graulich

Timothy Graulich, Davis Polk & Wardwell
On behalf of the Bank of New York Mellon, as Trustee

cc:   The Bank of New York Mellon
      240 Greenwich Street,
      New York, New York 10286
      USA
      Attn: International Corporate
      Trust Telephone: (212) 815-
      5218
      Facsimile: (212) 815-5802/5803

      and

      BHP Group plc
      BHP Group Ltd.
      171 Collins Street
      Melbourne Victoria 3000
      Australia
      Attn: Peter Beavan, CFO

      and

      Vale S.A.
      Praia de Botafogo, 186 – Salas 501 a 1901
      Botafogo – Rio de Janeiro/RJ – Brazil
      CEP: 22250-145
      Attn: Luciano Siani Pires, Executive Director

# Exhibit A
# Part 5

## REQUEST FOR JUDICIAL INTERVENTION

UCS-840
(rev. 07/29/2019)

**SUPREME** COURT, COUNTY OF **NEW YORK**

Index No: _____     Date Index Issued: _____

**For Court Use Only:**

| **CAPTION** | Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet. |
|---|---|

THE BANK OF NEW YORK MELLON, solely in its capacity as trustee for 4.125% Notes due 2022 issued by Samarco Mineração S.A.

IAS Entry Date

Plaintiff(s)/Petitioner(s)

Judge Assigned

-against-

SAMARCO MINERAÇÃO S.A.

RJI Filed Date

Defendant(s)/Respondent(s)

| **NATURE OF ACTION OR PROCEEDING** | Check only one box and specify where indicated. |
|---|---|

**COMMERICIAL**
- ○ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ● Contract
- ○ Insurance (where insurance company is a party, except arbitration)
- ○ UCC (includes sales and negotiable instruments)
- ○ Other Commercial (specify): _____

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).*

**REAL PROPERTY**   Specify how many properties the application includes: _____
- ○ Condemnation
- ○ Mortgage Foreclosure (specify):   ○ Residential   ○ Commercial
  Property Address: _____
  *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the FORECLOSURE RJI ADDENDUM (UCS-840F).*
- ○ Tax Certiorari
- ○ Tax Foreclosure
- ○ Other Real Property (specify): _____

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution   [see *NOTE* in **COMMERCIAL** section]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other (specify): _____

**MATRIMONIAL**
- ○ Contested
  *NOTE: If there are children under the age of 18, complete and attach the MATRIMONIAL RJI ADDENDUM (UCS-840M).*
  *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (UD-13).*

**TORTS**
- ○ Asbestos
- ○ Child Victims Act
- ○ Environmental (specify): _____
- ○ Medical, Dental or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability (specify): _____
- ○ Other Negligence (specify): _____
- ○ Other Professional Malpractice (specify): _____
- ○ Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- ○ CPLR Article 75 (Arbitration) [see *NOTE* in **COMMERCIAL** section]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ Extreme Risk Protection Order
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene (specify): _____
- ○ Other Special Proceeding (specify): _____

| **STATUS OF ACTION OR PROCEEDING** | Answer YES or NO for every question and enter additional information where indicated. |
|---|---|

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ● | ○ | If yes, date filed: 09/02/2020 |
| Has a summons and complaint or summons with notice been served? | ○ | ● | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ● | If yes, judgment date: _____ |

| **NATURE OF JUDICIAL INTERVENTION** | Check one box only and enter additional information where indicated. |
|---|---|

