UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

The Bank of New York Mellon,

               Plaintiff,

     -against-

Samarco Mineração S.A.,

               Defendant.

Case No. 20-cv-8206 (JPC)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(2) AND 12(b)(5), OR
IN THE ALTERNATIVE, STAY THE PROCEEDINGS**

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

Table of Authorities ................................................................................................... ii

Preliminary Statement ................................................................................................. 1

Statement of Facts ....................................................................................................... 2

    A. The 2015 Collapse Of The Fundão Dam Resulted In Numerous
    Governmental Proceedings And Civil Lawsuits Being Brought Against
    Samarco In Brazil ................................................................................................. 2

    B. Samarco Has Since Endeavored To Resume Its Operations In Order
    To Engage With Financial Creditors ................................................................... 4

    C. Plaintiff Commences This Action On September 4, 2020 In New
    York State Court ................................................................................................... 7

Argument ..................................................................................................................... 8

    I. This Court Lacks Personal Jurisdiction Because Plaintiff Failed To
    Properly Serve Samarco ...................................................................................... 8

    II. This Court Should Stay These Proceedings For A Limited Time,
    Both As A Matter Of The Court's Inherent Authority And As A Matter
    Of Comity. ......................................................................................................... 12

Conclusion ................................................................................................................. 16

# **TABLE OF AUTHORITIES**

**Page(s)**

**Rules and Statutes**

Federal Rule of Civil Procedure 12(b)(2) and 12(b)(5) ........................................................ 16

N.Y. C.P.L.R. 311 ................................................................................................................ 8, 9

**Cases**

*Aguilera v. Pistilli Construction & Development Corp.*,
63 A.D.3d 765 (2d Dep't 2009) .......................................................................................... 11

*Clinton v. Jones*,
520 U.S. 681 (1997) ............................................................................................................ 12

*Corson v. Power Moves, Inc.*,
No. 19-cv-8847 (VSB), 2020 WL 3318099 (S.D.N.Y. June 18, 2020) ............................... 10

*Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*,
773 F.2d 452 (2d Cir. 1985) ............................................................................................... 16

*Finanz AG Zurich v. Banco Economico S.A.*,
192 F.3d 240 (2d Cir. 1999) ............................................................................................... 15

*Hallock v. State of New York*,
64 N.Y.2d. 224 (N.Y. 1984) ............................................................................................... 11

*Highland Capital Mgmt. LP v. Schneider*,
607 F.3d 322 (2d Cir. 2010) ............................................................................................... 10

*Hilton v. Guyot*,
159 U.S. 113 (1895) ............................................................................................................ 12

*In re Bd. of Dirs. of Multicanal S.A.*,
314 B.R. 384 (Bankr. S.D.N.Y. 2004) ................................................................................ 16

*In re Republique Francaise*,
309 N.Y. 269 (N.Y. July 8, 1955) ......................................................................................... 9

*Kennedy v. Int'l Talent Negotiators, Inc.*,
No. 86 Civ. 4426 (MGC), 1988 WL 73374 (S.D.N.Y. June 30, 1988) ............................... 11

*Lakeside Concrete Corp. v. Pine Hollow Bldg. Corp.*,
104 A.D.2d 551, *aff'd*, 65 N.Y.2d 865 (1985)................................................................... 8

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936)........................................................................................................... 12

*Lightwater Corp. v. Republic of Argentina*,
No. 02 Civ. 3804 (TPG), 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003)......................... 13

*Matter of New Brunswick Theological Seminary v. Van Dyke*,
184 A.D.3d 176 (App. Div. 2nd Dept. 2020) .................................................................... 9

*Pravin Banker Assocs. v. Banco Popular Del Peru*,
165 B.R. 379 (S.D.N.Y. 1994)........................................................................................... 16

*Pravin Banker Assocs. v. Banco Popular Del Peru*,
109 F.3d 850 (2d Cir. 1997)............................................................................................... 15

*Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*,
466 F.3d 88 (2d Cir. 2006)................................................................................................. 12

*TAGC Mgmt., LLC v. Lehman*,
842 F. Supp. 2d 575 (S.D.N.Y. 2012)............................................................................... 9

*The Bank of New York Mellon v. Samarco Mineração, S.A.*,
Case No. 654214/2020 (N.Y. Sup. Ct. Sept. 9, 2020) ...................................................... 8, 9

*Volmar Distribs. Inc. v. N.Y. Post Co.*,
152 F.R.D. 36 (S.D.N.Y. 1993) ......................................................................................... 12

Samarco Mineração S.A. ("Samarco") submits this memorandum of law in support of its motion to dismiss or stay this action.

