**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE BANK OF NEW YORK MELLON,
solely in its capacity as trustee for 4.125%
Notes due 2022 issued by Samarco Mineração
S.A.,

                      Plaintiff,

            - against -

  SAMARCO MINERAÇÃO S.A.,

                    Defendant.

Case No. 1:20-cv-8206 (JPC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS OR STAY**

DAVIS POLK & WARDWELL LLP
Antonio Perez-Marques
Timothy Graulich
Matthew Cormack
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for The Bank of New York Mellon, as Trustee*

# TABLE OF CONTENTS

PAGE

I.    PRELIMINARY STATEMENT ............................................................................. 1

II.   STATEMENT OF FACTS .................................................................................... 5

 A. Samarco's Issuance of Notes, Consent to U.S. Jurisdiction, and
  Irrevocable Appointment of a U.S. Agent for Service of Process ............. 5

 B. Samarco's Admitted Payment Default and Breach Under Each
  Indenture ................................................................................................. 7

 C. The Noteholders' Unsuccessful Efforts to Engage Samarco Towards a
  Consensual Restructuring ........................................................................ 8

 D. Plaintiff Initiates Suit ............................................................................ 10

 E. Plaintiff Properly Effects—and Samarco's Agent Expressly
  Accepts—Service of Process .................................................................. 10

 F. The Noteholders' *Continuing* Efforts to Engage Samarco, and
  Samarco's Continuing Rejection of Those Efforts ................................... 12

III.  ARGUMENT ................................................................................................... 12

 A. BECAUSE PLAINTIFF PROPERLY EFFECTED SERVICE,
  DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED ........ 12

  1. Law Debenture Had Actual Authority to Accept Service ............ 13

  2. Law Debenture Had the Apparent Authority to Accept
   Service .......................................................................................... 16

  3. To Whatever Extent the Prior Service Is Deemed Defective,
   the Court Should Hold, nunc pro tunc, That Such Service Was
   Proper ........................................................................................... 18

 B. DEFENDANT'S MOTION TO STAY SHOULD BE DENIED ............. 20

  1. International Comity Does Not Warrant a Stay ........................... 20

  2. Defendant's Long-Standing Pattern of Non-Engagement
   Shows That a Stay Would Be Counterproductive ........................ 22

IV.   CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

P<small>AGE</small>(S)

C<small>ASES</small>

*Aguilera v. Pistilli Constr. & Dev. Corp.*,
  63 A.D.3d 765, 882 N.Y.S.2d 145 (2d Dep't 2009) ................................................ 18

*Alfred E. Mann Living Tr. v. ETIRC Aviation S.a.r.l.*
  78 A.D.3d 137, 910 N.Y.S.2d 418 (1st Dep't 2010) ............................................. 14

*Alvarado v. Am. Freightways, Inc.*,
  2005 WL 1467893 (S.D.N.Y. June 21, 2005) ...................................................... 20

*AMTO, LLC v. Bedford Asset Mgmt., LLC*,
  2015 WL 3457452 (S.D.N.Y. June 1, 2015) ....................................................... 18

*Brook. Fed. Sav. Bank v. Crosstown W. 28 LLC*,
  29 Misc. 3d 1237(a), 958 N.Y.S.2d 644 (Sup. Ct. Kings Cty. 2010) ..................... 15

*Cent. Savannah River Area Res. Dev. Agency, Inc. v. White Eagle Intern., Inc.*,
  117 Misc.2d 338, 458 N.Y.S.2d 167 (Sup. Ct. N.Y. Cty. 1983) ............................ 16

*Convergen Energy LLC v. Brooks*,
  2020 WL 4038353 (S.D.N.Y. July 17, 2020) ...................................................... 19

*Corson v. Power Moves, Inc.*,
  2020 WL 3318099 (S.D.N.Y. June 18, 2020) ..................................................... 14

*Export-Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*,
  2005 WL 1123755 (S.D.N.Y. May 11, 2005) ...................................................... 18

*Fashion Page v. Zurich Ins. Co.*,
  50 N.Y.2d 265, 406 N.E.2d 747 (1980) ............................................................. 16

*Finanz AG Zurich v. Banco Economico S.A.*,
  192 F.3d 240 (2d Cir. 1999) ............................................................................. 21

*First Nat'l City Bank v. Nanz, Inc.*,
  437 F. Supp. 184 (S.D.N.Y. 1975) .................................................................... 15

*In GLG Life Tech Corp. Securities Litig.*,
  287 F.R.D. 262 (S.D.N.Y. 2012) ................................................................. 19, 20

*GP Acoustics (US), Inc. v. J&V Audio, Inc.*,
  2017 WL 11570459 (S.D.N.Y. Sept. 13, 2017) .................................................. 18

*Hallock v. State of N.Y.*,
  64 N.Y.2d 224, 474 N.E.2d 1178 (1984) ........................................................... 17

*Harraz v. EgyptAir Airlines Co.*,
  2019 WL 6700946 (S.D.N.Y. Dec 9, 2019) ....................................................... 20

*Knopf v. Sanford,*
   150 A.D.3d 608, 55 N.Y.S.3d 214 (1st Dep't 2017) ................................................ 14

*Leo v. Gen. Elec. Co.,*
   111 F.R.D. 407 (E.D.N.Y. 1986) ........................................................................ 17, 18

*Lightwater Corp. Ltd. v. Republic of Argentina,*
   2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003) ......................................................... 25

*NYKCool A.B. v. Pac. Int'l Servs.,*
   66 F. Supp. 3d 385 (S.D.N.Y. 2014) ................................................................ 18, 19

*Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru,*
   109 F.3d 850 (2d Cir. 1997) ....................................................................... 3, 20, 22

*Matter of Renren Inc. Derivative Litig. v. XXX,*
   2020 WL 2564684 (Sup. Ct. N.Y. Cty. May 20, 2020).............................................. 19

*Royal and Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.,*
   466 F.3d 88 (2d Cir. 2006) ............................................................................. 20, 21

*SeaCube Containers LLC v. Compass Containers & Shipping Servs. Ltda.,*
   427 F. Supp. 3d 497 (S.D.N.Y. 2019) ................................................................... 19

*Snyder v. Alternate Energy Inc.,*
   19 Misc.3d 954, 857 N.Y.S.2d 442 (Civ. Ct. 2008) ................................................ 19

*Spanierman Gallery v. Arnold,*
   1996 WL 154189 (S.D.N.Y. April 3, 1996) ............................................................ 20