- ○ Infant's Compromise
- ○ Extreme Risk Protection Order Application
- ○ Note of Issue/Certificate of Readiness
- ○ Notice of Medical, Dental or Podiatric Malpractice   Date Issue Joined: _____
- ● Notice of Motion   Relief Requested: Motion for Summary Judgment in Lieu of Complaint   Return Date: _____
- ○ Notice of Petition   Relief Requested: _____   Return Date: _____
- ○ Order to Show Cause   Relief Requested: _____   Return Date: _____
- ○ Other Ex Parte Application   Relief Requested: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other (specify): _____

| RELATED CASES | List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**. | | | | |
|---|---|---|---|---|---|
| **Case Title** | **Index/Case Number** | **Court** | **Judge (if assigned)** | **Relationship to instant case** | |
| | | | | | |
| | | | | | |
| | | | | | |

| PARTIES | | For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**. | | | |
|---|---|---|---|---|---|
| **Un-Rep** | **Parties** List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | **Attorneys and Unrepresented Litigants** For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | **Issue Joined** For each defendant, indicate if issue has been joined. | **Insurance Carriers** For each defendant, indicate insurance carrier, if applicable. | |
| ☐ | Name: The Bank of New York Mellon, solely in its capacity as trustee Role(s): Plaintiff | Antonio Perez-Marques; Davis Polk & Wardwell LLP (450 Lexington Avenue, New York, New York 10017); (212) 450-4000; antonio.perez@davispolk.com | ○ YES ◉ NO | | |
| ☐ | Name: Samarco Mineração S.A. Role(s): Defendant | Douglas Deutsch; Clifford Chance US LLP; 31 West 52nd Street, New York, New York; (212) 878-4935; douglas.deutsch@cliffordchance.com | ○ YES ◉ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: ___09/02/2020___

_____
/s/ Antonio Perez-Marques
Signature

___4168571___
Attorney Registration Number

Antonio Perez-Marques
Print Name

# Exhibit A
# Part 6

Case 1:20-cv-08206-JPC   Document 1-1   Filed 10/02/20   Page 187 of 189

Print Form

UCS-840C
3/2011

**SUPREME COURT OF THE STATE OF NEW YORK**

COUNTY OF __New York_____
_____x

THE BANK OF NEW YORK MELLON, solely in its capacity as trustee f   ⊞

                                              Plaintiff(s)/Petitioner's

-against-

SAMARCO MINERAÇÃO S.A.

                                              Defendant(s)/Respondent(s)
_____x

Index No. _____

RJI No. (if any) _____

**COMMERCIAL DIVISION**
**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

- [x] Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)
- [ ] Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)
- [ ] Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only
- [ ] Shareholder derivative actions — without consideration of the monetary threshold
- [ ] Commercial class actions — without consideration of the monetary threshold
- [x] Business transactions involving or arising out of dealings with commercial banks and other financial institutions
- [ ] Internal affairs of business organizations
- [ ] Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters
- [ ] Environmental insurance coverage
- [ ] Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)
- [ ] Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold
- [ ] Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ No less than $1,196,367,187.50 _____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: __09/02/2020_____          /s/ Antonio Perez-Marques
                                      _____
                                                      **SIGNATURE**

                                      __Antonio Perez-Marques_____
                                                  **PRINT OR TYPE NAME**

# Exhibit A
# Part 7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE BANK OF NEW YORK MELLON, as
Trustee, solely in its capacity as trustee for
4.125% Notes due 2022 issued by Samarco
Mineração S.A.,

          Plaintiff,

       - against -

SAMARCO MINERAÇÃO S.A.,

          Defendant.

Index No. 654214/2020

**AFFIRMATION OF SERVICE**

Matthew Cormack, an attorney at law duly admitted to practice in the State of New York,

affirms, under the penalty of perjury and pursuant to CPLR 2106, that the following is true:

1. I am an attorney admitted to practice in the State of New York

2. On September 4, 2020, I served true and correct copies of (1) the Summons; (2) the

   Notice of Motion; (3) the Memorandum of Law; (4) the Affidavit of Support by Mr.

   David Kerr; (5) Exhibits 1 through 5; (6) the Request for Judicial Intervention; (7) the

   Request for Judicial Intervention Addendum; and (8) the Notice of Electronic Filing by

   electronic mail upon:

SAMARCO MINERAÇÃO S.A.
c/o Law Debenture Corporate Services, Inc.
sopny@lawdeb.com

Dated: New York, New York
      September 8, 2020

                                           Matthew Cormack