## Preliminary Statement

The present action should be dismissed because Samarco was not properly served with process and this Court therefore lacks personal jurisdiction over Samarco.  In the governing documentation Plaintiff and Samarco agreed that effective service in any dispute would be effectuated by hand on Samarco's designated agent.  Plaintiff served process only via electronic mail, which is neither in conformity with the parties' agreement nor otherwise a legally effective method of service on a corporation (absent prior court approval to use an alternative method of service).

In the alternative, this action should be stayed for 90 days under the Court's inherent authority to control its docket and/or under the doctrine of international comity.  Plaintiff seeks approximately $2.7 billion from Samarco, a mining company currently in the midst of dealing with the aftermath of the tragic 2015 collapse of the Fundão Dam.  That national tragedy has engendered over 86,000 suits against Samarco, of which approximately 58,000 suits remain unresolved.  Carvalho Decl. ¶ 16.[1]  Several suits have also been brought against Samarco by Brazilian federal and state agencies, including by the Public Prosecutor of the State of Minas Gerais.  *Id*. ¶¶ 18-20.  Samarco, and the Brazilian legal system, should be afforded additional time to resolve these matters—and to provide Samarco time to take the necessary steps so that it can engage with Plaintiff here on the consensual resolution of its claims (which Samarco fully intends to do)—rather than allowing the "race to judgment" sought by Plaintiff at the expense of

---

[1] "Carvalho Decl." refers to the Declaration of Eliane Cristina Carvalho and its appendix, dated November 13, 2020, submitted in support of Samarco's Motion to Dismiss or Stay.

claimants and authorities in Brazil.  A stay here would accordingly be justified both as part of the

Court's inherent authority over its docket and as a matter of comity.

**Statement of Facts**

**A.  The 2015 Collapse Of The Fundão Dam Resulted In Numerous Governmental
   Proceedings And Civil Lawsuits Being Brought Against Samarco In Brazil**

On November 5, 2015, Brazil suffered the world's largest tailings dam collapse when

there was a sudden breach of the tailings[2] containment structure of Samarco's Fundão Dam in

Mariana, Minas Gerais—Samarco's second-largest dam.[3]  Carvalho Decl. ¶¶ 3-4.  Thirty-two

point six million cubic meters of tailings were released from the dam.  *Id.*  The overflow reached

three rivers, ultimately affecting approximately 680 kilometers of waterways in the watershed

area of the Doce River, interrupting the water supply to nine cities, and impacting the lives of

thousands of people and the environment.  *Id.*  Nineteen people died as a result of this collapse.[4]

*Id.*  Samarco suspended its operations immediately,[5] and was required to stop its mining

operations by order of Brazil's State Secretariat for Sustainable Development and Environment

("SEMAD") and the National Mining Agency ("ANM").  De Lima Soares Decl. ¶ 1.[6]  The dam

collapse garnered immense media coverage on a national scale, with details of the collapse being

broadcast across newspapers, television stations, and social media.  Official data regarding the

---

[2] Tailings are material left over after a target mineral, such as iron ore, is mined.

[3] *See* Samarco, *2015-2016 Biennial Report: About the Failure of the Fundão Dam*,
https://www.samarco.com/relatoriobienal20152016/en/about-the-failure-of-the-fundao-dam.html
(last visited Oct. 23, 2020), attached as Ex. A to the Declaration of Carmine D. Boccuzzi
("Boccuzzi Declaration").  Unless otherwise indicated, referenced exhibits are attached to the
Boccuzzi Declaration.

[4] *Id.*

[5] Samarco, *Message from Management, Independent Auditors' Report and Financial Statements
as of December 31, 2019*, https://www.samarco.com/wp-content/uploads/2020/04/Samarco_
Financial-Statements-2019.pdf (last visited Nov. 5, 2020), at 3, attached as Ex. B to the Boccuzzi
Declaration.

[6] "De Lima Soares Decl." refers to the Declaration of Pedro Igor De Lima Soares, dated
November 13, 2020, submitted in support of Samarco's Motion to Dismiss or Stay.