*TAGC Mgmt., LLC v. Lehman,*
   842 F. Supp. 2d 575 (S.D.N.Y. 2012) ................................................................... 14

*Velez v. Vassallo,*
   203 F. Supp. 2d 312 (S.D.N.Y. 2002) ................................................................... 17

## STATUTES & RULES

11 U.S.C § 1515 ...................................................................................................... 24

28 U.S.C. § 1448 ..................................................................................................... 20

CPLR 311(a) ........................................................................................................... 19

CPLR 311(a)(1) ....................................................................................................... 13

CPLR 311(b) ................................................................................................ 3, 13, 18, 19

FRCP 4(f) ............................................................................................................... 19

FRCP 4(f)(3) ................................................................................................ 3, 13, 18, 19

FRCP 12(b)(2)......................................................................................................1, 25

iii

FRCP 12(b)(5) .................................................................................................................1, 25

### OTHER AUTHORITIES

*Brazil Mining Company Samarco Suspended Over Dams Burst*, BBC NEWS (Nov. 9, 2015),
https://www.bbc.com/news/world-latin-america-34772319 ...........................................7

*Press Release, Samarco Mineração S.A., Samarco obtains Corrective Operation License (LOC)
(October 25, 2019)*, https://www.samarco.com/en/noticia/samarco-obtains-corrective-operation-
license-loc/ ....................................................................................................................24

## I.        PRELIMINARY STATEMENT

Plaintiff The Bank of New York Mellon, as Trustee ("Plaintiff"), respectfully submits this memorandum of law in opposition to Defendant Samarco Mineração S.A.'s ("Defendant" or "Samarco") motion to dismiss this action pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(2) and 12(b)(5), or in the alternative, for a stay.

In its motion, Samarco freely concedes that it has defaulted on over $2.7 billion in debt that is the subject of this and two companion actions. Samarco stopped making the required interest payments years ago, shortly after the collapse of its Fundão dam. Samarco has no defense on the merits to Plaintiff's suit, which simply seeks a prompt judgment from a U.S. court establishing what Samarco has already conceded is the case: namely, that Samarco owes noteholders over $2.7 billion (plus interest) and it has failed to make the contractually required payments.

Lacking any defense on the merits, Samarco's sole basis in seeking dismissal is the contention that it has not been properly served. That is false. Plaintiff effected service by delivering proper service papers to the U.S. agent (Law Debenture) that was irrevocably appointed by Samarco as a key term when Samarco solicited these billions of dollars of investments through the U.S. capital markets. It is too late now to disavow its service agent. What's more, Law Debenture expressly confirmed, in writing, to Plaintiff's counsel not only that it was "***authorized*** to accept service on behalf of Samarco Mineração S.A.," but indeed that plaintiff "***ha[d] properly effectuated service upon Defendant Samarco Mineração S.A. today, September 4, 2020***." The service agent promptly notified Samarco of the claims, and there is no argument that Samarco lacked notice or suffered any prejudice. The law does not require more.

Samarco's only quibble with service is that—because its agent's physical offices were closed as a result of the COVID-19 pandemic—Law Debenture fulfilled its contractual obligation to accept service via email.  Samarco argues that, in so doing, Law Debenture exceeded its actual and apparent authority.  That is wrong.  Law Debenture was contractually and irrevocably authorized to accept service of precisely these types of papers on behalf of Samarco and had actual authority to do so.  To the extent Samarco claims the Indentures obligated Plaintiff to deliver service papers "by hand," that would not be a restriction on Law Debenture's authority to *accept* service, and Plaintiff in any event complied with any such obligation by delivering service papers by hand to the agent's physical address.  At that point, Law Debenture was not only authorized, but in fact contractually *obligated*, to accept service—as it did, by the only means that the COVID-19 pandemic permitted.  Samarco's effort to evade judgment on this basis in the midst of a pandemic is unseemly, and indeed a violation of its own contractual obligations, which included the obligation to maintain the designation of its agent "in *full* force and effect" and to take all reasonable actions to ensure the service agent "continued to act as such"—i.e., its commitment to investors that there would always be a U.S. agent capable of accepting service domestically.

These same facts establish Law Debenture's *apparent* authority to accept service: it had been held out by Samarco as its irrevocable agent for service in the U.S. and "direct[ed]" by Samarco to accept papers delivered to it, bolstered by a further covenant by Samarco to "take any and all reasonable action" necessary to cause the Process Agent "to continue to act as such."  Such promises—and the corresponding ability to effect domestic service readily and thereby to access U.S. courts—are critical  to investors like

the holders of the debt at issue here and were reasonably relied on.  Plainly, Law Debenture also reasonably understood itself as authorized to accept service in this case, notwithstanding the closure of its physical office as a result of the pandemic.  That too supports the reasonableness of Plaintiff's reliance on Law Debenture's apparent (and actual) authority.

And, in any event, even if the email service had been defective (which it was not), the Court would be entitled to order, nunc pro tunc, that such service was valid under New York Civil Practice Law & Rules ("CPLR") 311(b) and Federal Rule of Civil Procedure 4(f)(3).  The Court would be amply justified in doing so, given the good faith efforts (by both Plaintiff and Law Debenture) to comply with the letter and spirit of the Indentures and the unique circumstances of the COVID-19 pandemic.  Under any standard, there is no defect in service and no basis to dismiss this action—in which liability, again, has been conceded.

Samarco asks, in the alternative, for the Court to use its inherent authority to stay the proceedings for 90 days, purportedly to facilitate negotiations between Defendant and the holders (the "Noteholders") of Samarco's defaulted notes (the "Notes"), and in the interest of international comity. Samarco's position is in direct conflict with the "strong interest in ensuring the enforceability of valid debts under the principles of contract law, and in particular, the continuing enforceability of foreign debts owed to United States lenders." *Pravin Banker Associates, Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854-55 (2d Cir. 1997).  Samarco offers no persuasive reason to compromise this strong policy interest and its motion to stay also should be denied.

First, while Samarco suggests that a stay is necessary in order to facilitate a consensual resolution between itself and its creditors, Samarco provides no explanation for why this proceeding will in any way disrupt such a resolution.  To the contrary, Plaintiff brought this action (and the two other actions seeking the same relief with respect to two other issues of notes) upon request of the Noteholders following years of the Noteholders' voluntary forbearance, during which Samarco has utterly failed to obtain, or even actively pursue, creditor support for a consensual restructuring.  Whatever Samarco's professed beliefs or intentions regarding future creditor negotiations, Plaintiff has no present expectation or assurance that such discussions could take place—let alone bear fruit toward a settlement—and Samarco has made no showing to this Court that the stay it requests will result in anything other than further delay.