2

disaster was also published on the websites of the Ministry of Environment ("MMA") and Ministry of Mines and Energy ("MME").  Carvalho Decl. ¶ 3.

In 2016, as part of an ongoing remedial effort, the Transaction and Conduct Adjustment Agreement ("TTAC") was executed between and among the Brazilian federal government, two state governments (States of Minas Gerais and Espírito Santo), numerous public agencies, Samarco, Vale S.A. and BHP Billiton Brasil LTDA.[7]  Carvalho Decl. ¶ 7.  The purpose of the TTAC is explicitly "to end the litigation upon voluntary act by the parties, acknowledging that self-composition is the fastest and most effective way to solve the controversy."[8]  The TTAC also established 42 programs aimed at socio-environmental and socioeconomic remediation in 39 municipalities affected by the dam collapse, to be implemented and overseen by the Renova Foundation, a nonprofit foundation established and funded by Samarco and its Shareholders.[9]  Carvalho Decl. ¶ 7.  According to the TTAC, as of March 2, 2016, 17 public lawsuits in the State of Espírito Santo and 28 public lawsuits in the State of Minas Gerais were addressed by these programs.  Id.

The TTAC forms an Inter-Federative Committee comprised of representatives from various arms of the Brazilian federal and state governments[10] to monitor the Renova Foundation's administration of remediation programs and liaise with the relevant environmental

---

[7] Vale S.A. and BHP Billiton Brasil LTDA (collectively, the "Shareholders") are shareholders of Samarco.

[8] TTAC at 3, attached as Ex. C to the Boccuzzi Declaration.

[9] *See* The Renova Foundation, *The Foundation*, https://www.fundacaorenova.org/en/the-foundation/ (last visited Nov. 6, 2020), attached as Ex. D to the Boccuzzi Declaration; *see also* TTAC (Ex. C) at 96.

[10] Representatives on the Inter-Federative Committee are drawn from the Ministry of Environment, the Federal Government, the State of Minas Gerais, the State of Espírito Santo, as well as from the municipalities of Minas Gerais and the State of Espírito Santo affected by the Rupture of the Dam, and the Hydrographic Basin Committee of Rio Doce.  TTAC (Ex. C) at 109.

bodies, among other duties.[11]  Government agencies supervise and monitor the Renova

Foundation's required remediation measures—a complex, coordinated effort among Brazilian

authorities that is unprecedented in Brazil and reflects the strong public interests at stake.[12]  The

scope of matters the Foundation addresses is massive, ranging from compensation claims (R$

9.86 billion, or approximately USD $1,738,394,908.00, had been disbursed in repair and

compensation actions as of August 2020) to paying indemnities and emergency financial aid (R$

2.6 billion, or approximately USD $458,400,280.00 as of August 2020) to socioeconomic and

environmental programs, among other efforts.[13]  But all relate to the failure of the Fundão Dam

and the aftermath of that event.

### B.  Samarco Has Since Endeavored To Resume Its Operations In Order To Engage With Financial Creditors

Samarco has taken numerous steps since the dam's collapse in November 2015 to lay the

groundwork for engaging with its financial creditors, including hiring its own advisors and

entering into reimbursement agreements with advisors to various creditors.  De Lima Soares

Decl. ¶¶ 5, 7.  Samarco engaged J.P. Morgan and Brazilian and international legal counsel in

November 2015 to advise it in connection with formulating and negotiating a sustainable debt

restructuring proposal.  *Id*. ¶ 7.  In order to meet its significant financial commitments related to

the collapse of the dam, Samarco has relied on rescue financing, including shareholder

debentures first issued in August 2016 and substantial funds provided by the Shareholders to the

Renova Foundation, which Samarco is obliged to repay to its Shareholders.  *Id*. ¶ 5.

---

[11] TTAC (Ex. C) at 108-09.
[12] The Renova Foundation, *Repair Path Results*, https://www.fundacaorenova.org/en/repair-data/ (last visited Nov. 6, 2020), attached as Ex. E to the Boccuzzi Declaration.
[13] *Id.*

Upon dealing with the initial aftermath of the collapse, in August 2016 and again in March 2017 Samarco met with bank lenders. *Id*. ¶ 8. Samarco also entered into reimbursement agreements with various advisors to the Company and its creditors in March, July, and September of 2016, anticipating that their services would be needed for a potential negotiated resolution in the future. *Id*. ¶ 7. In parallel, Samarco implemented the remedial measures needed to obtain the licenses that would be required to resume operations and thereby generate revenues, including, from October 2016 to September 2017, conducting environmental studies and filing the related report to obtain the required Corrective Operating License ("LOC"). *Id*. ¶¶ 3, 4.