Although it is possible that a change in Samarco's tactics and posture toward its creditors could still lead to a negotiated resolution—and, to be sure, the Noteholders would welcome such a result—that theoretical possibility is not served by a stay, and the mere fact that Samarco now dangles a suggestion of negotiations should not prejudice or further delay Plaintiff's rights to pursue long-awaited remedies before this Court.  This is especially true given the complex negotiations that would be required to ultimately reach an agreement on a restructuring of Samarco's debts, when compared to the straightforward legal issues in this case.

Second, Samarco's attempt to invoke international comity is misplaced and contrary to law.  Samarco points to certain legal proceedings in Brazil that are working to address the humanitarian and environmental consequences of the mine disasters caused by Samarco and Vale S.A. (one of its 50% shareholders).  But this Court should not, and

indeed, cannot defer to those proceedings because there is no Brazilian proceeding that will adjudicate claims by the Noteholders. In its motion, Samarco describes the thousands of proceedings it faces in Brazil, but does not identify a single one arising out of Samarco's default under the Indenture at issue here.

For these reasons, Samarco's motion to dismiss and, in the alternative, for a stay should also be denied, and this straightforward matter—in which liability is undisputed—should proceed to a prompt judgment in Plaintiff's favor.

## II.     STATEMENT OF FACTS

### A.     Samarco's Issuance of Notes, Consent to U.S. Jurisdiction, and Irrevocable Appointment of a U.S. Agent for Service of Process

In 2012, Defendant issued $1 billion in principal amount of 4.125% Notes due 2022 (the "4.125% Notes"). (Dkt. No. 7-3, at 2.) The 4.125% Notes are issued under, and governed by, the Indenture dated as of October 30, 2012 (the "4.125% Indenture"), under which Plaintiff is Trustee, Registrar, Transfer Agent, and Paying Agent. (*See* Dkt. No. 7-4, at 1-2.) Defendant also issued two additional sets of Notes, each governed by a different indenture also with The Bank of New York Mellon as Trustee, Registrar, Transfer Agent, and Paying Agent.[1] Each of these Indentures provides for the Notes to be governed by New York law, and provides for nonexclusive jurisdiction in New York courts. (Dkt. No. 7-4, §§ 11.9 and 11.10(a); Docket No. 20-cv-08209, ECF No. 8-4, Indenture, §§ 11.9 and 11.10(a); Docket No. 20-cv-08211, ECF No. 1-1, Indenture, §§ 11.9 and 11.10(a).)

---

[1] $700 million in principal amount of 5.75% Notes due 2023 (the "5.75% Notes") issued pursuant to an Indenture dated as of October 24, 2013 (the "5.75% Indenture") and $500 million in principal amount of 5.375% Notes due 2024 (the "5.375% Notes"; together with the 4.125% Notes and the 5.75% Notes, the "Notes") issued pursuant to an Indenture dated as of September 26, 2014 (the "5.375% Indenture"; together with the 4.125% Indenture and the 5.75% Indenture, the "Indentures" and each an "Indenture").

In order to access the U.S. capital markets and induce the investment of billions of dollars by U.S. and other investors, Samarco made certain promises in the 4.125% Indenture[2] designed to facilitate the initiation of U.S. litigation and thereby assure investors that, in the event of a default, they would have ready access to U.S. courts. Those promises included a submission to the jurisdiction of state and federal courts in New York and agreement to the application of New York law.  (*See* Dkt. No. 7-4, § 11.10(a).)  And, critically for this motion, they included the "irrevocabl[e]" appointment of a U.S. agent for service of process.  (*Id.*)

Samarco further buttressed that commitment with additional covenants designed to assure investors that, at all times during the life of the Notes, there would *always* be a U.S. agent capable of accepting service.  Those further promises included Samarco's "covenant[] and agree[ment] that it shall take any and all reasonable action, including the execution and filing of any and all documents, that may be necessary to continue the designation of the Process Agent above in full force and effect during the term of the Notes, and to cause the Process Agent to continue to act as such."  (*Id.*, § 11.10(b).)

Specifically, Samarco "irrevocably appoint[ed] Law Debenture Corporate Services Inc. (the 'Process Agent'), with an office at 400 Madison Avenue, 4th Fl., New York, New York 10017, as its authorized agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any Proceeding."  (*Id.*, § 11.10(a).)[3]  That authorization is unqualified.

---

[2] Identical provisions are contained in each of the Indentures.

[3] "Proceeding" is defined to mean "actions brought in respect of any suit, action or proceeding or arbitral award arising out of or relating to this Indenture or the Notes or any transaction contemplated hereby or thereby. (*Id.*)

Section 11.10(b) further provides that "[s]uch service shall be made by delivering by hand a copy of such process to the Issuer in care of the Process Agent at the address specified above" and that the "Issuer hereby irrevocably authorizes and directs the Process Agent to accept such service on its behalf."  (*Id*.)  Section 11.10(a) ends by stating that "[n]othing herein shall affect the right of the Trustee . . . to serve process in any other manner permitted by law." [4]  (*Id*.)

## B.     Samarco's Admitted Payment Default and Breach Under Each Indenture

Samarco now concedes (as it must) that it has failed to make the promised payments on each of the three series of Notes and is accordingly in admitted default under each of the Indentures. (Dkt. No. 22 at 7 ("[T]he Company missed eight semi-annual interest payments . . . .").)  Based on the defaults under each of the Indentures, payment of the principal has been accelerated and Defendant owes over $2.7 billion in principal and interest across the three series of Notes.

As Samarco describes in its memorandum of law, on November 5, 2015, the Fundão tailings dam (which Samarco used as a reservoir to hold waste water from iron ore extraction) collapsed, causing "[t]hirty-two point six million cubic meters of tailings" to be released, destroying the Bento Rodrigues village in Minas Gerais, Brazil, killing nineteen people, and displacing thousands more.[5]  (*Id.* at 2.)  Following its dam's failure, Defendant was forced to suspend its operations and contend with government

---

[4] Samarco also "irrevocably consent[ed] to the service of any and all process in any such Proceeding by the delivery by hand of copies of such process to the Issuer at its address specified in Section 11.2." (Dkt. No. 7-4, § 11.10(b).)  Additionally, Samarco "irrevocably submit[ted] to the non-exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York, New York with respect to actions brought in respect of any suit . . . arising out of or relating to this Indenture or the Notes." (Dkt. No. 7-4, § 11.10(a).)