Due to the uncertain timeline for obtaining those licenses, Samarco was unable to formulate a viable business plan in the first half of 2018. De Lima Soares Decl. ¶ 9. Samarco's creditors acknowledged this uncertainty, and in February 2018, agreed to temporarily reduce their monthly advisors' fees pending the achievement of certain milestones required for productive negotiations. *Id*. In the summer of 2018, Samarco reached those milestones and by November 2018, the Company was able to engage with creditors, including holders of the notes at issue in the instant action. *Id*. ¶¶ 12-13. Those negotiations, which were expected to progress in earnest as soon as Samarco's business plan was ready, had the goal of achieving a consensual restructuring of Samarco's debt. *Id.* ¶ 13. The parties' discussions were within a common framework for a consensual restructuring, but the parties continued to discuss the economic terms of the securities, the ranking of creditors, and the terms of Samarco's future funding. *Id.* The parties presented proposals and counterproposals on November 27, 2018, December 10, 2018, and December 19, 2018. Further discussions continued through January 2019. *Id.* The parties were in good faith negotiations to extend the nondisclosure agreement governing these negotiations on the basis that an agreement could be reached. *Id.* However, on January 25,

2019, a second mining tragedy occurred in Brazil with the collapse of Vale's Brumadinho Dam in the State of Minas Gerais, resulting in additional uncertainty across the mining industry and disrupting those negotiations. As a result, Samarco announced on January 28, 2019 that a consensual restructuring agreement could not be reached. *Id.* ¶ 14.

Following the collapse of the Brumadinho Dam, a series of regulations affecting Samarco's operations were passed, further delaying recommencement of Samarco's operations. De Lima Soares Decl. ¶¶ 16-18. For example, the State of Minas Gerais passed State Law No. 23,291/19 to establish the State Dam Safety Policy, prohibiting the issuance of environmental licenses for the operation or expansion of upstream dams intended for the final or temporary disposal of tailings.[14] At the federal level, ANM Resolution No. 4/19 was passed on February 25, 2019, and ANM Resolution No. 13/19 was subsequently passed on August 8, 2019, to impose certain safety measures regarding the stability of mining dams.[15] Samarco determined that negotiating with creditors on the basis of a business plan keyed to previous environmental regulations would not be realistic or productive, and accordingly, paused negotiations with creditors as it revised its business plan. De Lima Soares Decl. ¶ 20. Over the course of 2019, Samarco revised its 2018 business plan consistent with the new environmental regulations. *Id.* ¶ 21. On October 25, 2019, Samarco obtained its LOC for the resumption of operating activities in the Germano Complex, which provides Samarco with all environmental licenses required to re-start its operations. *Id.* ¶ 22.

---

[14] Machado, Meyer, Sendacz e Opice Advogados, *New Legal Framework on Dam Safety and Disaster Prevention* (Sept. 24, 2019), https://www.machadomeyer.com.br/en/recent-publications/publications/environmental/new-legal-framework-on-dam-safety-and-disaster-prevention, attached as Ex. F to the Boccuzzi Declaration.
[15] *Id.*

In 2020, Samarco's technical advisor conducted a due diligence review on certain assumptions from the 2019 business plan.  Recently, the 2019 business plan was fully updated to account for certain macroeconomic assumptions and shared with the technical and financial advisors for diligence.  In parallel, Samarco is updating all assumptions in its current business plan and expects to have a revised business plan by December 2020.  Following diligence of the 2020 business plan, discussions with creditors will be planned for potentially the first half of 2021.  An update on these developments has been presented to creditors, and the business plan has been shared with Houlihan Lokey, a financial advisor to certain of Samarco's creditors.  De Lima Soares Decl. ¶¶ 23-25.  Samarco expects to engage in further discussions with creditors once diligence of the revised 2020 business plan is complete, potentially in the first half of 2021, with the goal of a consensual restructuring of Samarco's debt.  *Id*. ¶ 27.