[5] For further discussion of the dam failure, see *Brazil Mining Company Samarco Suspended Over Dams Burst*, BBC NEWS (Nov. 9, 2015), https://www.bbc.com/news/world-latin-america-34772319.

investigations into its complicity in the collapse.  (*Id.* at 1.)  These investigations

eventually led to homicide charges for several of Defendant's executives.  *See Brazil*

*Prosecutors charge 21 with homicide for Samarco dam spill* (Oct. 20, 2016),

https://br.reuters.com/article/us-brazil-samarco-miner-charges-idUSKCN12K2FE.

Samarco defaulted on the Notes by failing to pay the semi-annual installments of interest

under any of the series of Notes less than a year after the collapse of the dam.  (Dkt. No.

22 at 2, 7.)

Unsurprisingly, given the massive scale of damage Samarco has caused through

the collapse of its Fundão tailings dam, the dam failure has triggered a large number of

civil and regulatory proceedings in Brazil.  (*Id.* at 2-4.)  None of the proceedings in

Brazil, however, address the claims of the Noteholders pursued by Plaintiff in this action.

### C.   The Noteholders' Unsuccessful Efforts to Engage Samarco Towards a Consensual Restructuring

For almost four years after Defendant's default, the Noteholders attempted to

work with Defendant to negotiate a consensual resolution on the Notes.  The Noteholders

and Plaintiff were hopeful that a resolution could be negotiated without the need for

litigation.  However, Defendant demonstrated no interest in doing so, and by its own

admission, its last substantive contact with the Noteholders was in early 2019—nearly

two years ago.  (Dkt. No. 22 at 5-6 (detailing how Samarco "paused negotiations with

creditors as it revised its business plan" in the wake of a dam collapse at a mine owned by

Samarco's 50% shareholder, Vale S.A.).)  In contrast, the Noteholders have repeatedly

attempted to engage with Defendant.  Since the spring of 2019, the Noteholders have

made repeated requests through counsel to resume negotiations with respect to a

consensual resolution of Samarco's unpaid debts.  Samarco consistently rejected these

efforts.  Since cutting off communications in early 2019, Samarco has not only declined

to table a restructuring or settlement proposal to creditors, but has also refused to provide

a timeline for a negotiation process or even an acknowledgment of interest in engaging

with financial creditors.  (Graulich Decl. ¶ 3.)

Samarco has also refused or ignored requests from the Noteholders and their

advisors to engage in a meaningful due diligence process or take preliminary steps that

would be customary (and important) for parties preparing to negotiate a consensual

restructuring.[6]  It was not until mere hours before Plaintiff's brief was due that Samarco

contacted Plaintiff f*or the first time since this litigation was initiated* with an offer that

they "will prepare" (at some unspecified point in the future) drafts "for consideration" of

customary non-disclosure and reimbursement agreements with the Noteholders' legal

advisors.  (*Id.*, Ex. 7.)  Once again, Samarco purports to demonstrate its willingness to

engage, without actually engaging.

In November 2019, after months of less formal (and, in the restructuring context,

more customary) attempts at engagement proved unsuccessful, certain Noteholders sent

Defendant a formal letter hoping to restart negotiations and recognizing that Defendant's

"operating success is critical not only to repayment . . . , but also to assure economic

benefit for the surrounding communities and those most affected by the 2015 disaster."

(*Id.*, Ex. 1.)  Despite Defendant's promise to send the Noteholders "next steps" in the

"near future," the Noteholders heard nothing. *Id.* ¶¶ 7-9.)

---

[6] While Samarco has engaged in intermittent communications with financial advisors and a
technical consultant retained by the Noteholders, these communications are far short of what would
customarily lead to serious negotiations.

D.    **Plaintiff Initiates Suit**

After years of unsuccessful efforts to engage Samarco towards a consensual restructuring, the Noteholders were ultimately compelled to direct Plaintiff to initiate litigation on each series of Notes.  On September 2, 2020, Plaintiff initiated the instant litigation for breach of contractual obligations by filing a Motion for Summary Judgment In Lieu of a Complaint ("Motion for Summary Judgment") in New York State Supreme Court.  (*See* Dkt. No. 7-2; *see also* Docket No. 20-cv-08209, ECF No. 8-1; Docket No. 20-cv-08211-, ECF No. 1-1.)

In the papers submitted in support of that motion, Plaintiff submitted evidence demonstrating that Defendant's repeated failure to make interest payments on the 4.125% Notes constituted Events of Default, which, upon acceleration of the debt on August 31, 2020, rendered all unpaid principal and accrued and unpaid interest, totaling approximately $1,013,750,000, immediately due and payable.  (*See* Dkt. No. 7-4 at 3-4.) Plaintiff further demonstrated that as of the date of the filing of its Motion for Summary Judgment, Defendant had not paid any portion of the missed interest payments, interest on the missed interest payments, or the over $1 billion in unpaid principal and accrued interest that became immediately due and payable on August 31, 2020.  (*See id.* at 5.)

E.    **Plaintiff Properly Effects—and Samarco's Agent Expressly**
      **Accepts—Service of Process**

Two days after filing suit, on September 4, 2020, Plaintiff properly effected service on Samarco by serving process on Samarco's designated agent, Law Debenture. (Cormack Decl. ¶ 9.)

In compliance with the terms of the Indenture, on September 4, 2020 Plaintiff's process server attempted to deliver service copies of the Motion for Summary Judgment

to Law Debenture's address at 400 Madison Avenue, 4th Fl., New York, NY 10017.  (*Id.*
¶ 6.)  However, Law Debenture was unable to accept service at this address because it
had relocated its office to a new address.  (*Id.*)  None of the Indentures were amended to
reflect this new address.  Plaintiff's process server subsequently attempted to deliver by
hand copies of the Motion for Summary Judgment to Law Debenture's *current* address,
801 Second Avenue, Suite 403, New York, NY 10017.  (*Id.* ¶ 7.)  As a result of the
COVID-19 pandemic, however, Law Debenture's office was closed indefinitely.  The
process server informed Plaintiff's counsel, however, that although Law Debenture was
unable to accept personal service, it was fulfilling its continuing obligations to accept
service papers by accepting email service.  (*Id.* ¶ 5.)  Indeed, Law Debenture's website
reflects that it accepts email service due to the COVID-19 pandemic. (*Id.*).