### C.  Plaintiff Commences This Action On September 4, 2020 In New York State Court

The present action concerns a 4.125% Note due 2022 ("2022 Notes") issued by Samarco prior to the failure of the dam.  In the wake of the Fundão Dam collapse and the cessation of operations by Samarco, the Company missed eight semi-annual interest payments on each of November 1 and May 1, beginning in November 2016 for the 2022 Notes.  De Lima Soares Decl. ¶ 5.  Plaintiff provided Samarco with an Acceleration Notice and Reservation of Rights regarding each Series of Notes on August 31, 2020.[16]

Plaintiff purportedly served Samarco its Motion for Summary Judgment In Lieu of Complaint on September 9, 2020 via email to Law Debenture Corporate Services, Inc. ("Law Debenture"), the Process Agent designated in Section 11.10 of the Indenture Agreement between

---

[16] *See* Kerr Aff. in Supp. of Mot. for Summ. J. in Lieu of Compl., ECF No. 7-4.

Samarco, the Bank of New York Mellon, and The Bank of New York Mellon Trust (Japan), Ltd. (the "Indenture").[17]  Aff. of Service, *The Bank of New York Mellon v. Samarco Mineração, S.A.*, Case No. 654214/2020 (N.Y. Sup. Ct. Sept. 9, 2020), ECF No. 7.  The action seeks to recover money Plaintiff claims is due and owing under the 2022 Note.  There is no evidence that process was served on Samarco or the Process Agent in person.  Samarco removed this case from the Supreme Court of the State of New York, Commercial Division on October 2, 2020.  Notice of Removal, ECF No. 7.  The Court set the briefing schedule for this motion in its order dated October 30, 2020.  Order, ECF No. 18.

### Argument

### I.    This Court Lacks Personal Jurisdiction Because Plaintiff Failed To Properly Serve Samarco.

Pursuant to N.Y. C.P.L.R. 311(a)(1) "[p]ersonal service upon a corporation . . . shall be made by delivering the summons as follows: upon any domestic or foreign corporation, to an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service."  For a court to "acquire personal jurisdiction over a domestic corporation by personal service, service must be effectuated pursuant to CPLR 311 (subd 1)."  *Lakeside Concrete Corp. v. Pine Hollow Bldg. Corp.*, 104 A.D.2d 551, 552, *aff'd*, 65 N.Y.2d 865 (1985).  Service pursuant to N.Y. C.P.L.R. 311 must be made in person to be effective.  *See id.*  ("Since the process in the instant case was not personally delivered to [individual defendant and officer of defendant corporation], a corporate officer, nor any other authorized person, service was not effectively made upon the defendant corporations.").

---

[17] *Id.*

Consistent with N.Y. C.P.L.R. 311, the Indenture provides for hand delivery of service on Samarco in the care of the Process Agent.  *See* Indenture, Section 11.10(b) ("Such service shall be made by delivering by hand a copy of such process to the Issuer care of the Process Agent at the address specified above.").  When parties agree to a method of service, they are entitled to service by exactly the agreed-upon method.  *See In re Republique Francaise*, 309 N.Y. 269, 279 (N.Y. July 8, 1955) ("The method of service by which parties have agreed to be bound must be complied with according to the exact terms thereof in order that the requirements of due process be satisfied.").  Here, Plaintiff did not serve the Summons and other documents on Samarco by hand, but instead served the Process Agent designated in the Indenture by electronic mail.  *See* Aff. of Service, *The Bank of New York Mellon v. Samarco Mineração, S.A.*, Case No. 654214/2020 (N.Y. Sup. Ct. Sept. 9, 2020), ECF No. 7; *see also* De Lima Soares Decl. ¶ 33. Accordingly, under the plain terms of the Indenture, Plaintiff's purported service was insufficient.  *See Matter of New Brunswick Theological Seminary v. Van Dyke*, 184 A.D.3d 176, 180-81 (App. Div. 2nd Dept. 2020)  (citing *Republique Francaise*, 309 N.Y. at 279).