Plaintiff's counsel emailed Law Debenture that same day, recounting the above,
and providing the relevant filings for each of the three litigations.  (*Id.* ¶ 8.)  In response,
Plaintiff's counsel received an email from Giselle Manon, the Service of Process Officer
at Law Debenture.  Ms. Manon's email contained the following confirmations:

> Yes, we are the agent for service of process for Samarco Mineração
> S.A.  We will surely accept the legal documents on their behalf.
>
> I can confirm the below:
>
> 1.      I am Giselle Manon, Service of Process Officer at Law Debenture
> Corporate Services, Inc., the agent for service of process in NY for
> Samarco Mineração S.A.  ***We are authorized to accept service on behalf
> of Samarco Mineração S.A.***
>
> ***2.***      Yes, due to COVID-19 our office located at 801 Second Avenue,
> Suite 403, NY, NY 10017 is closed and all employees are working
> remotely. As an alternative to service by mail, ***service by email is
> accepted.***

     3.     By accepting  service by email, ***you have properly effectuated service upon Defendant Samarco Mineração S.A. today, September 4, 2020***.

(*Id.* ¶ 9 and Exhibit 2 (emphases added).)

     **F.**     **The Noteholders' *Continuing* Efforts to Engage Samarco, and Samarco's Continuing Rejection of Those Efforts**

In its October 23, 2020 letter to this Court, (Dkt. No. 16 at 2), and again in its memorandum of law in support of its motion to dismiss or stay, (Dkt. No. 22 at 7), Defendant conceded that it is indeed in default.  Rather than remedy that default, Defendant asked the Court for more time to reach a negotiated resolution.  (Dkt. No. 21.) Yet despite this admission and request, Defendant has made no subsequent effort to re-engage with the Noteholders.  In fact, on November 11, 2020, counsel for Plaintiff sent a letter to Samarco's counsel requesting that Samarco provide drafts of a customary NDA and a customary reimbursement letter ("Reimbursement Letter")—reasonable requests that typically mark the first steps in any refinancing negotiation—as well as a timeline for when the Noteholders could expect to receive a proposal for a restructuring or workout. (*See* Graulich Decl. ¶¶ 13-14.)  The Noteholders had initially requested these materials over a year ago, but have yet to receive a substantive commitment from Defendant.  (*Id.*)

## III.     ARGUMENT

     **A.**     **BECAUSE PLAINTIFF PROPERLY EFFECTED SERVICE, DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED**

The sole basis of Samarco's motion to dismiss—indeed, its sole defense to judgment in this case—is the contention that Plaintiff's service of process on Samarco's irrevocably authorized agent, which was expressly accepted by that agent, did not suffice. This unseemly effort to evade suit is contrary to law and should not long detain the Court. Law Debenture had both the actual and apparent authority to accept email service as

Defendant's authorized agent.  And, to whatever extent the service was deemed insufficient (which it was not), the unique circumstances presented by the COVID-19 pandemic and resulting impracticability of service by hand would warrant the Court's exercise of its authority to deem the service proper under CPLR 311(b) and/or FRCP 4(f)(3).

Plaintiff was entitled, under the unambiguous terms of the Indenture, to effectuate service of process by serving Samarco's irrevocable service agent, Law Debenture, in New York.  Plaintiff cannot lose that right—and Samarco cannot shirk the clear commitments it made to investors—because a global pandemic required Law Debenture to close its physical office and accept service by email.  In short, this case involves two parties (Plaintiff and Law Debenture) who have attempted in good faith to comply with the letter and spirit of the Indenture's service provisions in the unique context of a global pandemic, and another party (Samarco) who is by contrast seeking to exploit that pandemic to evade the service of process to which it contractually agreed.  That cynical effort should not be condoned or rewarded by the Court.

## 1.  Law Debenture Had Actual Authority to Accept Service

It is uncontroversial that an agent can accept service on behalf of a principal and that the acceptance is binding on the principal so long as the agent is acting within its authority.  CPLR 311(a)(1).  Here, Law Debenture's acceptance of email service is binding on Samarco because it was acting within the scope of its authority as described in the Indenture.

Under the Indenture, Defendant "irrevocably appoint[ed]" Law Debenture, a professional process agent, "as its authorized agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which

13

may be served in any Proceeding."  (Dkt. No. 7-4, § 11.10(a).)  This broad appointment

authorizes Law Debenture to accept service on behalf of Samarco and fully defines the

scope of Law Debenture's authority—i.e., "to accept on behalf of [Samarco] and its

property service of copies of the summons and complaint and any other process which

may be served in any Proceeding."  *Id.*  Proceeding is defined in turn to mean, among

other things, any action arising out of the Notes or Indenture—a category that includes

this action.  Samarco has not identified any separate agreement with Law Debenture that

purports to limit its authority.

 In fact, the Indenture has an expansive view of the Trustee's ability to serve

Samarco and it states that "[n]othing herein shall affect the right of the Trustee . . . to

serve process in any other manner permitted by law."  (Dkt. No. 7-4, § 11.10(a).)  And

New York law clearly permits service by email if the party being served consents to such

service.  *See, e.g.*, *Knopf v. Sanford*, 150 A.D.3d 608, 610, 55 N.Y.S.3d 214, 215-16 (1st

Dep't 2017); *Alfred E. Mann Living Trust v. ETIRC Aviation S.a.r.l.*, 78 A.D.3d 137, 141,

910 N.Y.S.2d 418, 422 (1st Dep't 2010).  Contrary to Samarco's assertion, a court order

authorizing such service is only necessary in the event the party being served does not

consent, which is inapplicable here given Law Debenture's unambiguous agreement. *See*

*Corson v. Power Moves, Inc.*, 2020 WL 3318099, at *1-2 (S.D.N.Y. June 18, 2020);

*TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 585 (S.D.N.Y. 2012).

 Samarco relies solely on the next section of the Indenture to argue that Law

Debenture's authority was actually limited to only accepting service made by hand

delivery.  That is a misreading of the Indenture.  In Section 11.10(b), Samarco

"irrevocably authorizes and directs the Process Agent to accept such service on its

behalf." (Dkt. No. 7-4, § 11.10(b).)  This provision obligates Law Debenture to accept service when copies of process documents have been hand delivered to its address (as they were in this case), but it does not *limit* Law Debenture's general authority, granted in the prior section, to accept only one form of service of process. *Cf. Brooklyn Fed. Sav. Bank v. Crosstown W. 28 LLC*, 29 Misc. 3d 1237(a), 958 N.Y.S.2d 644 (Sup. Ct. 2010) (holding, where agent had moved from contractually specified residential address, that service upon agent at business address was proper despite the fact that contract expressly provided for service at the agent's residential address). Nor does this section that states, "Such service shall be made by delivering by hand a copy of such process . . ." (Dkt. No. 7-4, § 11.10(b)) provide or purport to describe any limitation on Law Debenture's authority.   And to the extent it is an obligation imposed on the serving party, the Trustee *complied* with those requirements of the Indenture by attempting to deliver copies by hand to Law Debenture.[7]   At that point, Law Debenture was not only authorized, but obligated and "direct[ed]" by Samarco to accept service.  Law Debenture complied with this direction by accepting service and requesting copies of the documents by email.