Plaintiff may argue that their email service was proper under the language in Section 11.10(c) providing that "[n]othing in this Section 11.10 shall affect the right of any party . . . to serve legal process in any other manner permitted by law."  But Plaintiff's email "service" by electronic mail fails to comply with the methods of service set forth in N.Y. C.P.L.R. 311, absent Court permission to use an alternative means of service.  *See* N.Y. C.P.L.R. 311(b) (for electronic service to be effective under N.Y. C.P.L.R. 311, the party seeking to use an alternative means of service must make a showing that in-person service is impracticable, after which the court may in its discretion allow electronic service); *see also TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 585 (S.D.N.Y. 2012) (requiring plaintiffs to make a showing of impracticability

of service to the Court prior to obtaining permission for alternative means of service).  The requirement that a party must seek court permission before using an alternative method of service is not waived during a pandemic.  *See Corson v. Power Moves, Inc.*, No. 19-cv-8847 (VSB), 2020 WL 3318099 (S.D.N.Y. June 18, 2020) (denying permission for alternative service because plaintiff failed to demonstrate the impracticability of personal service during the COVID-19 pandemic).  Plaintiff made no application to use an alternative method of service, or any requisite showing that in-person service, or some other appropriate mode of service on a corporation, was impractical.[18]

Nor did Law Debenture somehow have authority to alter the service requirements set forth in the Indenture, which Plaintiff raised in its letter to this Court on October 28.[19]  Plaintiff's argument that Samarco's mere designation of Law Debenture as an agent for service of process gave Law Debenture the authority to alter the requirements of the Indenture flies in the face of black letter law that an agent's authority is limited by the plain language of the relevant controlling agreement.  *See Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010) (finding an agent's actual authority is subject to "whatever limitations the principal places on this power, either explicitly or implicitly").  Samarco merely designated Law Debenture to accept in-person service on its behalf.  De Lima Soares Decl. ¶ 32.  Nothing about that suggests Samarco empowered Law Debenture to modify the agreed-upon method of service in the Indenture; indeed, only a party to the Indenture—which Law Debenture is not—can modify it.[20]

---

[18] Nothing suggests that Samarco authorized its Process Agent, Law Debenture, to deviate from the terms of the contract appointing Law Debenture as Samarco's Process Agent.  In the absence of such authorization or court approval of alternative service, nothing relieved the Trustee of its obligation to serve Samarco by hand.

[19] *See* Letter Resp. to Mot.*, ECF No. 17 ("October 28 Letter").

[20] *See, e.g.,* Sections 9.1 and 9.2 of the Indenture Agreement between Samarco, the Bank of New York Mellon, and the Bank of New York Mellon Trust (Japan), Ltd., ECF No. 7-4.

Nor did Law Debenture have apparent authority to act contrary to the requirements of the Indenture.  Plaintiff's focus on statements by the *agent* purporting to have authority to accept an alternative form of service is misguided, as the law on apparent authority requires the third-party to have relied on the representations of the *principal*.  *See Kennedy v. Int'l Talent Negotiators, Inc.*, No. 86 Civ. 4426 (MGC), 1988 WL 73374, at *3 (S.D.N.Y. June 30, 1988) ("The agent cannot by his own acts imbue himself with apparent authority."); *see also Hallock v. State of New York*, 64 N.Y.2d. 224, 231 (N.Y. 1984) ("Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction.").[21]

There was no act by Samarco (the principal) cloaking Law Debenture with any purported authority to alter the express provisions requiring a particular form of service in the Indenture and authorize a manner of service not permitted by New York law.  De Lima Soares Decl. ¶¶ 35-36.  Even if Law Debenture had been cloaked with such authority, Law Debenture would have been required to seek permission from the Court to utilize an alternative method of service.  Law Debenture made no such application to the Court.

---

[21] Apparent authority requires some affirmative action by the principal that could reasonably lead the third-party to believe the agent had authority.  Plaintiff cited to *Hallock v. State of New York*, 64 N.Y.2d. 224, 231 (N.Y. 1984) in its October 28 Letter.  In that case, a lawyer was found to have had apparent authority to bind his client to a settlement made in open court, given the client's prior authorization of the lawyer to represent him in the years' long litigation and in negotiations leading up to the settlement.  Samarco did not take any such affirmative action in its mere designation of Law Debenture as its designated process agent.  Plaintiff's citation to *Aguilera v. Pistilli Construction & Development Corp.,* 63 A.D.3d 765, 767 (2d Dep't 2009) is equally inapposite for this same reason.