Samarco's position would effectively deprive the Trustee of the ability to serve Samarco via its service agent; a result that is inconsistent with the terms of the Indenture. Indeed, Samarco is obligated under the Indenture to "take ***any and all reasonable action*** . . . to cause the Process Agent to ***continue to act as such***," so that the designation of the Process Agent would remain "***in full force and effect***." (Dkt. No. 7-4, § 11.10(b) (emphases added).)  The Indenture irrevocably appoints Law Debenture as agent for

---

[7] But even then, the use of the word "shall" is merely permissive and not mandatory.  *See First Nat'l City Bank v. Nanz, Inc.*, 437 F. Supp. 184 (S.D.N.Y. 1975) (finding that language indicating that New York courts "shall have jurisdiction over any dispute" was permissive and not mandatory).

service, and precludes Samarco from taking a position that would prevent Law Debenture from "continu[ing] to act as such."  In the circumstances here, Law Debenture's actual authority necessarily includes the authority to accept email service where service by hand has been attempted but is not possible.[8]

Moreover, through Plaintiff's service of Law Debenture, Defendant clearly received notice of the suit and has not been prejudiced in any way by Law Debenture's acceptance of email service.  Indeed, it is clear from Defendant's submissions that it received prompt notice of the suit from Law Debenture.  (Dkt. No. 24-1.)  Given the clear lack of prejudice, service should be sustained.  *See Fashion Page v. Zurich Ins. Co.*, 50 N.Y.2d 265, 271-72, 406 N.E.2d 747, 750-51 (N.Y. 1980); *see also Central Savannah River Area Resource Dev. Agency, Inc. v. White Eagle Intern., Inc.*, 117 Misc.2d 338, 341, 458 N.Y.S.2d 167, 170 (N.Y. Sup. Ct. 1983) (sustaining service that was made in a manner which "objectively viewed, was calculated to give the corporation fair notice").

Thus, because Law Debenture had the actual authority to accept email service as Defendant's irrevocably appointed process agent, including while its offices were closed in the midst of a global pandemic, Plaintiff properly effectuated service on Defendant.

### 2.    Law Debenture Had the Apparent Authority to Accept Service.

Even if there is some uncertainty as to whether Samarco actually authorized Law Debenture to accept email service (there is not), the irrevocable designation of it as

---

[8] Samarco's reading would also lead to an absurd result.  Given that Law Debenture has ceased to operate at the contractually specified address due to a relocation of its office in the ordinary course of business, under Samarco's reading, Plaintiff would never be able to serve Samarco via Law Debenture in a manner consistent with the Indenture.  Depriving Plaintiff of a way to serve Samarco domestically would run counter to the purpose of the Indenture, whereby the parties intentionally appointed a domestic agent to avoid the costs and delay of attempting service internationally, and would essentially impose a stay on litigating the Notes domestically for the foreseeable future.

service agent gave "rise to the appearance and belief that the agent possesses authority to enter into a transaction." *Hallock v. State of New York*, 64 N.Y.2d 224, 231, 474 N.E.2d 1178, 1181 (N.Y. 1984). This is particularly true given Samarco's covenant in the Indentures to take reasonable action to ensure that the process agent continue as such, which constitutes a commitment that there would always be a domestic agent available to accept service of process. (Dkt. No. 7-4, § 11.10(b).) And Samarco is bound by Law Debenture because Plaintiff reasonably relied on that authority. *See Velez v. Vassallo*, 203 F. Supp. 2d 312, 321 (S.D.N.Y. 2002). In the circumstances here, where Plaintiff attempted service by hand but was prevented by a global pandemic, it was eminently reasonable for Plaintiff to rely on Law Debenture's apparent authority to accept the completion of service via email.

Plaintiff's reliance is even more reasonable in light of the fact that Law Debenture itself understood the scope of its actual authority to include requesting and accepting email service. Indeed, Law Debenture expressly represented that it was authorized to accept service on Samarco's behalf, that it was accepting email service due to the COVID-19 pandemic, and that Plaintiff had "properly effectuated service upon Defendant Samarco Mineração S.A." (Cormack Decl. ¶ 9 and Exhibit 2.) The law is clear that these representations are reflective of Law Debenture having the apparent authority to accept email service, and that Plaintiff thus properly effectuated service on Samarco via Law Debenture. *See, e.g., Velez*, 203 F. Supp. 2d at 322 (holding that the "subsequent execution of [a] written acknowledgment of service, without qualification, entitled [plaintiff] to believe that [the agents] had either sought, or had always had, authorization to make such an acknowledgment"); *Leo v. General Elec. Co.*, 111 F.R.D.

407, 414 (E.D.N.Y. 1986) (holding that the process server "reasonably relied on [recipient's] apparent authority to accept process. Since [server] was told . . . that . . . the managing agent[] was unavailable to accept service, it was reasonable for him to believe that the employee assisting him would accurately state her authority"); *Aguilera v. Pistilli Construction & Development Corp.*, 63 A.D.3d 765, 767, 882 N.Y.S.2d 145, 147 (2d Dep't 2009) (binding principal where service of process was made on apparent agent based on said agent being seated behind a particular reception desk).[9]

### 3.   To Whatever Extent the Prior Service Is Deemed Defective, the Court Should Hold, nunc pro tunc, That Such Service Was Proper.

Even if this Court finds that Law Debenture was not authorized to accept email service, the Court should retroactively apply either CPLR 311(b) or FRCP 4(f)(3) to hold, nunc pro tunc, that email service upon Samarco via Law Debenture was proper. *See Export-Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 2005 WL 1123755, at *4-5 (S.D.N.Y. May 11, 2005) (granting plaintiff's motion to declare service valid nunc pro tunc where "the agreements between the parties provided for simple and inexpensive means of service," but the defendants "thwarted service under these agreements" by, inter alia, failing to maintain a service agent in New York). Courts have frequently allowed for email service under both CPLR 311(b) and FRCP 4(f)(3). *See, e.g.*, *GP Acoustics (US), Inc. v. J&V Audio, Inc.*, 2017 WL 11570459 (S.D.N.Y. Sept. 13, 2017); *AMTO, LLC v. Bedford Asset Mgmt., LLC*, 2015 WL 3457452 (S.D.N.Y. Jun. 1, 2015); *NYKCool*

---

[9] Samarco argues that the cases Plaintiff cited in its pre-motion conference letter are inapposite because "Samarco did not take any such affirmative action in its mere designation of Law Debenture as its designated process agent" in order to create apparent authority. (Dkt.. No. 22 at 11, n.21.) This is incorrect. Apparent authority has been inferred from the mere placement of a person behind a particular reception desk. *See Aguilera.*, 63 A.D.3d at 767. If that is enough, surely a written contract expressly designating Law Debenture as agent is sufficiently "affirmative."