## II.    This Court Should Stay These Proceedings For A Limited Time, Both As A Matter Of The Court's Inherent Authority And As A Matter Of Comity.

This Court has the inherent power to grant a stay here.  *See Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."); *Volmar Distribs. Inc. v. N.Y. Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993) ("It is well settled that district courts have the inherent power, in the exercise of discretion, to issue a stay when the interests of justice require such action.").  In the words of Justice Cardozo, writing for a unanimous Supreme Court:

> We must be on our guard against depriving the processes of justice of their suppleness of adaptation to varying conditions.  Especially in cases of extraordinary public moment, the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted.

*Landis v. N. Am. Co.*, 299 U.S. 248, 256 (1936).  Where, as here, a case is connected to proceedings underway in a foreign jurisdiction, a court also may grant a stay as a matter of comity.  *See Hilton v. Guyot*, 159 U.S. 113, 164 (1895) (comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."); *Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 94 (2d Cir. 2006) (comity is based on "respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency").  Here, a brief stay is warranted for several reasons.

*First*, as explained in the Declaration of Pedro Igor De Lima Soares, Samarco has previously sought to engage with its bondholders since 2016, following the Fundão Dam collapse.  Those efforts however have been stalled given the negative impact of the disaster on Samarco's operations.  De Lima Soares Decl. ¶ 11.  A necessary pre-condition for any

productive and realistic debt workout is a plausible business plan, something that Samarco could not create until, at the very least, it was re-licensed to resume operations. *Id.*  Samarco was in fact engaged in discussions with its bondholders between November 2018 through January 2019, and was negotiating in January 2019 to extend the parties' non-disclosure agreement governing the negotiations, when on January 25, 2019, the Brumadinho Dam collapse occurred, again throwing the relevant Brazilian regulatory regime into uncertainty and confusion. *Id*. ¶¶ 13-14. With its 2020 business plan near completion, Samarco intends to re-engage with its bondholders in an effort to resolve their financial claims in a consensual manner.  De Lima Soares Decl. ¶ 31. Because Samarco has now reached the milestones required to formulate a viable business plan that can facilitate productive and realistic negotiations with financial creditors, such as redesigning its tailings disposal system and obtaining the license to operate the Germano complex, and Samarco anticipates being able to resume negotiations in the first half of 2021, the additional time required in this case is limited. *Id.* ¶¶ 26-27.  A stay of 90 days is appropriate under these circumstances. *Cf. Lightwater Corp. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2003 WL 1878420, at *14-15 (S.D.N.Y. Apr. 14, 2003) (temporarily staying execution of judgment pending resolution of Argentina's debt structuring, while rejecting a six month stay in proceedings given the "indeterminate" duration of the restructuring process).

*Second*, a stay is further warranted as a matter of comity, given the interest of the Brazilian government in a continued orderly resolution of the claims arising out of the Fundão Dam collapse.  Those interests are reflected in the ongoing judicial, administrative and regulatory proceedings in Brazil involving Samarco and numerous state and federal agencies in Brazil.  Along with Samarco, these governmental entities are currently engaged in implementing the comprehensive plan set forth in the TTAC to address the urgent claims and issues arising

from the failure of the dam in an orderly and efficient manner.  Carvalho Decl. ¶ 7.  The claims

following the failure of the dam are numerous.  According to the numbers provided by Samarco,

more than 86,000 actions have been brought against Samarco, of which approximately 58,000

remain in dispute.  *Id*. ¶ 16.  Approximately forty-five lawsuits against Samarco following the

failure of the dam are being resolved through the TTAC through the Samarco-funded Renova

Foundation.  Moreover, claims related to the TTAC and the Renova Foundation are, legally, a

priority for Samarco, especially claims relating to emergency financial assistance and

indemnification claims.  *Id*. ¶¶ 6, 17.  The TTAC specifies Samarco's financial obligations

related to the failure of the dam,[22] as well penalties for any failure to fully meet those

obligations.[23]

       The plan set forth in the TTAC targets all manner of issues and claims arising from the

failure of the dam.[24]  To resolve individual claims through mediation, the TTAC formed a

Coordinated Negotiation Program led by a legal coordinator.[25]  The Inter-Federative Committee,

comprising government representatives from the federal and affected state governments,

oversees the Renova Foundation and its efforts in a variety of ways: budget review;[26] "guid[ing]

the foundation about the priorities to be met" in connection with the TTAC's objectives;[27]