*A.B. v. Pac. Int'l Servs.*, 66 F. Supp. 3d 385 (S.D.N.Y. 2014); *Snyder v. Alternate Energy Inc.*, 19 Misc.3d 954, 857 N.Y.S.2d 442 (N.Y. Civ. Ct. 2008).

FRCP 4(f) allows the Court to order service of a foreign corporation "by other means not prohibited by international agreement, as the court orders." FRCP 4(f)(3). The Hague Convention does not prohibit email service on a domestic agent because that treaty is inapplicable "where no documents are transmitted abroad." *See e.g., Matter of Renren Inc. Derivative Litig. v. XXX*, 2020 WL 2564684, at *18 (N.Y. Sup. Ct. 2020). Alternative service is also justified under CPLR 311(b) because traditional service under CPLR 311(a) is impracticable. *See* CPLR 311(b). Service of Law Debenture by hand delivery here was not only impracticable, but in fact impossible, because its office was closed. And service in Brazil would require compliance with the Hague Convention. *See SeaCube Containers LLC v. Compass Containers & Shipping Servs. Ltda.*, 427 F. Supp. 3d 497, 500 (S.D.N.Y. 2019). Even under normal circumstances, service pursuant to the Hague Convention can take approximately six months and these complexities are exacerbated by the COVID-19 pandemic, where compliance with the Hague Convention would likely take even longer. (Padis Decl. ¶¶ 5-13.); *see also Convergen Energy LLC v. Brooks*, 2020 WL 4038353, at *4-5 (S.D.N.Y. Jul. 17, 2020); *In GLG Life Tech Corp. Securities Litig.*, 287 F.R.D. 262, 266 (S.D.N.Y. 2012). Moreover, Brazil has *objected* to Articles 8 and 10 of the Hague Convention, which permit service by diplomatic agents or judicial or postal channels. (Padis Decl. ¶¶ 6, 7.) "Courts have frequently cited delays in service under the Hague Convention as supporting an order of alternative service." *In*

*GLG Life Tech Corp. Securities Litig.* 287 F.R.D. at 266.[10]  To require Plaintiff to

effectuate service through such means would be all the more inappropriate here, given

Samarco's irrevocable appointment of a U.S. agent for service and covenant to take all

reasonable action to ensure it continued to act as such.

For these reasons, even were the Court to conclude that Law Debenture was not

authorized to accept email service, it should hold, nunc pro tunc, that such service was

proper.[11]

> **B.      DEFENDANT'S MOTION TO STAY SHOULD BE DENIED**
>
> **1.      International Comity Does Not Warrant a Stay**

The United States has a strong interest in holding Samarco accountable for the

default on its nearly $3 billion in debt that it sold to investors.  Indeed, the Second Circuit

has recognized the "strong interest in ensuring the enforceability of valid debts under the

principles of contract law, and in particular, the continuing enforceability of foreign debts

owed to United States lenders."  *Pravin*, 109 F.3d at 855.  And this Court has a "virtually

unflagging obligation . . . to exercise the jurisdiction given [to it]," even in light of

arguments that it should defer to another proceeding in the interest of comity.  *Royal and*

---

[10] Plaintiff, which relied on the right to serve Samarco in New York, should not be required to spin its wheels in attempting service pursuant to the Hague Convention prior to obtaining this relief.  *In GLG Life Tech Corp. Securities Litigation*, 287 F.R.D. 262, 266 (S.D.N.Y. 2012) ("[N]othing in Rule 4(f) itself or controlling case law suggests that a court must always require a litigant to first exhaust the potential for service under the Hague Convention before granting an order permitting alternative service.").

[11] Should the Court not retroactively authorize Plaintiff's email service on Law Debenture, Plaintiff requests that it be authorized to effect future email service on Law Debenture for the reasons discussed above.  Moreover, even should the Court deny these requests in full, dismissal of this case would not be warranted, and Plaintiff should still be permitted to reattempt service pursuant to 28 U.S.C. § 1448, which permits a party in a removed case to serve new process where prior service was defective.  *See, e.g., Harraz v. EgyptAir Airlines Co.*, 2019 WL 6700946, at *5 (S.D.N.Y. Dec 9, 2019); *Alvarado v. Am. Freightways, Inc.*, 2005 WL 1467893, at *6, n.2 (S.D.N.Y. June 21, 2005); *Spanierman Gallery v. Arnold*, 1996 WL 154189, at *3 (S.D.N.Y. April 3, 1996).d

*Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 91 (2d Cir. 2006) (internal quotations omitted).

In the context of cross-border debt offerings, courts in the Second Circuit generally extend comity to one type of foreign litigation—a foreign bankruptcy proceeding. *See, e.g., Royal and Sun Alliance Ins. Co.*, 466 F.3d at 92-93 ("We have recognized one discrete category of foreign litigation that generally requires the dismissal of parallel district court actions—foreign bankruptcy proceedings."); *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 247 (2d Cir. 1999) (affirming dismissal of claims on comity grounds in favor of foreign liquidation proceeding). Otherwise, comity is only a consideration when the pending, "parallel" foreign litigation involves parties that are "substantially the same, litigating substantially the same issues in both actions." *Royal and Sun Alliance Ins. Co.*, 466 F.3d at 94. But even then, the cases "should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other." *Id*. at 92 (internal quotations omitted).

Here, there is no foreign proceeding to which this Court can or should defer. To begin, there is no foreign bankruptcy or restructuring proceeding that will render any judgment applicable to the Notes or Samarco's default. What does exist in Brazil is a claims resolution process involving actions arising out of the Fundão dam collapse. The resolution of these tens of thousands of claims is not a parallel proceeding that would satisfy the threshold for invoking comity. (Padis Decl. at ¶¶ 3, 4.)