---

[22] *See, e.g.*, TTAC (Ex. C) at 78, 79, 102, 326.
[23] *See, e.g.*, TTAC (Ex. C) at 114 ("In case of failure to meet the deadlines for the
implementation of the planned projects in each of the socioeconomic and socioenvironmental
programs by the foundation, Samarco will be obliged to pay a fine of R$ 1,000,000.00 (one
million reais) per item that was not complied with, coupled with a daily fine of R$ 50,000.00
(fifty thousand reais) per item that was not complied with.").
[24] *See, e.g.*, TTAC (Ex. C) at 24 (listing socioeconomic programs); *id.* at 69 (listing
socioenvironmental programs).
[25] TTAC (Ex. C) at 36.
[26] TTAC (Ex. C) at 89.
[27] TTAC (Ex. C) at 111.

"evaluat[ing]" "monitor[ing]" and "supervis[ing]" the programs and the TTAC itself; and

serving as a liaison between the Renova Foundation and public authorities, among other duties.[28]

It is clear that claims against Samarco following the failure of the Fundão Dam are

comprehensively being addressed by a government-approved plan complete with mechanisms

for resolving claims in an orderly and efficient manner.  The Fundão Dam collapse was a

national tragedy, plainly warranting the priority given to the humanitarian and environmental

claims that arose from it.  Brazilian government agencies undoubtedly have an interest in

resolving claims following failure of the dam and, in partnership with Samarco and the Renova

Foundation, are doing so.  This Court should temporarily stay this proceeding, which threatens

the orderly claims process in which Brazilian government agencies are participating, as a matter

of comity to provide the parties with the opportunity to work together to explore a resolution that

respects the Brazilian proceedings and claims and is consistent with the orderly and

comprehensive approach underway in Brazil.  *See Pravin Banker Assocs. v. Banco Popular Del

Peru,* 109 F.3d 850, 854 (2d Cir. 1997) (U.S. courts have long accorded comity to other

sovereigns by "refus[ing] to review acts of foreign governments and defer[ing] to proceedings

taking place in foreign countries, allowing those acts and proceedings to have extraterritorial

effect in the United States"); *see also Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240

(2d Cir. 1999) (affirming the district court's dismissal based on deference to ongoing

extrajudicial liquidation proceedings in Brazil).

Courts recognize that a stay of litigation on comity grounds can be appropriate.  In

particular, courts have been sensitive to foreign sovereigns experiencing financial and political

distress, so long as extending comity to these sovereigns would not be contrary to U.S.

---

[28] *Id.*

government policies or prejudicial to the interests of the United States. *See Pravin Banker Assocs. v. Banco Popular Del Peru,* 165 B.R. 379 (S.D.N.Y. 1994) (adjourning proceedings by six months to allow Peru time to resolve its national debt crisis). Such deference is not limited to sovereign parties experiencing distress, but also extended to private parties whose interests and obligations have been affected by their sovereign's laws and policy decisions. *See In re Bd. of Dirs. of Multicanal S.A.*, 314 B.R. 384, 389-90 (Bankr. S.D.N.Y. 2004) ("[E]very person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes. To all intents and purposes, he submits his contract with the corporation to such a policy of the foreign government, and whatever is done by that government in furtherance of that policy . . . will necessarily bind him."). A stay based on comity is also appropriate in situations such as this one where numerous claims must be resolved in an equitable and orderly manner. *See Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) (allowing dismissal under the principle of comity such that "the assets of the debtor . . . [can] be dispersed in an equitable, orderly, and systematic manner, rather than a haphazard, erratic or piecemeal fashion"). Such a stay will provide the parties to this action with the opportunity to work toward a resolution consistent with the orderly and comprehensive approach to claims underway in Brazil.

## Conclusion

The Court should dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(5), or in the alternative, the Court should, in the interests of justice and as a matter of comity, stay this action for a period of 90 days.

Dated: November 13, 2020
         New York, New York

Respectfully submitted,


*/s/ Carmine D. Boccuzzi*
Carmine D. Boccuzzi
(cboccuzzi@cgsh.com)
Lisa Vicens
(evicens@cgsh.com)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006
T: 212-225-2000
F: 212-225-3999

*Attorneys for Defendant Samarco Mineração S.A.*