Even if the Court assumed that the Brazilian proceedings (none of which involve adjudication of Samarco's failure to pay the Notes) were "parallel" for the purposes of an international comity analysis (which they are not), a stay would not be warranted because

21

there is no compelling reason to unsettle the "strong interest in ensuring the enforceability of valid debts under the principles of contract law, and in particular, the continuing enforceability of foreign debts owed to United States lenders."  *Pravin*, 109 F.3d at 855.  The Bank of New York Mellon is the Trustee under the Indentures with Samarco for $3 billion in principal (plus interest) of Notes that were issued willingly and opportunistically by Samarco into the United States capital markets, under instruments expressly governed by New York law.  Moreover, the Indentures have, since the time they were issued to investors in the U.S. markets, unequivocally designated the courts of the State of New York as the forum for which defaults under the Notes should be litigated.  Plaintiff is entitled to the prompt entry of judgment in its favor by a U.S. court, particularly where Defendant has already conceded default, and the enforcement of this debt in the United States is entirely consistent with the express terms of the Notes and the interest of the United States in assuring predictable legal treatment of debt issued into its markets.

### 2.     Defendant's Long-Standing Pattern of Non-Engagement Shows That a Stay Would Be Counterproductive

The Court should also not exercise its inherent power to stay this case in deference to Samarco's purported desire to negotiate a resolution out of court, for the simple reason that a stay will in no way facilitate, and in fact might hinder, such negotiations.  It bears repeating: Samarco *concedes that it is in default and that Plaintiff is entitled to a judgment*.  As a result, any negotiations will not revolve around *whether* Samarco owes nearly $3 billion to its Noteholders; they will focus on what to do about it.  A stay is not needed to have those discussions.

First, notwithstanding its platitudes before this Court regarding the prospect of negotiation, there is no reason to believe that Samarco will engage in negotiations absent litigation pressure.  The Noteholders and Plaintiff have already given Samarco more than four years since its first act of default to negotiate a consensual restructuring plan. Indeed, Samarco concedes that it has not meaningfully engaged with the Noteholders since early 2019.  (Dkt. No. 22 at 5-6.)  During this time, Samarco has steadfastly rebuffed requests from the Noteholders' legal advisors that would be necessary (but, in isolation, not nearly sufficient) to facilitate informed discussions that could provide for the *beginning* of a process to undertake the highly complex task of negotiating a potential consensual restructuring of Samarco's debts. (Graulich Decl. ¶¶ 3-17.)  Additionally, Samarco refused to *permit* the sharing of information with the Noteholders' legal advisors and it continues to delay entry into such agreements with the Noteholders' legal advisors.  (*Id*. at ¶¶ 3, 9, 14-17.)  It also has declined to enter into customary Reimbursement Letters.  (*Id*. at ¶¶ 14-17.)

Notably, even now, when counsel for Plaintiff recently contacted Samarco's advisors to ask when it can expect Samarco to take these initial steps that it has represented to the Court it is now willing to take, Samarco's advisors again failed to provide any meaningful response.  (*Id*. at ¶¶ 14-17.)  Given this track record of evasion and delay, there is simply no reason to believe that Samarco will change its tune if given an additional 90 days.

Second, litigation in this Court should be quick and simple because Samarco has no defense on the merits and it will not disrupt any negotiations, if Samarco is actually willing to engage.  Samarco's suggestion that a stay of this litigation is a keystone to

progress lacks any credibility.   For instance, in its motion to dismiss or stay, Samarco claims that finalizing its "business plan" is a necessary precondition to any resolution of its indebtedness and that a final "business plan" is expected to be complete in the coming months.  (*See* Dkt. No. 22 at 13.)  But Defendant has been playing cat-and-mouse with its "business plan" for years—repeatedly asserting that it was an essential first step to negotiations, unilaterally postponing the completion of the plan, and then relying on its own delay as an excuse to avoid negotiating.  Samarco has provided no explanation for why continued revisions to a business plan (which Samarco claimed to already be in the process of updating as early as October 2019) have taken so long to complete.  (*See id.*; *see also* Press Release, Samarco Mineração S.A., Samarco obtains Corrective Operation License (LOC) (October 25, 2019), https://www.samarco.com/en/noticia/samarco-obtains-corrective-operation-license-loc/.)  Nor has Samarco explained why a formal business plan is even necessary before preliminary negotiations can take place.  (*See* Dkt. No. 22 at 13.)

Samarco provides no support for the idea that continued litigation, or even a judgment, would in any way disrupt negotiations between itself and its creditors.  Indeed, in the insolvency context to which Samarco seeks to analogize (though, again, Samarco has not sought bankruptcy protection anywhere, let alone through a proceeding under Section 1515 of the Bankruptcy Code that would require a stay of these cases (11 U.S.C § 1515)), negotiation in the midst of an active court process is not uncommon. Negotiations may also proceed in the wake of judgment, as there are numerous tools available to consensually forestall enforcement of such a judgment, such as the entering into a forbearance agreement by which execution of a judgment could be delayed.

Indeed, Samarco's own authority would support the Court resolving this litigation and entering judgment against Samarco, and then—at most—briefly staying enforcement of that judgment. *See Lightwater Corp. Ltd. v. Republic of Argentina*, 2003 WL 1878420, at *5 (S.D.N.Y. Apr. 14, 2003) (denying motion to stay litigation where "restructuring situation is uncertain as to possible success and timing," and instead granting one month stay on execution of judgment). There is no reason, then, to delay the proceedings now—especially when Defendant explicitly concedes that it does not actually intend to begin negotiating until next year. (Dkt. No. 22 at 7.)

Nor is it clear that a 90-day stay would provide the relief Defendant purportedly seeks. The Brazilian proceedings have been underway for years, and there is no end in sight. Moreover, Plaintiff has already provided Defendant with four years of runway and proactive attempts by Noteholders to negotiate toward a global resolution, to no avail. Respectfully, the time to sit and wait has passed. The motion to stay should be denied.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss this action pursuant to FRCP 12(b)(2) and 12(b)(5), and that the Court deny Defendant's alternative motion to stay these proceedings. Should the Court hold that Plaintiff's prior service on Defendant was defective, Plaintiff respectfully requests that the Court hold, *nunc pro tunc,* that such service was authorized.

Dated:   New York, New York
        December 1, 2020

Respectfully Submitted,

DAVIS POLK & WARDWELL LLP


By:   */s/ Antonio Perez-Marques*
      Antonio Perez-Marques
      Timothy Graulich
      Matthew Cormack


Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

antonio.perez@davispolk.com
timothy.graulich@davispolk.com
matthew.cormack@davispolk.com

*Attorneys for Plaintiff*